# EXHIBIT A

HCL 1246598 78

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Mark C. Mazzarella (SBN 082494)<br>Michael J. Cody (SBN 197610)<br>Marisa Janine-Page (SBN 199316)<br>550 West "C" Street, Suite 700<br>San Diego, CA 92101<br>TELEPHONE NO.: (619) 238-4900 FAX NO.:<br>ATTORNEY FOR *(Name):* Defendants/Cross-Complainants | FILED<br>SUPERIOR COURT OFFICE 13<br><br>2010 DEC 10 A 8:51<br>CLERK-SUPERIOR COURT<br>SAN DIEGO COUNTY, CA<br><br>**RECEIVED**<br>DEC 17 2010<br>personal - 3pm - MTC<br>**LEGAL DEPT** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA
BRANCH NAME: Central

CASE NAME: KAMRAN BANAYAN v. ONEWEST BANK, F.S.B., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 37-2010-00105791-CU-OR-CTL |
|---|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | JUDGE: |

*Items 1-6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[X] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [X] Large number of separately represented parties
b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [X] Substantial amount of documentary evidence
d. [X] Large number of witnesses
e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [X] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
**4.** Number of causes of action *(specify):* Nineteen Causes of Action (See Attached List)
**5.** This case [ ] is [X] is not a class action suit.
**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 9, 2010

Mark C. Mazzarella (SBN 082494)
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|---|

**CIVIL COVER SHEET ATTACHMENT:  LIST OF CAUSES OF ACTION**

**VERIFIED COMPLAINT FOR:**
(1)  **BREACH OF CONTRACT**
(2)  **QUIET TITLE**
(3)  **REFORMATION**
(4)  **RESCISSION**
(5)  **FRAUD – INTENTIONAL MISREPRESENTATION**
(6)  **FRAUD – CONCEALMENT**
(7)  **NEGLIGENCE**
(8)  **BREACH OF FIDUCIARY DUTY**
(9)  **INTENTIONAL INTERFERENCE WITH PROSPECTIVE   ECONOMIC ADVANTAGE**
(10) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
(11) **VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) (12 USC §§ 2601, et seq.)**
(12) **VIOLATION OF THE TRUTH IN LENDING ACT 15 U.S.C. §§ 1600, et seq. (TILA)**
(13) **VIOLATION OF THE        CALIFORNIA ROSENTHAL FAIR        DEBT COLLECTION        PRACTICES ACT (CCP §§ 1788, et seq.)**
(14) **VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. §§ 1692, et seq.)**
(15) **VIOLATION OF THE   RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) (Title 18 U.S.C. 1961, et seq.)**
(16) **WRONGFUL FORECLOSURE**
(17) **VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, et seq. FOR UNFAIR AND UNLAWFUL BUSINESS PRACTICE**
(18) **DECLARATORY RELIEF**
(19) **INJUNCTIVE RELIEF**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS:   330 West Broadway | |
| MAILING ADDRESS:   330 West Broadway | |
| CITY AND ZIP CODE:   San Diego, CA 92101 | |
| BRANCH NAME:   Central | |
| TELEPHONE NUMBER: (619) 450-7073 | |

| PLAINTIFF(S) / PETITIONER(S):   Kamran Banayan |
|---|
| DEFENDANT(S) / RESPONDENT(S): Onewest Bank F S B |

| BANAYAN VS. ONEWEST BANK F S B | |
|---|---|
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2010-00105791-CU-OR-CTL |

Judge:  Steven R. Denton                                            Department: C-73

**COMPLAINT/PETITION FILED: 12/10/2010**

### CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

---

Exhibit A, page 8

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2010-00105791-CU-OR-CTL     CASE TITLE: Banayan vs. Onewest Bank F S B

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court Local Rules Division II Chapter 3 and Code of Civil Procedure 1141 et seq. address this program specifically.

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

Exhibit A, page 10

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |

| PLAINTIFF(S): Kamran Banayan |
|---|
| DEFENDANT(S): Onewest Bank F S B |
| SHORT TITLE: BANAYAN VS. ONEWEST BANK F S B |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221) | CASE NUMBER: 37-2010-00105791-CU-OR-CTL |
|---|---|

Judge: Steven R. Denton                                    Department: C-73

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

☐ Court-Referred Mediation Program          ☐ Court-Ordered Nonbinding Arbitration

☐ Private Neutral Evaluation                ☐ Court-Ordered Binding Arbitration (Stipulated)

☐ Private Mini-Trial                        ☐ Private Reference to General Referee

☐ Private Summary Jury Trial                ☐ Private Reference to Judge

☐ Private Settlement Conference with Private Neutral   ☐ Private Binding Arbitration

☐ Other (specify): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____          Date: _____

_____          _____
Name of Plaintiff                         Name of Defendant

_____          _____
Signature                                 Signature

_____          _____
Name of Plaintiff's Attorney              Name of Defendant's Attorney

_____          _____
Signature                                 Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 12/10/2010                        _____
                                          JUDGE OF THE SUPERIOR COURT

| SDSC CIV-359 (Rev 01-07) | STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION | Page: 1 |
|---|---|---|

Exhibit A, page 13

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |

| PLAINTIFF(S): Kamran Banayan |
|---|
| DEFENDANT(S): Onewest Bank F S B |
| SHORT TITLE: BANAYAN VS. ONEWEST BANK F S B |

| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221) | CASE NUMBER: 37-2010-00105791-CU-OR-CTL |
|---|---|

Judge: Steven R. Denton                                                            Department: C-73

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

☐ Court-Referred Mediation Program                    ☐ Court-Ordered Nonbinding Arbitration

☐ Private Neutral Evaluation                          ☐ Court-Ordered Binding Arbitration (Stipulated)

☐ Private Mini-Trial                                  ☐ Private Reference to General Referee

☐ Private Summary Jury Trial                          ☐ Private Reference to Judge

☐ Private Settlement Conference with Private Neutral  ☐ Private Binding Arbitration

☐ Other (specify): _____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate: (mediation & arbitration only) _____

Date: _____                        Date: _____

_____                      _____
Name of Plaintiff                                    Name of Defendant

_____                      _____
Signature                                            Signature

_____                      _____
Name of Plaintiff's Attorney                         Name of Defendant's Attorney

_____                      _____
Signature                                            Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 12/10/2010                                    _____
                                                     JUDGE OF THE SUPERIOR COURT

| SDSC CIV-359 (Rev 01-07) | STIPULATION TO USE OF ALTERNATIVE DISPUTE RESOLUTION | Page: 1 |
|---|---|---|

3

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF San Diego

I have read the foregoing ___COMPLAINT___
_____ and know its contents.

☐ **CHECK APPLICABLE PARAGRAPHS**

[X]   I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am ☐ an Officer ☐ a partner _____ ☐ a _____ of _____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.  [X] I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.  [X] The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am one of the attorneys for

a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ___DECEMBER 8, 2010___ , at ___SAN DIEGO___ , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____KAMRAN BANAYAN_____                 _____
Type or Print Name                                         Signature

## PROOF OF SERVICE
1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF _____

I am employed in the county of _____ , State of California.

I am over the age of 18 and not a party to the within action; my business address is: _____

On, _____ I served the foregoing document described as _____

_____ on _____ in this action

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

☐ by placing ☐ the original ☐ a true copy thereof enclosed in sealed envelopes addressed as follows:

☐ **BY MAIL**

   ☐ *I deposited such envelope in the mail at _____ , California. The envelope was mailed with postage thereon fully prepaid.

   ☐ As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at _____ California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on _____ , at _____ , California.

☐ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on _____ , at _____ , California.

☐ (State)   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____                 _____
Type or Print Name                                         Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal
Solutions
& Plus                                              Rev. 7/99

Exhibit A, page 13

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

**NOTICE TO DEFENDANT:** ONEWEST BANK F.S.B.; ONEWEST
*(AVISO AL DEMANDADO):* VENTURES HOLDINGS, LLC; INDYMAC
MORTGAGE SERVICES, a division of ONEWEST BANK;
INDYMAC VENTURE,LLC, a Delaware Limited Liability
Company; HOME CONSTRUCTION LENDING, a Division of
ONEWEST BANK; T.D. SERVICE COMPANY, a California
Corporation; BRAD PRAY, Individually; KARI JACKSON,
Individually; MARISA BROYLES, Individually; and DOES

**YOU ARE BEING SUED BY PLAINTIFF:** 1 Through 100, inclusive
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KAMRAN BANAYAN, an individual



**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

---

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Superior Court of California (Central Division)<br>County of San Diego<br>330 West Broadway<br>San Diego, CA 92101 | **CASE NUMBER:**<br>*(Número del Caso):*<br>37-2010-00105791-CU-OR-CTL |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark C. Mazzarella (SBN 082494)                    (619) 238-4900
Michael J. Cody (SBN 197610); Marisa Janine-Page (SBN 199316)
Mazzarella Caldarelli
550 West "C" Street, Suite 700; San Diego, CA 92101-3235

| DATE: DEC 1 0 2010 | Clerk, by WYNNIE S. ABELLA | , Deputy |
|---|---|---|
| *(Fecha)* | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
[SEAL]
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [✓] on behalf of *(specify):* OneWest Bank, F.S.B

under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)          [ ] CCP 416.70 (conservatee)
[✓] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

**Page 1 of 1**

---

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**


Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465
Exhibit A, page 14

# SU...MONS
## (CITATION JUDICIAL)

**SUM-100**

|  | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):* ONEWEST BANK F.S.B.; ONEWEST VENTURES HOLDINGS, LLC; INDYMAC MORTGAGE SERVICES, a division of ONEWEST BANK; INDYMAC VENTURE, LLC, a Delaware Limited Liability Company; HOME CONSTRUCTION LENDING, a Division of ONEWEST BANK; T.D. SERVICE COMPANY, a California Corporation; BRAD PRAY, Individually; KARI JACKSON, Individually; MARISA BROYLES, Individually; and DOES

**YOU ARE BEING SUED BY PLAINTIFF:** **1 Through 100, inclusive**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
KAMRAN BANAYAN, an individual

*(court stamp: 2010 DEC 10  A 9: 13)*

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br>*(El nombre y dirección de la corte es):* <br>Superior Court of California (Central Division) <br>County of San Diego <br>330 West Broadway <br>San Diego, CA  92101 | **CASE NUMBER:** <br>*(Número del Caso):* 37-2010-00105791-CU-OR-CTL |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark C. Mazzarella (SBN 082494)          (619) 238-4900
Michael J. Cody (SBN 197610); Marisa Janine-Page (SBN 199316)
Mazzarella Caldarelli
550 West "C" Street, Suite 700; San Diego, CA 92101-3235

| DATE: *(Fecha)* DEC 1 0 2010 | Clerk, by *(Secretario)* Wynnie S. Abella | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* One West

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):* 12-17-10

Page 1 of 1

| Form Adopted for Mandatory Use <br>Judicial Council of California <br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Legal Solutions Plus | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

Exhibit A, page 15

**MAZZARELLA ■ CALDARELLI LLP**
Mark C. Mazzarella (SBN 082494)
Michael J. Cody, Esq. (SBN 197610)
Marisa Janine-Page (SBN 199316)
550 West C Street, Suite 700
San Diego, California 92101-3235
Telephone: (619) 238-4900
Facsimile: (619) 238-4959

Attorneys for Plaintiff
Kamran Banayan

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**CENTRAL DIVISION**

| | |
|---|---|
| KAMRAN BANAYAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ONEWEST BANK F.S.B.; ONEWEST VENTURES HOLDINGS, LLC; INDYMAC MORTGAGE SERVICES, a division of ONE WEST BANK; INDYMAC VENTURE, LLC, a Delaware Limited Liability Company; HOME CONSTRUCTION LENDING, a Division of ONEWEST BANK; T. D. SERVICE COMPANY, a California Corporation; BRAD PRAY, Individually; KARI JACKSON, Individually; MARISA BROYLES, Individually; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.  37-2010-00105791-CU-OR-CTL<br><br>**VERIFIED COMPLAINT FOR:**<br>(1) **BREACH OF CONTRACT**<br>(2) **QUIET TITLE**<br>(3) **REFORMATION**<br>(4) **RESCISSION**<br>(5) **FRAUD – INTENTIONAL MISREPRESENTATION**<br>(6) **FRAUD – CONCEALMENT**<br>(7) **NEGLIGENCE**<br>(8) **BREACH OF FIDUCIARY DUTY**<br>(9) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>(10) **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>(11) **VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA) (12 USC §§ 2601, et seq.)**<br>(12) **VIOLATION OF THE TRUTH IN LENDING ACT 15 U.S.C. §§ 1600, et seq. (TILA)**<br>(13) **VIOLATION OF THE CALIFORNIA ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT (CCP §§ 1788, et seq.)**<br>(14) **VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. §§ 1692, et seq.)**<br>(15) **VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) (Title 18 U.S.C. 1961, et seq.)**<br>(16) **WRONGFUL FORECLOSURE** |

Exhibit A, page 16

[CAPTION and CAUSES OF ACTION CONTINUED FROM PREVIOUS PAGE]

RE: BANAYAN v. ONEWEST BANK, F.S.B., et al.

**(17) VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200, et seq. FOR UNFAIR AND UNLAWFUL BUSINESS PRACTICE**
**(18) DECLARATORY RELIEF**
**(19) INJUNCTIVE RELIEF**

**[JURY TRIAL REQUESTED]**

Plaintiff Kamran Banayan ("Plaintiff") as and for his Verified Complaint against the Defendants alleges the following:

**OVERVIEW**

1) This is an egregious case of illegal lending, loan servicing, construction fund disbursement, and debt collection practices by Defendants, who intentionally and fraudulently delayed disbursement of funds due to Plaintiff pursuant to a thirty two (32) year Construction to Permanent loan ("the Loan"), charged and collected excessive interest and fees, manufactured bogus claims of default by Plaintiff, and initiated a false, fraudulent and wrongful non-judicial foreclosure in an effort to force Plaintiff either to abandon his Loan in favor of terms much more favorable to Defendants or face foreclosure on Plaintiff's home at 5955 La Jolla Corona Drive, La Jolla, California 92037 (the "Subject Residence" or the "Project" or the "Property"), if Plaintiff did not yield to Defendants' scheme.

2) This is **not** a suit by a borrower to prevent a foreclosure sale after the borrower borrowed more money from the lender than he could afford to repay, and then defaulted on the Loan. To the contrary, in this case, **Plaintiff has fully performed his end of the bargain** at great personal and financial cost, and despite numerous obstacles erected by Defendants. Plaintiff is **not** in default. Defendants owe Plaintiff money; not the other way around. In this case, Plaintiff does **not** want to avoid his obligations -- he wants Defendants to be held responsible for **not** performing theirs, and worse, for engaging in seemingly every ploy possible to benefit by their wrongful and illegal criminal enterprise scheme.

///
///

2

**VERIFIED COMPLAINT**

Exhibit A, page 17

## JURISDICTION AND VENUE

3) Subject matter jurisdiction over the parties herein and venue in this Judicial District are proper because the Subject Residence is located in San Diego County and all, or substantially all, of the events giving rise to the claims asserted herein occurred in this Judicial District.

4) This Court has *in personam* jurisdiction over the parties, as all Defendants are engaging, or have engaged, in business within the State of California, County of San Diego, and thus have sufficient contacts herein.

5) This Court has jurisdiction over Plaintiff's related, non-exclusive federal claims by virtue of concurrent jurisdiction.

## THE PARTIES

6) Plaintiff is a real estate investor, a resident of La Jolla, California, and the owner of the Subject Residence.

7) Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, IndyMac Bank, F.S.B. ("IndyMac Bank"), was authorized to conduct, and conducting, business in the State of California, County of San Diego, and was a for-profit federally chartered bank in the business of providing mortgage products and services in the State of California, County of San Diego, and subject to the rules and regulations of the Federal Deposit Insurance Corporation ("FDIC") and the Federal Home Loan Bank ("FHLB").

8) Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, IndyMac Federal Bank FSB ("IndyMac Federal"), was authorized to conduct, and conducting, business in the State of California, County of San Diego, and was or is a for-profit federally chartered bank in the business of providing mortgage products and services in the State of California, County of San Diego, and subject to the rules and regulations of the FDIC and FHLB.

9) Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, Defendant OneWest Bank FSB ("OneWest"), was and is a for-profit federally chartered bank in the business of providing mortgage products and services in the State of California, County of San Diego, and subject to the rules and regulations of the FDIC and FHLB. Plaintiff is further informed and believes and thereon alleges that Defendant OneWest claims to have succeeded in the same

1   fashion to the interest previously held by IndyMac Bank and/or IndyMac Federal and/or the FDIC in

2   the Loan, and is therefore subject to the claims and defenses applicable to its predecessors in interest.

3         10) Plaintiff is informed and believes and thereon alleges that Defendant, IndyMac Venture,

4   LLC ("IndyMac Venture"), is a Delaware limited liability company managed, owned and controlled

5   by OneWest, and/or OneWest Ventures Holdings, LLC ("OneWest Holdings"), which, at all times

6   mentioned herein, was conducting business in the State of California, County of San Diego. Plaintiff

7   is further informed and believes and thereon alleges that Defendant IndyMac Venture claims to have

8   an interest in the Loan previously held by IndyMac Bank and/or IndyMac Federal and/or the FDIC

9   and/or OneWest and/or OneWest Holdings; and is, therefore, subject to the claims and defenses

10  applicable to its predecessors in interest.

11        11) Plaintiff is informed and believes and thereon alleges that at all times mentioned herein,

12  Defendant Home Construction Lending ("HCL") was and is a division of OneWest of unknown

13  structure, which at all times mentioned herein, was conducting business in the State of California,

14  County of San Diego.

15        12) Plaintiff is informed and believes and thereon alleges that Defendant IndyMac Mortgage

16  Services ("IndyMac Mortgage") is a division of OneWest, and is a "debt collector" of unknown

17  status, and at all times mentioned herein was and is doing business in the State of California, County

18  of San Diego, and was and/or is responsible in some manner for servicing and/or collecting

19  payments claimed due on Plaintiff's Loan, as hereinafter alleged.

20        13) Plaintiff is informed and believes and thereon alleges that the FDIC formed IndyMac

21  Venture on March 6, 2009, as part of the transaction whereby OneWest and/or OneWest Holdings

22  acquired IndyMac Federal. Simultaneously with creating IndyMac Venture, the FDIC entered into a

23  Contribution Agreement pursuant to which the FDIC contributed a portfolio of approximately $2

24  billion in Construction Loans to IndyMac Venture ("the Construction Loan Portfolio) and became

25  the 100% owner of IndyMac Venture.

26        14) Plaintiff is informed and believes and thereon alleges that concurrently with execution

27  of the IndyMac Venture Limited Liability Company Operating Agreement, and the Contribution

28  Agreement, on March 19, 2009, the FDIC and IndyMac Venture entered into a Participation and

1  Servicing Agreement (the "Participation Agreement") pursuant to which, among other things,

2  IndyMac Venture conveyed a Participating Interest in the Construction Loan Portfolio to the FDIC.

3      15)  Plaintiff is informed and believes and thereon alleges that immediately thereafter, the

4  FDIC transferred all of its interest as the initial and sole member of IndyMac Venture to Defendant

5  OneWest Holdings, and OneWest Holdings became the sole member of IndyMac Venture pursuant

6  to a Limited Liability Company Interest Sale and Assignment Agreement.

7      16)  Plaintiff is informed and believes and thereon alleges that before transfer of its

8  ownership interest in IndyMac Venture to OneWest Holdings, the FDIC was the manager of

9  IndyMac Venture.   Thereafter, OneWest Holdings became and has remained the manager of

10  IndyMac Venture with the exclusive right and non-delegable obligation to manage IndyMac

11  Venture. All income and losses of IndyMac Venture are to be allocated to OneWest Holdings.

12      17)  Plaintiff is informed and believes and thereon alleges that Defendant Brad Pray

13  ("PRAY") was employed by IndyMac Bank as a Customer Experience Manager.

14      18)  Plaintiff is informed and believes and thereon alleges that Defendant KARI JACKSON

15  ("JACKSON") was previously employed by IndyMac Bank and IndyMac Federal, and is currently a

16  Regional Vice President for OneWest.

17      19)  Plaintiff is informed and believes and thereon alleges that Defendant MARISA

18  BROYLES ("BROYLES") was or is an employee acting as Senior Underwriter/Asset Manager for

19  both IndyMac Bank and IndyMac Mortgage Services, a division of OneWest, and/or OneWest.

20      20)  Plaintiff does not currently know the precise manner in which any beneficial interest in

21  Plaintiff's Loan is, or has been, held by and/or the intricacies of the relationship between the

22  Defendants as purported servicers of Plaintiff's Loan, or otherwise, and, therefore, sometimes refers

23  to OneWest, IndyMac Venture, HCL, IndyMac Mortgage and IndyMac Holdings as "the Lender

24  Defendants."

25      21)  Plaintiff is informed and believes and thereon alleges that T. D. Service Company, also

26  known as T. D. Service Company of Arizona, ("T.D. Service") is a California Corporation whose

27  principal place of business is in Santa Ana, California, and at all times mentioned herein was and is

28  doing business in the State of California, County of San Diego, and that T.D. Service, claiming to be

1   the duly appointed Substitute Trustee, and/or acting as the authorized agent for the Beneficiary or the

2   Trustee under a Deed of Trust securing the Loan recorded on January 12, 2007, recorded a Notice of

3   Default and Election to Sell ("NOD") the Subjection Residence, and is the purported foreclosing

4   servicer or Trustee under the Deed of Trust recorded January 12, 2007, as more particularly alleged

5   hereinafter.

6       22) Plaintiff does not know the names of all persons who may claim an interest in the

7   Subject Property, and therefore identifies as among the Doe Defendants 1 through 100, inclusive,

8   such persons as follows: ALL PERSONS CLAIMING BY, THROUGH OR UNDER SUCH

9   PERSON OR PERSONS, ALL PERSONS UNKNOWN, CLAIMING ANY LEGAL OR

10  EQUITABLE RIGHT, TITLE, ESTATE, LIEN, OR INTEREST IN THE REAL PROPERTY

11  DESCRIBED IN THIS COMPLAINT AS 5955 LA JOLLA CORONA DRIVE, LA JOLLA,

12  CALIFORNIA 92037, A.P.N. 357-272-02-00, THAT IS ADVERSE TO THE PLAINTIFF'S TITLE

13  THERETO, OR ANY CLOUD ON PLAINTIFF'S TITLE THERETO (SOMETIMES REFERRED

14  TO AS THE "UNKNOWN DEFENDANTS").

15      23) The true names and capacities of Defendants sued herein as Does 1 through 100,

16  inclusive, are presently unknown to Plaintiff who therefore sues these Defendants by such fictitious

17  names. Plaintiff will amend this Complaint and include these Defendants' true names and capacities

18  when they are ascertained.

19      24) Plaintiff is informed and believes and thereon alleges that at all times mentioned herein,

20  each of the Defendants was the agent, alter-ego, servant, employee, instrumentality, representative,

21  partner or joint venture of each other Defendant and performed the acts as described in this

22  Complaint while acting within the scope of his, her or its authority and with the consent of each

23  other Defendant, and/or that each of the acts and/or omissions of every Defendant was ratified by

24  every other Defendant. Plaintiff is also informed and believes and thereon alleges that each of the

25  Defendants conspired to cause Plaintiff's damages alleged herein and/or aided and abetted each of

26  the other Defendants in the commission of the acts and/or omissions alleged herein.

27  ///

28  ///

## THE RISE AND FALL OF INDYMAC BANK

25) Plaintiff is informed and believes and thereon alleges that, at one point, IndyMac Bank was the seventh largest mortgage originator in the United States. IndyMac Bank was founded in 1985 as Countrywide Mortgage Investment ("Countrywide") as a means of collateralizing Countrywide Financial's loans to be sold to Freddie Mac and Fannie Mae. In 1997, Countrywide spun off IndyMac Mortgage Holdings, Inc. as an independent company. In July 2000, IndyMac Mortgage Holdings, Inc. acquired SGV Bank Corp., the parent of First Federal Savings and Loan Association of San Gabriel Valley, and thereafter changed its name to IndyMac Bank.

26) Plaintiff is informed and believes and thereon alleges that IndyMac Bank's business strategy was to originate and securitize Alt-A or "subprime" loans (a high-risk category of consumer loans) on a massive scale; and that IndyMac Bank's rapid growth was a result of its aggressive "lend at any cost" approach, which led to a high concentration of extremely risky assets. For example, during 2006, IndyMac Bank originated over $90 billion of mortgages, most of which were subprime. In fact, IndyMac Bank became a "poster child" for irresponsible lending based upon promotion of loan products to fit the borrower's desires regardless of risk, the use of an extensive array of risky option-adjustable-rate mortgages ("Option ARMs"), subprime loans, 80/20 loans and other non-traditional products made to many borrowers who obviously could not afford to make the required payments, and made without regard for traditional or prudent underwriting practices.

27) Plaintiff is informed and believes and thereon alleges that in its haste to originate as many marketable loans as possible, by the latter half of 2006 and the beginning of 2007, IndyMac Bank had intentionally, recklessly, and out of gross negligence disregarded compliance with applicable Federal and State laws, prudent industry practices and its own stated practices, policies and procedures, and did so with regard to virtually every aspect of its business.

28) Plaintiff is informed and believes and thereon alleges that IndyMac Bank's aggressive growth strategy, use of Alt-A and other non-traditional loan products, insufficient underwriting, credit concentrations in residential real estate in the California and Florida markets, and heavy reliance on costly funds borrowed from the FHLB and from broker deposits, led to its failure when the mortgage market declined in 2007.

Exhibit A, page 22

7

29) Plaintiff is informed and believes and thereon alleges that IndyMac Bank remained profitable only as long as it was able to sell its subprime loans in the secondary mortgage market as collateralized mortgage obligations ("CMOs"), or other newly popularized investment vehicles, to buyers who were either unaware of, or in denial as to, the fact that massive defaults on the underlying mortgages were inevitable.

30) Plaintiff is informed and believes and thereon alleges that on or about May 12, 2008, after suffering declining liquidity and increasing defaults in its loan portfolio for several months, IndyMac Bank revealed in its first quarter 2008 10-Q filing that it was no longer a well-capitalized institution and it was headed for insolvency. IndyMac Bank revealed that during April 2008, Moody's and Standard & Poor's downgraded the ratings of a significant number of mortgage backed securities ("MBS"), which IndyMac Bank retained in its portfolio.

31) In its 10-Q filing for the first quarter of 2008, IndyMac Bank also reported that as of March 31, 2008, its risk-based capital was only $47 million above the minimum required for the institution to be deemed "well capitalized" under regulatory guidelines. IndyMac Bank did not disclose that some of that $47 million did not actually exist, but was fictional.

32) Plaintiff is informed and believes and thereon alleges that as home prices declined in 2007, and the secondary mortgage market collapsed, IndyMac Bank had been forced to hold $10.7 billion of high-risk loans it could not sell in the secondary market as it had intended when the loans were made. This significantly impaired IndyMac Bank's liquidity and its ability to fund its existing loan commitments, such as the Loan to Plaintiff, which is the subject of this Complaint. As a result, IndyMac Bank began altering and/or ignoring its past policies and procedures and concocting various excuses not justified either by its own past business practices, general industry business practices, or the Loan Agreement with Plaintiff, and others like Plaintiff, in order to defer funding Construction Draws under the Loan Agreements, to increase interest collected and other charges assessed against borrowers such as Plaintiff, and to orchestrate circumstances under which IndyMac Bank would be able to obtain a substantial portion of the funds required to be paid to Plaintiff (and other borrowers) as Construction Draws under the Loan Agreement from Plaintiff as interest payments and charges, prior to making the Construction Draws, thereby in essence funding the

1    Construction Draws with Plaintiff's own funds.   Plaintiff is informed and believes and thereon
2    alleges that the Lender Defendants adopted these same practices once they acquired Plaintiff's Loan.
3         33)  Plaintiff is informed and believes and thereon alleges that IndyMac Bank's reduced
4    liquidity was further exacerbated in late June 2008, when account holders withdrew $1.55 billion or
5    about 7.5% of IndyMac Bank's deposits.  This run on IndyMac Bank followed the public release of
6    a letter from Senator Charles Schumer to the FDIC and the Office of Thrift Supervision ("OTS")
7    outlining the Senator's concerns that IndyMac Bank was in severe financial distress.
8         34)  Plaintiff is informed and believes and thereon alleges that on or about July 7, 2008,
9    IndyMac Bank announced on the company blog that it had failed to raise capital assets in its May 12,
10   2008 quarterly earnings report and had been notified by bank/thrift regulators that IndyMac Bank
11   was no longer deemed "well capitalized." IndyMac Bank therefore announced the closure of both its
12   retail lending and wholesale divisions, and halted new loan submissions, cutting approximately
13   3,800 jobs.
14        35)  Plaintiff is informed and believes and thereon alleges that on or about July 8, 2008,
15   IndyMac Bank announced the sale of its retail lending group to Prospect Mortgage Company, LLC.
16   That day, IndyMac Bank's shares closed at .44 in trading on the New York Stock Exchange, a loss
17   of over 99% from its high at $50 in 2006.
18        36)  Plaintiff is informed and believes and thereon alleges that on or about July 11, 2008,
19   citing liquidity concerns, IndyMac Bank was placed into conservatorship by the FDIC.  IndyMac
20   Federal was established by the FDIC as a bridge bank to assume control of IndyMac Bank's assets
21   and secured liabilities, and the bridge bank, IndyMac Federal, was then put into conservatorship
22   under control of the FDIC. The FDIC announced plans to reopen IndyMac Federal, on Monday, July
23   14, 2008.
24        37)  Plaintiff is informed and believes and thereon alleges that IndyMac Bancorp, IndyMac
25   Bank's parent company, filed for Chapter 7 Bankruptcy on July 31, 2008.  With $32 billion in assets,
26   IndyMac Bank's failure was one of the largest bank failures in American history.
27        38)  Plaintiff is informed and believes and thereon alleges that as IndyMac Bank's liquidity
28   worsened in the first quarter of 2008, it began taking new measures to preserve capital, such as

1   deferring interest payments on some preferred securities, suspending dividends on common shares,

2   and delaying Construction Draws due borrowers, such as Plaintiff, on existing loan commitments.

3       39) Plaintiff is informed and believes and thereon alleges that continuously from several

4   months before the time IndyMac Bank was closed and reopened by the FDIC as IndyMac Federal

5   Bank, and after IndyMac Federal was acquired by OneWest Holdings and/or OneWest, and IndyMac

6   Venture was created, until the present time, all of these entities and their successor Defendants and

7   the Defendants acting on their behalf, including but not limited to, the Lender Defendants, continued

8   to implement and expand upon the scheme and criminal enterprise that was initiated by IndyMac

9   Bank, as alleged herein.

10                          **ONEWEST ACQUIRES INDYMAC BANK**

11      40) Plaintiff is informed and believes and thereon alleges that in or about March 2009, the

12  FDIC held an auction for IndyMac Federal and sold it to IMB HoldCo, LLC, a new bank. IMB

13  HoldCo, LLC was controlled by IMB Management Holdings, LP, a limited partnership composed

14  primarily of hedge funds created and/or funded in part by Defendant Does 1 through 25. Among the

15  conditions of the FDIC sale of IndyMac Federal to IMB HoldCo, LLC was that IMB HoldCo would

16  capitalize Defendant OneWest with approximately $1.2 billion in cash.  As another condition of the

17  sale, IMB HoldCo also agreed to continue the FDIC's existing loan modification program. The

18  FDIC also agreed to share losses on a portfolio of qualifying loans with IMB HoldCo assuming the

19  first 20% of the losses, and the FDIC sharing losses at 80/20% for the next 10% of losses, and

20  95%/5% thereafter. OneWest Holdings and/or OneWest were created for the sole purpose of

21  acquiring IndyMac Federal. Additionally, OneWest Holdings agreed to a participation structure

22  affecting an approximately $2 billion portfolio of construction and other loans, which Plaintiff was

23  informed purportedly includes his Loan, pursuant to which the FDIC and OneWest and/or OneWest

24  Holdings were, and are, to share cash flows generated from the loans, as well as asset management

25  fees.  Specifically, the FDIC is to receive 80%, and OneWest is to receive 20% of all cash flows

26  generated during the first three years of OneWest's operation; and the FDIC is to receive 60% of all

27  cash flows, and OneWest is to receive 40% of all cash flows generated thereafter.

28  ///

Exhibit A, page 25

41) Plaintiff is informed and believes and thereon alleges that the agreements reached between the FDIC and the Lender Defendants incentivized the Lender Defendants not to modify loans acquired from the FDIC, but rather to foreclose upon such loans claimed due when and if the borrowers were no longer willing or able to pay the interest, fees and other charges by the Lender Defendants.

## THE INVOLVEMENT OF THE INDIVIDUAL DOE DEFENDANTS

42) Plaintiff is informed and believes and thereon alleges that the individuals, named as Doe Defendants 1 through 25, inclusive, are among the Wall Street and political insiders who were involved actively and significantly contributed to the failure of IndyMac Bank and/or other financial institutions, through what has now become a well known and well documented pattern and practice, enterprise, or scheme of knowingly and willfully making loans without any realistic expectation that the borrowers would be able to repay the loans, and with complete disregard of prudent underwriting practices, with the intent to sell the loans in the secondary marketplace and reap huge profits. Said Defendants structured such transactions in a manner that was intended to avoid any recourse against IndyMac Bank and/or other lending institutions first making the loans, and/or themselves, when massive amounts of the underlying mortgages defaulted, as they knew was inevitable; thereby reaping huge profits while avoiding any liability when the underlying loans defaulted, the purchasers of the MBSs suffered devastating losses, and the hundreds of thousands of defaulting borrowers lost their homes to foreclosure.

43) Plaintiff is informed and believes and thereon alleges that Doe Defendants 1 through 25, inclusive, by participating in the pattern, practice, enterprise, or scheme of making, and/or packaging, selling, and/or reselling subprime mortgages, made hundreds of millions of dollars, notwithstanding that: (1) the institutions for which they worked suffered huge losses, and in some cases failed, and in other cases survived only because of multi-billion dollar governmental bailouts; (2) borrowers were subjected to numerous predatory lending practices employed in order to fill the market demand for subprime loans; (3) borrowers to a large extent suffered financial ruin and loss of homes and/or other property to foreclosure as a result; and (4) said Defendants' greed ultimately led to the collapse of the United States' financial markets.

44) Plaintiff is informed and believes, as alleged above, that IndyMac Bank was a leader among those banks that made irresponsible subprime mortgage loans with the intent to obtain huge profits in the short term, while disregarding the long-term consequences. As a result of the conduct of Doe Defendants 1 through 25, IndyMac Bank failed, the FDIC took over IndyMac Bank, and ultimately the FDIC sold billions of dollars of IndyMac Bank's subprime mortgages, Construction Loans and other debt instruments to the Lender Defendants, and/or other entities such as the Lender Defendants, that were created by Doe Defendants 1 through 25 for the sole purpose of buying assets from the FDIC, distressed banks, or other financial institutions, or their successor, for pennies on the dollar.

45) Plaintiff is further informed and believes and thereon alleges that Defendant Does 1 through 25 further magnified the reprehensibility of their conduct when, after substantially contributing to the practices which led to the collapse of the subprime mortgage market in the United States, and after forming entities such as the Lender Defendants to buy the assets of those same distressed and/or failed financial institutions at pennies on the dollar, they then engaged in further profiteering by, for example, maliciously, willfully, oppressively and fraudulently withholding Construction Loan proceeds, seeking to cause borrowers, such as Plaintiff, to pay excessive interest, fees and other charges, and then claiming the borrowers, such as Plaintiff, defaulted on their Loans in order to give Defendants a pretextual basis for demanding that the borrowers, such as Plaintiff, renegotiate their Loans or suffer foreclosure.

## INDYMAC BANK MISREPRESENTED ITS ONGOING
## ABILITY TO FUND THE LOAN

46) Plaintiff is informed and believes and thereon alleges that at all times prior to the final execution of the Loan Documents memorializing the Loan, on or about January 3, 2007, Defendant IndyMac Bank represented to Plaintiff, the general public and bank regulators, that IndyMac Bank was a strong, viable construction lender with sound underwriting, lending, servicing and other business policies and practices, which had truthfully and completely disclosed its true financial condition and business practices to the public, including Plaintiff, and to all governmental regulators. In truth and in fact, IndyMac Bank was among the most irresponsible of the many lenders who

Exhibit A, page 27

1  compromised sound underwriting, lending and servicing policies during the years immediately
2  preceding and following the execution of the Loan Documents, as herein alleged.

3      47) Plaintiff, in good faith, reasonably relied upon IndyMac Bank's representations and,
4  based upon those representations, reasonably believed that IndyMac Bank would have the ability to
5  distribute Construction Loan funds in the manner, amount, and at the times agreed upon in the Loan
6  Documents.

7      48) Plaintiff is informed and believes and thereon alleges that in truth and in fact, however,
8  IndyMac Bank's house of cards was about to tumble when Plaintiff's Loan Documents were
9  executed in early January, 2007.  IndyMac Bank knew that its financial collapse was imminent and
10  that, with that collapse, it would be unable to meet its commitments to its many borrowers, including
11  Plaintiff, with regard to making disbursements of Construction Loan funds.

12      49) Had Plaintiff known that IndyMac Bank had intentionally or negligently misrepresented
13  and concealed its true financial condition from the public, from regulators, and from Plaintiff,
14  Plaintiff would not have executed the Loan Documents, but rather would have sought and obtained
15  other financing.

16    **AT THE TIME THE LENDER DEFENDANTS ACQUIRED INDYMAC FEDERAL**
17    **AND AT ALL TIMES THEREAFTER, THE LENDER DEFENDANTS KNEW THAT**
18      **INDYMAC BANK HAD MADE PROMISES TO BORROWERS SUCH AS**
19      **PLAINTIFF THAT INDYMAC BANK COULD NOT AND DID NOT KEEP**

20      50) Plaintiff is informed and believes and thereon alleges that when the Lender Defendants
21  acquired IndyMac Federal, and the Loan portfolio that purportedly included Plaintiff's Loan, the
22  Lender Defendants knew that loans such as Plaintiff's Loan had been made by IndyMac Bank based
23  upon false pretenses, misrepresentations and promises that could not be kept, and were not kept, as
24  alleged herein. The Lender Defendants also knew that IndyMac Bank had breached its loan
25  agreements with borrowers such as Plaintiff by, among other things, delaying, or failing altogether,
26  to make Loan disbursements when due, and charging and collecting excessive interest and fees
27  under threat of foreclosure – hence causing significant delays and damage to its borrowers, such as
28  Plaintiff.

Exhibit A, page 28

51) Plaintiff is informed and believes and thereon alleges that after purportedly acquiring Plaintiff's Loan, the Lender Defendants and Doe Defendants 1 through 100 became familiar with the manner and extent to which Plaintiff's Loan and Construction Draws had been mishandled by IndyMac Bank and IndyMac Federal and that they had breached the Loan Agreements and had engaged in other wrongful acts, as alleged herein. In fact, Plaintiff's primary contacts with the Lender Defendants, and their predecessors in interest, Jackson and Broyles, have remained the same since Plaintiff's Loan was made. Nonetheless, the Lender Defendants have continued to seek to assert that Plaintiff is in default, and to engage in the same wrongful conduct as their predecessors, and are attempting to foreclose on Plaintiff's home with full knowledge that Plaintiff was not, and is not, in default of the Loan Agreements, but rather, that Plaintiff has fully performed all his obligations pursuant to the Loan Agreement, except as prevented from doing so by the Defendants.

## ONEWEST'S DEBT COLLECTION, POLICIES AND PRACTICES HAVE BEEN FOUND TO BE HARSH, REPUGNANT, SHOCKING AND REPULSIVE

52) Plaintiff is informed and believes and thereon alleges that since its creation, OneWest has taken an unfair and overly aggressive, and often illegal, and wrongful, approach to foreclosing on property purporting to secure debts the Lender Defendants acquired from financial institutions such as IndyMac Federal. For example, Plaintiff is informed and believes and thereon alleges that on November 25, 2009, a judge in Long Island, New York, penalized OneWest for its "harsh, repugnant, shocking and repulsive" actions by canceling the debt in favor of the borrower. Plaintiff is informed and believes in another case, that on December 8, 2009, OneWest worked with the Sheriff's department to change the locks on distressed homes after agreeing with the borrower, just 8 days earlier, to renegotiate the loans. This was done without any court order or approval and violated acknowledged and mandated due process and home foreclosure laws. Plaintiff is informed and believes that numerous judges throughout the United States have issued temporary restraining orders and preliminary and permanent injunctions against OneWest preventing OneWest from foreclosing on properties where borrowers have claimed OneWest failed to follow proper foreclosure procedures, breached its Loan Agreements, sought to foreclose on loans without standing to do so, committed fraud by, among other things, routinely promising to enter into loan

Exhibit A, page 29

**VERIFIED COMPLAINT**

1  modifications to induce borrowers to continue making payments while truly intending to foreclose,

2  and not modify loans, or otherwise violated the borrower's rights and/or applicable law. OneWest's

3  egregious acts are well documented throughout the Internet and in court files from across the United

4  States, and demonstrate that OneWest's and the other Lender Defendants' conduct in this case is part

5  of an overall plan, enterprise and scheme, and not the result of inadvertence or mistake.

6      53) Plaintiff is further informed and believes and thereon alleges that IndyMac Bank, and its

7  agents, servants, employees, officers, directors and others associated with it, have been under

8  investigation for numerous illegal activities leading to the demise of IndyMac, including, but not

9  limited to, back-dating contributions from IndyMac's parent company in order to preserve the bank's

10 appearance as a "well capitalized institution," allegations filed by customers and former employees

11 of IndyMac alleging that managers and supervisors were pressured to approve loans at risk of being

12 fired, and/or investigated by the FBI, the FDIC, and numerous other Federal and State law

13 enforcement agencies and regulators, all of which the Lender Defendants are and at all times

14 mentioned herein were aware.

15     54) Plaintiff is informed and believes and thereon alleges that OneWest and the other

16 Lender Defendants knew of the illegal and wrongful policies, procedures and practices of IndyMac

17 Bank, and of the impact of such policies, procedures and practices on borrowers, such as Plaintiff, at

18 the time the Lender Defendants purportedly acquired Plaintiff's Loan.

19     55) Plaintiff is further informed and believes and thereon alleges that the Lender Defendants

20 knew that to the extent their purported predecessors in interest, IndyMac Bank and IndyMac Federal,

21 had breached the Loan Agreements with Plaintiff, and/or prevented Plaintiff from performing his

22 obligations pursuant to the Loan Agreements, Plaintiff could assert all claims and defenses against

23 the Lender Defendants that could have been asserted against IndyMac and/or IndyMac Federal,

24 except only as specifically prohibited by Federal law. The Lender Defendants also knew Plaintiff

25 could not be deemed to be in default of his Loan until such time as the breaches of the Lender

26 Defendants and their predecessors were remedied, and at all times mentioned herein, the Lender

27 Defendants knew, and currently know, that such breaches have not been remedied.

28 ///

Exhibit A, page 30

**PLAINTIFF'S LOAN**

56)  In the summer of 2006, Plaintiff was the owner of the Subject Residence, and had been since 1994. He applied for a Loan from Defendant IndyMac Bank with which to pay off the existing encumbrances on the Property in the amount of approximately $1,500,000, and extensively remodel the Subject Property. Plaintiff's Loan Application was processed during the latter half of 2006 during which time Plaintiff began the demolition and remodeling of the Subject Residence.  Prior to the Loan being funded, Plaintiff expended over $500,000 towards the remodel.

57)  On or about January 3, 2007, Plaintiff executed a series of documents including a Construction Loan Agreement, Note and Deed of Trust (sometimes referred to collectively as "The Loan Agreement," "Loan Agreements," or "The Loan Documents").  The original Lender for this Loan was Defendant IndyMac Bank. The original Trustee under the Deed of Trust was United Title Company.

58)  Plaintiff is informed and believes and thereon alleges that at no time has any assignment of the Note, or beneficial interest in the Deed of Trust, or Substitution of Trustee designated in the Deed of Trust, been recorded with the San Diego County Recorder.

**THE TRUE NATURE OF PLAINTIFF'S LOAN  -  DEFENDANTS' PURPORTED PREDECESSOR IN INTEREST AND PLAINTIFF AGREED TO ONE LOAN, NOT TWO**

59)  As reflected in the Loan Agreements, Plaintiff obtained a "Construction to Permanent Loan" with a term of thirty-two (32) years.  Plaintiff's stated intention, as alleged previously, was to use the Loan Proceeds to refinance and remodel the Property.

60)  Plaintiff's Loan was given a single loan number, "124659878-PERM" a single "construction and permanent security instrument" was created and recorded; and the insured mortgage is described in the Loan Agreement as "the Construction and Permanent Secured Interest." The "PERM" reference incorporated into the Loan number, of course, demonstrates the permanent nature of the Loan.  No new loan had to be obtained or approved at any time during the thirty-two (32) year period term of the Loan, and the Plaintiff's obligation to replay the Loan could be accelerated only in strict accordance with the terms of the Loan Agreements.

///

Exhibit A, page 31

1    61)  The Loan Agreement contemplates circumstances under which a borrower might obtain

2    a "Bridge Loan," which is a loan of relatively short duration from which to purchase property upon

3    which construction is to take place, and then finance construction on the Property, with the intent to

4    obtain a new and separate "permanent loan" of longer duration to pay off the Bridge Loan after

5    construction is complete.  However, that did not take place in this case.  Rather, Plaintiff's Loan was

6    a single "Construction to Permanent Mortgage."  Specifically, the Loan Agreements provide the

7    Plaintiff's Loan is a "Construction to Permanent 1-month LIBOR Payment-Capped Non-Convertible

8    ARM."

9    62)  As stated in the ARMs disclosures required by applicable law, discussed further *supra*,

10   Plaintiff's Loan is a single loan in the amount of $3,412,500 with two "phases," due and payable in

11   full not later than February 1, 2039.  The January 3, 2007, ARM disclosures made in connection

12   with Plaintiff's Loan state: "Your loan consists of a Construction <u>Phase</u> and a Permanent <u>Phase</u>.  The

13   Construction <u>Phase</u> has an Adjustable Interest Rate.  The Permanent <u>Phase</u> also has an Adjustable

14   Interest Rate; but the terms are different that during the two <u>Phases</u> the interest rate and

15   payment of this loan may each change during the term of this loan.  THIS LOAN ALLOWS FOR A

16   NEGATIVE AMORTIZATION during the permanent <u>phase</u>." [Emphasis added.]

17   63)  The ARM disclosures required by law further state, "This loan is a combination

18   construction and permanent ARM loan.  The construction phase may last no longer than up to 24

19   months from the date of your loan.  During the construction phase you will pay monthly interest only

20   payments based upon the total disbursed funds from the construction account … at the date on which

21   the construction is completed (the 'permanent loan commencement date'), your loan payment will be

22   converted to a principal and interest payment.  Your payment, after the permanent loan

23   commencement date, will be based upon the then current index plus permanent phase margin, loan

24   balance and remaining term."  Any portion of the $3,412,500 loan which remained undisbursed as of

25   the date construction was completed, as defined in the Loan Agreement, was to be disbursed to

26   Plaintiff at that time.

27   ///

28   ///

Exhibit A, page 32

17

**VERIFIED COMPLAINT**

**THE LENDER DEFENDANTS PURPORTED PREDECESSOR IN INTEREST**

**FAILED TO PROVIDE SIGNED LOAN DOCUMENTATION TO PLAINTIFF**

64)  As alleged in greater detail hereinafter, pursuant to applicable law, complete and fully executed copies of all Loan Documents must be provided to borrowers, such as Plaintiff, upon execution thereof.  Defendants failed to do so.  In fact, Plaintiff never received fully executed copies of the Loan Agreements, or any related documents, until after Defendants initiated the wrongful non-judicial foreclosure on the Subject Residence.  For example, it was not until Plaintiff requested a copy of his "Note" and "Deed of Trust" on September 28, 2010, that Defendants provided him with an executed copy of the "Construction Loan Agreement" for the first time.  No executed copy of the Note or Deed of Trust was provided.  The copy of the Construction Loan Agreement provided did not contain Plaintiff's initials on all pages where initials were called for, and contained a date written on the last page which was not written in Plaintiff's handwriting.  Furthermore, Plaintiff's telephone number, supposedly written by Plaintiff, but in actuality written by someone else at some unknown time, contains the wrong area code.   The construction costs breakdown included with the Construction Loan Agreement bears Plaintiff's signature only on the last page, and is largely illegible.

**DEFENDANTS KNEW DELAYS IN FUNDING CONSTRUCTION DRAW REQUESTS**

**WOULD CAUSE SIGNIFICANT CONSTRUCTION DELAYS, DAMAGE THE**

**BORROWER, PLAINTIFF, AND MAKE IT IMPOSSIBLE  TO COMPLETE**

**THE CONSTRUCTION DURING THE CONSTRUCTION PHASE**

65)  The Loan Agreement states that "fast access to [Plaintiff's] Construction Loan fund" would be achieved by wire transfer if [Plaintiff] were to open a saving account at IndyMac Bank."  In fact, the same "fast access" not only could be, but was required to be, available to Plaintiff by wire transfer of the funds to any account designated by Plaintiff.  To have required borrower to have opened a savings account at IndyMac Bank in order to obtain "fast access to [his] Construction Loan fund," would have violated federal and state anti-trust laws.  The promotion of "fast access to the Construction Loan Fund is an acknowledgement of the obvious, that for Plaintiff to

///

Exhibit A, page 33

1  complete construction on time and within the Budget, Plaintiff needed and depended upon the

2  Lender Defendants to provide "fast access to the Construction Loan Fund."

3       66)  The Loan Agreement further provides that Construction Funds would be transferred to

4  Plaintiff within 72 to 96 hours (3 to 4 days) from the time they were requested by Plaintiff.

5  Defendants' promotion of and representation that it would provide "fast access," to Construction

6  Funds demonstrates the Defendants' knowledge of the importance to a borrower such as Plaintiff, of

7  being able to quickly access funds from his Construction Loan Fund in order to pay contractors,

8  subcontractors, material men and laborers, and to keep the construction on schedule in order to

9  complete construction during the Construction Phase, and to avoid the significant damages, and

10  increased costs and expenses known by Defendants to result from construction delays.  The failure to

11  fund the construction for even a few days could, and did, cause a rippling effect of increased delays

12  and costs.  The failure to fund any of the construction for periods up to 110 days (almost 1/3 of a

13  year) after Plaintiff made a proper Draw request, as occurred in this case, had catastrophic effects, as

14  alleged more fully below.  If one contractor was not paid and walked off of the job, and had to

15  reschedule its work, all contractors whose work was to follow also had to be rescheduled and their

16  work delayed. Furthermore, when prompt payment was not made, contractors were in no hurry to

17  reschedule, or simply walked off the job and either did not return, or charged a premium for their

18  work thereafter.  Additionally, Plaintiff's reputation for not timely paying contractors, and others,

19  was a deterrent to others thereafter to work on the Project, which lessened the competition among

20  the contractors and increased the Project cost. Defendants knew that by denying fast access to

21  Construction Loan Funds, Plaintiff not only would suffer construction delays and substantially

22  higher construction costs, but also that he would be forced to pay the Lender Defendants interest,

23  fees and other charges on the Loan proceeds for periods of time during  which Plaintiff was

24  receiving no benefit from the Loan.

25  ///

26  ///

27  ///

28  ///

Exhibit A, page 34

19

**VERIFIED COMPLAINT**

**PLAINTIFF HAS FULLY PERFORMED ALL OBLIGATIONS OF THE LOAN AGREEMENTS EXCEPT AS EXCUSED AND/OR PREVENTED BY DEFENDANTS AND/OR THEIR PURPORTED PREDECESSORS, AND WOULD HAVE COMPLETED THE CONSTRUCTION ON TIME AND UNDER BUDGET BUT FOR DEFENDANTS' AND THEIR PURPORTED PREDECESSORS' MANY BREACHES OF CONTRACT AND OTHER WRONGFUL AND ILLEGAL ACTS**

67) Plaintiff commenced construction of the Project several months in advance of closing the Loan in January 2007. Specifically, Plaintiff commenced construction of the Project in the summer of 2006 and continued construction of the Project during the approximately 5 months in which it took to process and approve Plaintiff's Loan Application.

68) The Project required an unusually significant amount of effort and time to be expended "up front" to complete the permitting, demolition, grading, foundation, and framing of the Subject Residence. This process, which commenced in the summer of 2006, was completed by the end of the first year of the Construction Phase of the Loan. The $500,000 Plaintiff expended of his own funds was separate and apart from any Construction Loan proceeds, even though the Loan Agreement did not require that he contribute any personal funds to the construction.

69) At of the beginning of the second year of the "Construction Phase," the work which remained, such as drywall, windows, flooring, hardscape, landscape, carpentry, and finishing, easily could have been, and would have been, completed prior to the Completion Date had the Lender Defendants and their purported predecessors made funds available as agreed, not cause considerable delays and increased costs, and not demanded from Plaintiff interest, fees and other charges to which Defendants were not entitled as a result of their own conduct.

70) As alleged in this Complaint, the Project was not completed by the Completion Date through a litany of stalling tactics, breaches of contract, misrepresentations, bad faith acts, violation of federal and state laws, and willful and intentional efforts to delay distribution of the Loan Funds, collect unlawful and unauthorized interest, fees and other charges, and thereby fund Construction Draws with Plaintiff's own money, and ultimately place Plaintiff in a position in which he had to renegotiate the Loan or suffer Defendants' wrongful efforts to foreclose on the Subject Residence.

///

20

Exhibit A, page 35

71) Throughout 2007, consistent with the express terms of the Loan Agreements, the parties' intention, and the custom and practice in the industry, IndyMac Bank was prompt, cooperative, flexible and reasonable when asked to disburse Construction Funds. However, as IndyMac Bank's liquidity declined at the end of 2007, and in the beginning of 2008, first IndyBank, then IndyMac Federal, and eventually the Lender Defendants began employing progressively more frequent, severe, wrongful and obvious tactics to avoid making Construction Loan Draws when due. Plaintiff is informed and believes and thereon alleges that what follows is a partial list of various breaches of contract and other wrongful acts engaged in by Defendants in furtherance of their scheme as described throughout this Complaint. The parties' correspondence, some of which is set forth further below, reveals the constant abusive and egregious nature of Defendants' conduct.

a) Beginning in 2008, Defendants began asserting that the percentage of total funds disbursed for the Project exceeded the percentage of completion of the total Project. This criteria for disbursement of the Loan Proceeds was contrary to the terms of the Loan Agreement, and had not been applied during the first year of construction, prior to the Lender Defendants' liquidity problems arising.

b) Even if the criteria used in the preceding subparagraph (a) were permitted by the Loan Agreements, Defendants used a formula in performing their calculations that made absolutely no sense, could not be verified, was never explained, and severely distorted the true facts to support Defendants' contextual refusal to make Construction Draws.

c) Notwithstanding dozens of written and oral requests to explain, check, and/or adjust their methodology and the facts upon which they relied in refusing to fund Construction Draws, Defendants continued to do so without meaningful responses, or for that matter, any responses to Plaintiff's requests and inquiries.

d) At all times when Defendants were claiming that the percentage of construction funds that had been disbursed was greater than the percentage of construction that had been completed, Defendants knew there were sufficient funds remaining in the Construction Loan Account to fund all remaining construction and that the

1    actual contractual criteria for withholding Construction Funds did not justify their

2    refusal to fund construction.

3    e) Plaintiff was told by Defendant IndyMac Bank, through its Vice President, Darin

4    Judis, that in order to protect against personal liability once the Loan was closed

5    Plaintiff could transfer ownership of the Subject Property into an LLC in which

6    Plaintiff was the sole member and manager.  Accordingly, Plaintiff transferred

7    title for the Property to YBA Nineteen LLC, which was as such, an LLC.  This

8    transfer was made with the knowledge of IndyMac Bank, and thereafter the

9    Lender Defendants, and was based on the statement of IndyMac's Vice President,

10   Darin Judis, that IndyMac Bank recognized such transfer as a necessary and

11   appropriate means to provide asset protection against potential individual liability

12   during construction. Plaintiff is informed and believes and thereon alleges that

13   Lender Defendants later refused to fund Construction Draws until Plaintiff

14   transferred title back from YBA Nineteenth LLC to himself, for the sole purpose

15   of delaying disbursement of Construction Funds.

16   f) Throughout 2007, Plaintiff had little or no difficulties dealing with IndyMac

17   Bank.  His Draw requests were processed promptly and distributions were made

18   within a few days after they were requested. Also, initially, IndyMac Bank

19   acknowledged that Budget line items were not intended to be "set in stone," but

20   rather, were estimates for each item, and would need to be reviewed and revised

21   as construction proceeded.  (The fact that Budget line items were intended to be

22   just estimates, and subject to refinement as construction progressed, is obvious

23   from the fact that they are all "round numbers.") This was recognized and

24   acknowledged by Indymac Bank as being particularly important in this instance

25   because Plaintiff did not have an independent contractor who was responsible for

26   bidding out the job and refining the Budget estimates. Accordingly, for the first

27   year of construction, when Plaintiff made requests to move funds from one

28   category to another, they were processed promptly.  Offsets were made when

appropriate.   Draws were made in accordance with the Loan Agreements whenever the percentage of completion on any particular Budget item justified the draw, without reference to alleged and concocted "overall" completion and/or disbursement percentages.

g)   Beginning during the second year of the Construction Phase, the Lender Defendants, and their predecessors, began employing numerous wrongful tactics to avoid transferring funds from one line item to another line item in the Construction Budget when funds were over budgeted for one line item and under budgeted for another, claiming, for example, that they were not aware of what funds should be transferred to what line items when, in fact, they had been provided this information on numerous occasions over many months.

h)   Defendants or their purported predecessors lied about not receiving emails from Plaintiff requesting or supporting requests for Construction Draws.

i)   Defendants claimed that "IndyMac does not reimburse for items that are provided up front as borrowers equity," in order to justify refusing to reimburse certain expenses paid by Plaintiff, even though, pursuant to the Loan Agreements, Plaintiff expressly was not required to provide any funds up front as "borrowers equity," and none of the expenses paid by Plaintiff legitimately could be considered "borrowers equity" under the Loan Agreements.

j)   Defendant Pray, as Customer Experience Manager with IndyMac Bank, lied in order to delay distribution of Construction Funds claiming that he was told by someone from the City of San Diego that any home built on a hillside in San Diego had to have fire sprinklers installed.  Based on this lie, Defendants refused to transfer funds allocated in a Budget line item for fire sprinklers to a Budget line item for rough HVAC, which had been omitted in the original Budget, in order that Plaintiff could be reimbursed for funds he had already personally expended on rough HVAC.

k) Defendants depleted Plaintiff's interest reserve by paying themselves interest while construction was delayed by Defendants' own acts, and once the interest reserve was depleted, then demanded that Plaintiff pay interest out of his personal funds before Defendants would make any Construction Fund Draws, even when the amount of the Construction Funds to which Plaintiff was entitled greatly exceeded the interest allegedly owed Defendants, and even though Defendants knew that during the periods of delay caused by Defendants own acts, Plaintiff received no benefit from the Loan, and should not have been charged interest.

l) Defendants delayed payment of Draws until they could force Plaintiff to make interest payments and/or payment for late fees, unnecessary inspections and other charges from his personal funds, from which they could then, in part, pay the Construction Draws.

m) After previously offsetting any amounts claimed due from Plaintiff to Defendants against any Construction Draws due to Plaintiff, Defendants during 2008, began refusing on almost all occasions to offset amounts claimed due from Plaintiff against any Construction Draws due to Plaintiff as part of their scheme as alleged in this Complaint.  For example, if Defendants owed Plaintiff $100,000 in Draws, and Plaintiff allegedly owed $20,000 in interest, Defendants would not offset the $20,000 against the $100,000, and pay Plaintiff $80,000. They would make Plaintiff give them $20,000 cash and then pay the $100,000 due, knowing this would cause significant delay and hardship to Plaintiff, since Plaintiff had paid $100,000 of his funds toward the construction for which he was entitled to be reimbursed.

n) Defendants willfully ignored the inspection data obtained from inspectors who inspected the Property to determine the percentage of work completed.

o) Defendants falsified and/or misrepresented the actual inspection data, obtained from their own inspectors, claiming the percentage completed was less than that which their own inspectors found completed.

p) Defendants pressured their inspectors and/or their inspection companies to distort or hide their findings from Plaintiff so Defendants could lie about them with impunity. For example, on one occasion, plaintiff requested a copy of the field notes containing one of the inspector's conclusions as to the percentage of completion of each line item in the Budget at the time of the inspection. The inspector complied; and a copy of the inspector's notes was provided to Plaintiff. The inspector then left the Property. Within the hour, the inspector returned to the Property and requested that Plaintiff return the copy of the inspection notes previously provided to Plaintiff, stating that the inspector was advised by his boss that he would be fired if he did not immediately obtain a return of the notes. Plaintiff complied. On another occasion, the inspector told Plaintiff that Plaintiff's reference in his communications with the Lender Defendants as to the findings made by the inspector were "causing [the inspector] problems." Plaintiff is informed believes and thereon alleges that the reason why the inspector was threatened with termination if he did not retrieve the inspector's notes, and why Plaintiff's previous reference to the inspector's findings in correspondence with the Lender Defendants was causing the inspector "problems," was that the inspector's boss was aware, as a result of communications directly with the Lender Defendants, that the Lender Defendants did not intend to and, in fact, did not utilize the actual percentages of completion determined by the inspectors when deciding what amounts would be distributed to the Plaintiff. Rather, Defendants altered, modified and/or ignored those percentages to their advantage in whole, or part, in order to wrongfully withhold Construction Loan Distributions.

q) Defendants terminated and replaced inspection companies in an effort to find inspection companies that would provide Lender Defendants with a lower percentage of completion of the Project than was merited.

Exhibit A, page 40

25

**VERIFIED COMPLAINT**

r) Defendants refused, after numerous requests from Plaintiff, to explain to Plaintiff what criteria was being used to determine the percentage of funds distributed, the percentage of work completed, or any other basis for withholding funds.

s) Defendants refused to pay the remaining balance of the Loan proceeds once the Loan was accepted for occupancy by the City of San Diego on May 13, 2010 which, pursuant to the Loan Agreement, satisfies the requirements and definitions for "completion" and triggers Defendants' obligation to fully fund the Loan by payment to Plaintiff of all funds then remaining in the Construction Loan Account. On May 13, 2010, the amount of Construction Funds which should have been distributed to Plaintiff were then sufficient to pay all amounts Lender Defendants claimed were due from Plaintiff

t) After almost 3 years, Defendants for the first time, in late 2009, withheld Construction Loan Draws which were due to Plaintiff until Defendants had completed an "estimated cost to complete," although there was no authority for Defendants to withhold funding the Loan on this basis within the Loan Agreement, and notwithstanding that at the time, Defendants knew that there were sufficient funds remaining in the Loan Construction Fund to fund the remaining construction.

u) When liens were filed against the Property by subcontractors for non-payment, the Defendants refused to reimburse Plaintiff for the work they had done, and merely give Plaintiff the ability to satisfy the liens; but rather, told Plaintiff that he would not be given the funds due for completion of the work until Plaintiff first paid off the lien with his personal funds. As a result, the Lender Defendants forced Plaintiff to pay for the same work twice before the Lender Defendants would reimburse him.

v) The Lender Defendants, specifically by Jackson, promised on several occasions after May 13, 2010, including on or about August 18, 2010, that if Plaintiff would do certain things, such as install the appliances, the Lender Defendants would

fully fund the Loan as required by the Loan Documents upon "completion." Yet, on each occasion, the Lender Defendants refused to honor their promises after Plaintiff did what they asked.

w) Defendants ignored numerous "qualified written requests" by Plaintiff which mandated prompt responses pursuant to RESPA, Federal and State Fair Debt Collection Practices Acts, and the duty of good faith and fair dealing implied by law in the Loan Agreements, and to this day, have not explained either their criteria or formula for determining the percentage of the Loan Funds which were disbursed, and/or the percentage of the construction that was complete, or the basis within the Loan Agreements for refusing to fund Construction Draws based upon this criteria.

x) Defendants modified their criteria for determining the percentage of funds distributed and/or percentage of work completed from time to time, based upon which numbers justified their contextual refusal to make Loan Draws.

y) Defendants refused to disburse funds for HVAC because condensers were not installed, even though the plans submitted to Defendants prior to funding did not call for condensers, and therefore funds could not be withheld for this reason.

z) Initially IndyMac Bank did not require Plaintiff to submit proof of payments he made to complete construction before reimbursing him. As provided in the Loan Agreement, his Draw requests were deemed to be representations by him that the funds had been, or would be, spent as represented. However, once Defendants' scheme was implemented, and Defendants began delaying payment of Construction Funds, Defendants required proof of payment of certain expenses solely for the purpose of causing delay.

aa) None of the excuses which Defendants concocted starting in early 2008 were used until the Lender Defendants began implementing their scheme in 2008, to delay distribution of Loan Funds, as alleged herein.

**VERIFIED COMPLAINT**

Exhibit A, page 42

bb) As a result of Defendants' various wrongful acts, during the most critical time for construction, beginning the second year of the Construction Phase, the time between Draw requests and Draw distributions was measured in weeks or even months, not days, as had been the case before, and as required by the Loan Agreements. In fact, over one span of **187 days,** Defendants made only one (1) Construction Draw, notwithstanding dozens of fully supported written and oral requests, demands and pleas for Construction Funds by Plaintiff, accompanied by statements by Plaintiff that without the funds promised him by the Loan Agreement, Plaintiff was suffering severe delays and damage. Defendants' responses, detailed in part in the correspondence that follows, speaks volumes of Defendants' callous, malicious and truly despicable attitude and conduct toward Plaintiff and their obligations pursuant to the Loan Agreements and any applicable laws

cc) Ultimately, when Plaintiff would no longer tolerate Defendants' wrongful conduct, the Lender Defendants initiated a wrongful foreclosure, utilizing a false and fraudulent NOD, and with full knowledge that they were not entitled to foreclose for literally dozens of reasons.

dd) In November 2008, when it became obvious that Plaintiff would not complete construction by the completion date due to the delays caused by Defendants' failure to fund construction as promised, the Lender Defendants' successor in interest agreed orally to modify the Loan Agreements by reducing the interest rate by approximately 50% of the interest called for during the Construction Phase pursuant to the Loan Agreements. This agreement was thereafter confirmed in writing each month in the loan statements provided to Plaintiff. From November 2008 until July 2010, the Lender Defendants, through their loan statements and numerous oral promises made by Jackson to Plaintiff, promised to confirm this amendment to the Loan Agreement in a written modification agreement, and Plaintiff fully performed what was required of him pursuant to the agreement by

Exhibit A, page 43

1    paying interest on the Loan and continuing to work to complete the construction.

2    However, once the construction was 98% complete, Defendants refused to honor

3    their agreements and representations, and initiated a wrongful foreclosure on the

4    Subject Residence.

5    ## DEFENDANTS IGNORED RESPA (AS WELL AS THE CALIFORNIA AND FEDERAL

6    ## FAIR DEBT COLLECTION PRACTICES ACTS) AND PLAINTIFF'S "QUALIFIED

7    ## WRITTEN REQUESTS" UNDER RESPA AS WELL AS THE FEDERAL

8    ## AND STATE FAIR DEBT COLLECTION PRACTICES ACT

9    72) The RESPA Servicing Disclosure Statement (RESPA Disclosure) prepared by

10   Defendants' predecessors in interest describes Plaintiff's rights with regard to a mortgage loan

11   covered by RESPA (12 USC §§ 2601, et seq.)  Among other things, the RESPA Disclosure provides

12   that if the servicing of bank's loan is assigned, sold or transferred to a new servicer, Plaintiff must be

13   given written notice of that transfer not less than 15 days before the effective date of the transfer.

14   The new loan servicer must also send Plaintiff notice within 15 days after the effective date of the

15   transfer.  Any notices must contain the effective date of the transfer of the servicing of Plaintiff's

16   Loan and the name, address and toll-free or collect call telephone number of the new servicer, and

17   the toll-free or collect call telephone numbers of any persons or departments for both Plaintiff's

18   present servicer and new servicer.

19   73) Furthermore, Section 6 of RESPA provides that if Plaintiff sends any written

20   correspondence other than notice on a payment coupon or other payment medium supplied by the

21   servicer, which includes Plaintiff's name and account number, and any information regarding

22   Plaintiff's request, not later than 60 business days after receiving Plaintiff's request, the servicer

23   must make any appropriate corrections to Plaintiff's account, or must provide Plaintiff with a written

24   clarification regarding any disputes. During the 60 business day period, the servicer may not provide

25   information to a consumer reporting agency concerning any overdue payment related to such period

26   or qualified written request.

27   ///

28   ///

Exhibit A, page 44

29

74) No corrections were made to Plaintiff's account, and Plaintiff is informed and believes the Lender Defendants provided information to consumer credit reporting agencies in violation of RESPA.

75) Both Federal and California State Fair Debt Collection Practices Acts require responses to communications such as Plaintiff's qualified written requests. Defendants' failed to respond, therefore, they also violated those Acts.

76) On dozens of occasions, Plaintiff sent "Qualified Written Requests" to Defendants which were either ignored entirely, as alleged herein, or to which Defendants did not respond in any meaningful way. Those requests include, but are not limited to, the correspondence set forth below.

## THE PARTIES' CORRESPONDENCE REVEALS DEFENDANTS' PATTERN OF CONSTANT, WILLFUL, WRONGFUL AND ILLEGAL CONDUCT

77) As alleged previously, beginning in late 2007 or early 2008, Plaintiff began having difficulty obtaining Construction Draws on a timely basis and/or in the full amounts due. The problem worsened throughout the first half of 2008 as IndyMac's financial condition deteriorated and continued to the present time. While the entities involved may have changed over time, Plaintiff dealt with essentially the same individuals: i) Pray, who was initially a Customer Experience Manager with IndyMac, and upon information and belief, Plaintiff alleges is now with the FDIC as a Post Closing Asset Management Technician; ii) Jackson, who previously worked for IndyMac Bank and is now a Regional Vice President of OneWest; and (iii) Broyles who has been, or is now, a Senior Underwriter/Asset Manager for IndyMac Bank and Indymac Mortgage Services, a division of OneWest.

78) When Plaintiff learned of IndyMac's failure in July 2008, he not only concluded that this was the reason there had been a dramatic change in the way his Construction Loan had been handled over the previous several months, but also that he might experience more of the same or similar problems in the future. Accordingly, in July 2008, Plaintiff began documenting more, although not all, of his communications with the Defendant Lenders, and their purported predecessors. What follows is correspondence between Plaintiff and the Defendant Lenders and their predecessors which reveals the Defendants' many breaches of contract, fraud and statutory

1   violations, which demonstrate a clear pattern, scheme and criminal enterprise.  While Plaintiff had

2   not yet begun documenting Defendants conduct in emails before IndyMac's public collapse,

3   essentially the same conduct by Defendants existed during the first 6 months of 2008, as is

4   memorialized in writing below.

5       79) On July 18, 2008, Plaintiff emailed Pray at IMB.com referencing Plaintiff's Loan

6   number 124 659 878.  In the request, Plaintiff noted, "I need these funds as soon as possible, since I

7   have to make these payments to contractors and suppliers.  It has been very difficult in the last six

8   months to get funds disbursed.  Of course now, with the FDIC takeover of your bank, we know the

9   reasons why.  You have been helpful, but the reality is that the funds have been lagging . . . I would

10  like to get some assurances that disbursement of funds would not be further delayed and that my

11  Construction Loan will be fully funded.  Can you communicate to me as to who would be able to

12  give me these assurances at this point?"  The July 18, 2008 email was typical of Plaintiff's

13  correspondence with Defendants, and as with all of Plaintiff's emails referenced below, constituted a

14  "qualified written request" under RESPA (12 USC section 2605) to which Defendants were legally

15  obligated to respond.

16      80)  In the July 18, 2008 email, Plaintiff also wrote "the total [due but unpaid] draw request

17  up to this point and according to the percentages that your inspector has already approved is:

18  $180,000."  Plaintiff further complained that the bank was not accurately determining the percentage

19  of completion of the Project.  On July 23, 2008, Plaintiff again emailed Pray noting: "I still have not

20  received a response from you to my prior email.  I received a call from Azad [Marfazelian]

21  informing me that there will be no further fund disbursements.  I indicated to her that there are some

22  serious mistakes in draw and project completion percentages, as I have indicated to you in my prior

23  email and over numerous phone calls.  Azad told me that she will talk to you and get back to me.  I

24  will be waiting for a response.  We need to take care of this as soon as possible since I have many

25  subcontractors demanding payment."

26      81)  Among the items requested in Plaintiff's July 18, 2008 email was a $30,000 draw for

27  rough HVAC which was 100% complete.  There was no category for rough HVAC in the

28  Construction Budget.  Furthermore, both Jackson and Pray were aware that the Property had been

1 | inspected by their appointed building inspector and that, in fact, the work had been completed as
2 | represented by Plaintiff weeks earlier. Payment for the rough HVAC had been advanced from
3 | Plaintiff's own funds. In several earlier conversations with Pray, and as reflected in various emails,
4 | Plaintiff also requested that the amount in the Budget line item allocated to "fire protection
5 | sprinklers" be transferred to a line item for rough HVAC and disbursed to Plaintiff for payment of
6 | the cost of rough HVAC. This request was made because the fire protection sprinklers were not
7 | required by any applicable building ordinance or code, as Plaintiff advised Defendants, and would
8 | not be installed.

9 |     82) On July 23, 2008, Pray wrote an email to Plaintiff claiming he had never received
10 | Plaintiff's July 18, 2008 email, although the email address in Plaintiff's July 18, 2008 email to Pray
11 | is correct. In Pray's July 23, 2008 email he writes: "On 7/9/08 I assisted you with entering a draw
12 | for $45,000 from your contingency reserve account. At that time, I also assisted with submitting a
13 | line item change request; because in a recent conversation we discovered that the rough HVAC was
14 | not included in the original budget. One of the items that were being reallocated was the Fire
15 | Protection Sprinklers." Pray then claimed that he had made efforts to verify that no fire protection
16 | sprinklers were required, as he had been advised by Plaintiff, and states specifically, "So far I have
17 | been verbally told that any home located on a hillside, in the City of San Diego, is required to have
18 | fire protection sprinklers. However, I have not been able to obtain written confirmation of this
19 | requirement."

20 |     83) Pray's statement was false. Fire protection sprinklers are not required on every home
21 | built on a hillside in San Diego, and, specifically, were not required at the Subject Residence.
22 | Therefore, Pray's excuse for not immediately transferring the $20,000 allocated to fire protection
23 | system to rough HVAC had no merit.

24 |     84) When advised by Pray that he was told by someone at the City of San Diego that fire
25 | protection sprinklers were required, Plaintiff asked Mr. Pray to whom he had spoken. Pray was
26 | never able to give Plaintiff the name of any person at the City of San Diego, or elsewhere, from
27 | whom he had obtained such information. Yet for two months, Plaintiff was denied access to
28 | Construction Loan Funds on the basis of Pray's claim that fire protection sprinklers were required

Exhibit A, page 47
**VERIFIED COMPLAINT**

and as a consequence, he could not, and would not, transfer any funds allocated to fire sprinklers in the Budget to the HVAC line item so they could be distributed to Plaintiff and used to complete the Project.

85) In yet another email from Brad Pray to Plaintiff dated July 24, 2008, Pray states: "Rough HVAC – the issue with the HVAC was addressed in my previous email. Until the line item change request is completed, we are unable to disburse any funds toward the rough HVAC as this was not in the original budget. I will request for Azad to follow upon this today."

86) On August 19, 2008, Plaintiff received an email from Jackson, with a copy to Pray, in which Jackson states, in part, "I have verified with the City that the Fire Sprinklers aren't required, please let me know which line items you would like the monies moved to . . . currently, we are showing that you are 5% over disbursed. Once we receive the information on where you want the fire sprinklers re-allocated to we can discuss the amount of the next draw."

87) Jackson's August 19, 2008 email acknowledged that Pray had not been truthful regarding the requirement that fire sprinklers had to be installed at the Property. As Plaintiff noted in his August 19, 2008 email response to Jackson, "In regard to the fire sprinklers, it only took two months to verify what I had been saying all along, but I do appreciate you finally had it verified. Please move the fire sprinkler line item to rough HVAC." In fact, Defendants had been told months earlier where the fire sprinkler funds should be allocated. Then, even after being told again where to move the funds allocated to fire sprinklers, as a further delay tactic, funds were not reallocated to the HVAC until an invoice proving Plaintiff had paid for the rough HVAC was provided. This invoice was demanded even though the Defendants' own inspector had verified the work was complete and, therefore, that the funds necessarily must have been spent.

88) In response to Plaintiff's August 19, 2008 email, Jackson replied by email of the same date, "Please send me the paid invoice for the HVAC so I can move the monies." Defendants' previously had made no request for receipt of a "paid invoice" prior to transfer of Budget line items.

89) After receiving the requested invoice for $18,288.50, Jackson wrote Plaintiff on September 4, 2008, "I see that you have entered the draw in. We are working to process that for you [defendants supposedly had been doing this for 3 months now]. You are correct that the monies for

1  the HVAC and fire sprinklers haven't been changed.  This isn't however a lack of the Bank not

2  wanting to disburse funds.  Per an email that was sent to you on 8/20 I have asked were (sic) the

3  remaining funds in the sprinkler line item of $1,812.50 should go towards as the HVAC bill is then

4  than (sic) $20k that has been allotted in the Fire Sprinkler line.  When you are able to advise where

5  the monies go I can re-allocate these funds for you. I have also asked this question to you in phone

6  conversation."

7      90) Plaintiff responded to Jackson's September 4, 2008 email later that same day stating,

8  "Please add the $1,812.50 amount to line item 5014 (Security & Communications pre-wiring.) I did

9  communicate this to you as a response to your email on 8/20/08, I also left a voicemail for you on

10  that date regarding this amount."

11      91) On November 18, 2008, Plaintiff wrote to Jackson: "The Property was inspected

12  yesterday by your inspector. He has approved all these categories I am requesting funds for. The

13  grand total for the line items which have been completed as approved by your inspector Brian

14  Chatfield yesterday is what I am requesting: $40,000."

15      92) Jackson responded on November 18, 2008: "The home shows an increase of 1% since

16  your last inspection. You are currently over disbursed and the most I can get out to you would be

17  $18k."

18      93) Plaintiff responded on November 19, 2008: "The percentage of completed work for the

19  line items I am requesting funds for were confirmed by your inspector on Monday, November 17th.

20  I would appreciate if you can disburse accordingly. However, of course I would accept the $18,000,

21  since I have no choice." That afternoon, on November 19, 2008, Jackson responded to Plaintiff: "We

22  sent 40k out to you."

23      94) Jackson's Tuesday, November 18, 2008 email shows a time sent of 4:01 p.m. However,

24  the Project Summary into which Plaintiff logged-in on December 4, 2008 reflects that the date and

25  time of the last $40,000 draw was November 18, 2008 at 2:20 p.m. That same log-in reflects that the

26  construction funds still available amounted to $528,067.70, the interest reserve account balance was

27  $3,917.13, and the contingency account balance was $43,674. The cost of completion of the Project

28  including hard costs and soft costs was $1,796,460. The remaining funds available for construction,

1    excluding the interest reserve accounts, was $571,741.70. Therefore, only 68.2% of the funds set

2    aside for construction had been disbursed, even after including the $40,000 disbursement made on

3    November 18, 2008. Prior to the $40,000 disbursement having been made, only 66% of the

4    Construction Funds had been disbursed. Nonetheless, Defendants claimed that 83.13% of the funds

5    had been disbursed. If 83.3% of the $1,796,460 in hard construction costs had been disbursed, only

6    $300,008.82, not $528,067.70, would have remained non-disbursed. Plaintiff is informed and

7    believes and thereon alleges that the Defendant Lenders used unfounded and inaccurate criteria and

8    numbers for their calculations, not only when dealing with Plaintiff, but "across the board," with all

9    construction loan borrowers, knowing that most borrowers would not question a bank's

10   computations and, therefore, the Defendants successfully would perpetrate their scheme.

11       95) Broyles wrote to Plaintiff on April 24, 2009: "We have had some reassignments of

12   positions since the Bank was sold last month and I will now be taking care of your file, my contact

13   information is below. We have received your inspection and I have reviewed your draw request

14   with Kari. Your current % complete is 71.75% and you are 79.89% disbursed [note that on

15   November 18, 2008, the Defendants claimed the Loan was 83.13% disbursed. No explanation was

16   ever offered regarding why the percentage disbursed dropped from 83.13% to 71.75% during the

17   prior six months]. Although you have had progress in drywall and hardscape because your overall

18   % disbursed is over your % complete, we will not be able to disburse any additional funds at this

19   time. We will need to verify further increase in % complete in order to disburse any additional

20   funds." Broyles' statement was false, as could have been determined by "doing the math," as

21   Plaintiff repeatedly requested. Furthermore, nothing in the Loan Agreement allowed Defendants to

22   withhold disbursements of funds allocated to particular line items if the work

23   described in that line item was complete, as long as there were sufficient funds remaining to

24   complete the Project – which there were.

25       96) On April 29, 2009, Plaintiff wrote to Broyles asking her to: "Please demonstrate your

26   calculations for both Project percent completion and project percent disbursements, item by item! It

27   seems to me that there are either huge discrepancies in calculations or a double standard being

28   applied here. This project is far beyond 71.75% complete. Before, it was about percent completion in

1    budget items. I have demonstrated to you and we are in agreement that I am owed disbursements at

2    this point for several budget items. Now you are presenting me with the total project completion

3    standard. Please show me how you have arrived at your conclusions." At that time $15,690.09 was

4    owed on completed drywall, $8,925 was owed on completed finished hardware; $2,000 is owed on

5    electrical fixtures, all of which has been approved. Additionally, at that time $35,000.00 was

6    requested for front retaining walls, walkways, planters and a northeast retaining wall and backfill for

7    which there was no contingency item.   The $35,000 draw was requested to come from the

8    contingency line item.

9        97) Broyles did not respond to Plaintiff until May 15, 2009, more than two (2) weeks later,

10   at which time she indicated she had ordered an inspection and upon receipt would review it to

11   determine if there is any possible disbursement of funds forthcoming. She also stated that the "4/1

12   and 5/1" interest payments were outstanding.  Furthermore, she states: "Your percentage complete is

13   derived off the line item cost in relation to the total hard cost budget of $2,063,896." How anyone

14   could possibly determine what percentage of the work had been completed based not on a physical

15   inspection of the property, but upon numbers in a Budget which were not explained.  Nor did

16   Defendants explain why they had the Project inspected if the inspectors' conclusions regarding the

17   completion percentage of the Project was not used.  Additionally, in fact, the hard cost budget was

18   $1,796,460, not $2,063,896, as clearly reflected in Defendants' files, and the percentage of the

19   Project that actually was complete was much greater than 71.75% (and could not be determined from

20   the percentage of the hard costs Budget disbursements in any event).  The percentage of completion

21   could have been, and should have been, determined exclusively from inspection of the work actually

22   done, compared to the work that needed to be done on a Budget line item by line item basis pursuant

23   to the plans for construction provided to, and approved by, IndyMac before the Loan was approved.

24   All funds allocated to completed items in the Budget should have been disbursed.

25       98) On May 15, 2009, Plaintiff wrote to Broyles stating: "Up to date you still have not

26   provided your calculation for percent completion [which had been requested for over a year] and

27   have not released any funds for all the work that had been done in the past 26 days.  I am not able to

28   enter the system!!! I am out of funds. . . I NEED TO GET REIMBURSED FOR ALL THE WORK

1  IN THE PREVIOUS EMAIL IN THE BOTTOM AND ALSO THE WORK THAT HAS BEEN

2  COMPLETED SINCE THEN."

3       99)   On May 18, 2009, Broyles wrote to Plaintiff stating, as follows: "I have received the

4  newest inspection back and your % complete is now 73.08% and your % disbursed is 79.89%,

5  resulting in a 6.81% over disbursement."

6       100)   On May 18, 2009, Plaintiff wrote to Broyles: "In regards to your calculations for

7  Project completion, I am afraid the bank's numbers are way off.  Looking at the inspector's list, the

8  numbers Do Not match with the numbers in the table below.  Just one example is the fire sprinkler

9  system.  It still shows that it has a credit of $20,000, but in the table it shows a credit of -$0-.  Please

10  update your figures for Project % completion since you are using it as a basis of not to Disburse

11  funds."  Plaintiff further documents completion of items requiring additional disbursement at that

12  time of $116,293.70.

13       101)   On May 18, 2009, almost a year after Plaintiff requested funds be moved out of the

14  fire sprinkler line item, Broyles writes to Plaintiff: "I am a bit unclear as to what you mean in your

15  below email about the fire sprinklers [referring to the above email from Plaintiff to Broyles of May

16  18, 2009, noting a discrepancy in the fire sprinkler system reserve shown in the Bank's schedules],

17  according to the inspection, this is 0% complete and the inspector was informed that these would not

18  be installed, if this is the case we should change this line item if you are *not doing this work, since

19  you have indicated there are overruns in retaining walls, we can change the line item to reflect that,

20  please advise.*" As alleged above, the Bank had been told repeatedly over the course of almost a

21  year, that Plaintiff "was not going to do this work," and where the funds should be re-allocated.

22       102)   In Broyles' May 18, 2009 email, she also states: "Site Drainage and Drywall do

23  reflect 100% complete" as Plaintiff had noted, but hardscape reflected 85%, not 100% because of "a

24  small driveway" remaining and landscape and irrigation reflected 0%. [Emphasis added.]  As alleged

25  hereinafter, in January 2010, more than 6 months *after* this email exchange, the Lender Defendants

26  unilaterally, and in conflict with their own inspector's finding, reduced the percentage completion of

27  the hardscape from 85% to 40%, because this "small driveway" remained, in fact, known when the

28  inspector found the hardscape to be 85% complete.

Exhibit A, page 52

**VERIFIED COMPLAINT**

103) On May 27, 2009, Plaintiff wrote to Broyles and advised her that if all of the line items shown on the Bank's report were added up, the total is 103.01%. "This means that even if I am 100% complete, I would still be 3.01% behind." He further advised her that if all the individual line items were tallied, the total percent complete would be 85.58%, not the 73.08% claimed by Broyles in her May 18, 2009 email. Plaintiff received no explanation for these discrepancies, nor did he receive the Draw which he needed to fund the construction.

104) Having heard nothing back from Defendants, on July 10, 2009, Plaintiff again wrote to Broyles: "It has been 83 days and there have been no disbursements from the bank. The Project looks entirely different even to a lay person in terms of substantial progress [due entirely to Plaintiff's funding the construction with his personal funds]. Of course the bank is aware of this progress as a result of numerous inspections performed by the bank's inspector, the last of which was 2 days ago. I have incurred and continue to incur substantial damages due to lack of funds and the delays caused and the confrontations with the contractors." During the extreme periods of delay in making Loan Draws, Plaintiff had to obtain funds from other sources to pay for the work that was being done. This was difficult and at times impossible. The result was not only that Plaintiff at times did not have the money to pay interest, since all his available funds were being spent to keep construction moving, but also was causing considerable delay and damage.

105) On July 10, 2009, Broyles wrote Plaintiff: "Kari is out of the office until next week. I have reviewed your most recent inspection and do see progress. As we have previously mentioned we do disburse on overall Project completion [which is not what the Loan Agreement provides] and the overall completion is now 78.07% per the most recent inspection [note that in Broyle's April 29, 2009 email, Broyles says, "your percentage complete is derived off the line item cost in relation to the total hard cost budget of $2,063,896, [not any actual inspection] and your disbursed construction funds are 78.23%. Your percentage complete is strictly derived from your budget, so if you are not going to complete certain items such as the security system and intercom, we should reallocate those funds." Plaintiff is informed and believes and thereon alleges that the Lender Defendants purposefully misrepresented the facts and the parties' rights and obligation, and were "hiding the ball" regarding how Defendants were making their computations because Defendants knew that

**VERIFIED COMPLAINT**

1  most borrowers would not go back to the Loan Documents or otherwise seek to determine if the

2  Lender Defendants were fabricating the data upon which they relied to withhold Construction

3  Draws.

4      106)  At no time did Defendants ever even attempt to explain how they could justify a

5  determination of percentage completion that is not based on "any actual inspection."  Nor did

6  Defendants attempt to explain why they sent inspectors to the Project, at considerable cost, to

7  determine the status of the Project's completion, if such "actual inspections" were not used.

8  Obviously, Defendants never explained this because there was no explanation other than that

9  Defendants were acting fraudulently, oppressively, maliciously and despicably in furtherance of

10  their criminal enterprise.

11      107)  In Plaintiff's July 10, 2009 email to Broyles, Plaintiff also states: "We need to go

12  over the line items one by one, if you are still refusing to make disbursements due to total Project

13  completion. According to my calculations the total Project completion is 85%." The Lender

14  Defendants once again did not respond with an explanation, and an adjustment of Plaintiff's account

15  was never made as required by RESPA and other applicable law.  Instead, the Lender Defendants

16  responded with a "Default Letter," as alleged below.

17      108)  On July 10, 2009, Broyles wrote to Plaintiff: "Kari is out of the office until next

18  week. I have reviewed your most recent inspection and do see progress. As we have previously

19  mentioned we do disburse on overall project completion and the overall completion is now 78.07%

20  per the most recent inspection and your disbursed construction funds are 78.23%.  Your percentage

21  complete is strictly derived from your budget, so if you are not going to complete certain items such

22  as the security system and intercom, we should reallocate those funds."

23      109)  On July 15, 2009, for the first time, IndyMac Mortgage Services, on behalf of

24  IndyMac Venture, sent Plaintiff a letter stating, among other things: "You are in default under the

25  terms of the above referenced loan." The "specific defaults" identified were: (1) "failure to complete

26  the improvements prior to the required completion date."  The action required to cure that default

27  was "completion of the improvements in compliance with section 14 of the Loan Agreement; and

28  (2) "failure to pay interest, late charges and costs as and when required under the Loan Documents."

1  The action required to cure that default was "payment of $38,307.88 as of July 1, 2009, plus any

2  additional accrued interest, late charges and costs." Additionally, the default letter states: "Due to

3  your default, lender is not obligated to, and does not intend to, provide you long term financing when

4  the improvements are complete." Nowhere do the Loan Documents provide that after an alleged

5  default, even if cured in a timely fashion, the lender may terminate the construction to permanent

6  loan unilaterally.  Furthermore, as alleged above, in November 2008, as reconfirmed repeatedly

7  thereafter, the Defendants had agreed to a modification of the Loan removing the requirement of

8  completion by the construction date and applying a new and different interest rate.

9      110)  The July 15, 2009 letter clearly initiated debt collection activities by the Lender

10  Defendants and IndyMac Mortgage.  Thereafter, said Defendants, and all who acted in concert with

11  them, or on their behalf, were required to comply with the California Rosenthal Fair Debt Collection

12  Practices Act ("RFDCPA) and the Federal Fair Debt Collection Practices Act ("FDCPA").  As

13  alleged below, said Defendants willfully, intentionally and with complete disregard for, and

14  contempt of, ignored and continue to ignore their obligations pursuant to the RFDCPA and FDCPA.

15      111)  Paragraph 14 of the Loan Agreement, referred to in the Default Letter provides:

16  "Completion. For purposes of this Agreement the Work shall be deemed completed and

17  "completion" shall be deemed to have occurred on the day the Property is ready for occupancy,

18  subject only to the completion of the usual punch list items. The property was "ready for occupancy"

19  and therefore completed on May 13, 2010.

20      112)  The Default Letter states: "If you do not fully cure the identified defaults as indicated

21  above on or before the close of business August 20, 2009, lender may accelerate payment of all

22  amounts payable under the loan and initiate foreclosure proceedings."  This was in direct

23  contradiction to the promises made by Defendants as alleged above.

24      113)  As alleged above, the Default Letter states: "Due to your default, Lender is not

25  obligated to, and does not intend to, provide you long term financing when the improvements are

26  complete."  This is in conflict with both the Loan Agreement and the earlier statements of the

27  Default Letter that the defaults could be cured, and renders the default notice void and of no effect.

28  The Defendants agreed to provide Plaintiff with long term financing.  As previously alleged,

1   Plaintiff did not have a Bridge Loan.  He had one thirty-two (32) year "Construction to Permanent

2   Loan."  Defendants had no right to unilaterally refuse to honor the Loan Agreements prior to the

3   time, even by their own admission, they were entitled to accelerate repayment of the Loan.

4           114)    Further, the Loan was not in default, either for the stated reasons, or for any other

5   reason, since the alleged defaults were caused by Defendants wrongful acts, as alleged in this

6   Complaint, and Plaintiff's performance was excused or prevented by Defendants' wrongful acts; and

7   since the request of completion by the completion date had been expressly waived in consideration

8   of Plaintiff's agreement to continue to pay interest and work to the complete the Project. The Default

9   Letter was a false, fraudulent, and illegal attempt by Defendants to extort money and other

10  concessions from Plaintiff through the threat of wrongfully foreclosing on his home.

11          115)    As alleged above, from January 1, 2009 until July 15, 2009, Jackson had represented

12  to Plaintiff on several occasions that if Plaintiff continued to make payments on the Loan, and

13  diligently complete construction, the Lender Defendants would not require the construction to be

14  completed within the Construction Phase.  Plaintiff relied upon these representations and continued

15  to make payments to Defendants, to work on the Project, and to complete it.

16          116)    Throughout the period of time when Defendants refused to make disbursements for

17  their many concocted and bogus reasons, Defendants repeatedly advised Plaintiff that NO

18  disbursements could be, or would be, made if Defendant was in default of the Loan Agreement in

19  any respect.  Since numerous draws were made after the July 15, 2009 Default Letter, the defaults

20  alleged in the July 15, 2009 Default Letter were, by Defendants' own admission, cured.  And, since

21  no subsequent Default Letter was sent to Plaintiff in accordance with the Loan Agreement, and a

22  current "Default Letter" is a condition precedent to accelerating repayment of the Loan, Defendants

23  cannot proceed with any of their remedies "in the event of a default," as provided in the Loan

24  Agreement.

25          117)    On July 24, 2009, Plaintiff wrote to Broyles: "I need at least $100k as soon as

26  possible. Please send me your most recent line item budget percentages, and please refer to my most

27  recent emails. It has been 97 days since my last request for disbursements!!!!!!" Ultimately it took

28  110 days to get any money from the bank in response to Plaintiff's disbursement requests. When he

1  did receive a disbursement, it was $86,290, which was substantially less than the line items required

2  and it took more than 6 inspections before any funds were disbursed.

3       118)   Therefore, on July 30, 2009, Jackson wrote to Plaintiff: "As discussed this morning

4  we will be able to get a draw of approximately $80,000 out to you once the interest payments have

5  been made current, separate from any late fees. Once the payments are current it will take another 48

6  to 72 hours to release your draw. Please let me know if you have any additional questions or

7  concerns." As alleged previously, the Lender Defendants had previously stated that no draws would

8  be made if the Loan was in default. Jackson repeated this statement in her telephone conversation

9  with Plaintiff on July 30, 2009, in which she stated the defaults specified in the July 15, 2009

10 Default Letter would be deemed cured if Plaintiff complied with Jackson's demands.

11      119)   On July 30, 2009, Jackson promised and agreed that if Plaintiff made 2 interest

12 payments, the Defendant Lenders would deduct 2 more payments from the interest reserve, the

13 defaults set forth in the July 15, 2009 Default Letter would be cured. Defendants would then

14 disburse $60,000 by the upcoming Friday or Monday. Plaintiff agreed and did make a payment of

15 $18,909.47 out of his LLC's account, which was sent to the Bank based on Jackson's representations

16 and agreement that any alleged defaults would be cured by this payment, and the Lender Defendants

17 withdrew two more interest payments from the Construction Funds. This among other things,

18 constituted a written and oral modification of the Loan Agreement, removing the requirement that

19 the construction be completed by January 3, 2009, and constituted full compliance with the demands

20 in the Default Letter prior to August 20, 2009.

21      120)   No other "Default Letter" or notice of default in compliance with the Loan

22 Documents has been sent to Plaintiff after July 15, 2009.  Plaintiff's failure to complete construction

23 by January 3, 2009, even if it had constituted a default, was cured on July 30, 2009; and the alleged

24 failure of Plaintiff to complete construction prior to January 3, 2009 cannot form the basis of any

25 claim by Defendants that Plaintiff is in default under the terms of the Loan Agreements.

26      121)   On October 7, 2009 at 12:04 p.m., Plaintiff wrote to Jackson advising her that the

27 total amount of draws due pursuant to the most recent inspections amounted to $81,942.

28 ///

**VERIFIED COMPLAINT**

122)    On October 7, 2009 at 1:38 p.m. Jackson responded to Plaintiff: "You owe $28,000 in back due interest on the loan. Once paid we can look at issuing a draw." Once again, at this time, Jackson knew that the failure to pay Plaintiff draws to reimburse Plaintiff for the significant, unreimbursed expenditures he had made was the reason why the interest payments had not been made.  The Defendant Lenders also knew that during the months that the construction was stalled due to Defendants' breaches of contract, and other wrongful, bad faith and illegal acts, Plaintiff received no benefit from the Loan and, therefore, Defendants were not entitled to charge interest fees or other charges.  Jackson's refusal to offset the interest payments against the draws that were due was in furtherance of Defendants' overall scheme as alleged herein.

123)    On October 14, 2009, Jackson wrote to Plaintiff: "If your loan was current today the draw that you may be eligible for would be $16,300."  However, no offer to make that draw was made, nor was the draw made.  Significantly, Jackson acknowledges that all that was required to bring Plaintiff's loan "current" was payment of the past due interest payments totaling $28,000.  No claim was made that the Loan was in default for non-payment of the full amount of the Loan in this or any other correspondence between July 30, 2009 and at least July of 2010.

124)    On October 16, 2009, Plaintiff responded to Jackson: "It is interesting to note that even when there were No interest payments due, the disbursement patterns were not much different, there were many excuses the bank was using not to disburse or to delay disbursements."

125)    On October 26, 2009, Plaintiff wrote to Jackson that 100% of the stucco had been completed, and requested a Draw of $32,000; and 100% of the cabinets had been installed and completed, and requested a Draw of $42,135. The exterior paint also was completed for which a $4,500 Draw was requested.  Adding the October 26, 2008 Draw request to the previous unpaid Draw request, $119,077 was then due for completed Budget line items.

126)    On October 30, 2009, 24 days since the last draw request, Plaintiff wrote to Jackson: "I have limited funds (that is why I obtained a construction loan), and there are a lot of expenses for the Project...you are making it very difficult if not impossible by withholding funds. I cannot sign up new contracts, and cannot order material that takes several weeks to deliver, and the contractors doing the work now are stopping due to lack of funds."

127)    On October 30, 2009, Jackson advised Plaintiff that the Defendants would not issue the Draws to which Plaintiff was entitled due to "over disbursement and overall completion of work and delinquent interest payments." At that time, the amount of the alleged "delinquent interest payments" were a fraction of what was due to Plaintiff; and, in fact, the interest claimed due was for periods of time when construction was delayed due to Defendants conduct, and therefore, not earned by or "due" to Defendants. Defendants had been told that Plaintiff was out of funds and needed the Draws to continue the construction, yet consistent with the practices which they began implementing in early 2008, Defendants would not pay Plaintiff what he was due, so he would have the funds to pay the interest Defendants were wrongfully demanding. Plaintiff, therefore, had to fund more than a hundred thousand dollars of construction from his own funds, and additionally had to raise the funds from other sources to pay the interest that never should have been due, before Defendants would make a Draw payment, further delaying construction, increasing Plaintiff's damages, and allowing Defendants to pay a portion of the Construction Draws they owed to Plaintiff from Plaintiff's own funds.

128)    On November 4, 2009, Plaintiff wrote to Jackson, making the interest payment "under protest." He stated in his email: "For the first 2 years of the Loan, the Bank always deducted the interest from the total loan amount and transferred the money into the interest account and also on the last disbursement you did deduct the interest due from the disbursements. Your refusal to disburse before you receive the interest payments separately and refusing to just deduct the interest payments from the disbursement is yet another tactic to delay disbursements which is and has been creating delays and is incurring further damages." Plaintiff is informed and believes, and thereon alleges, that Defendants were continuing to purposely withhold disbursement payments from which interest payments, including those interest payments that were claimed but were not actually due, would have been made, for the sole purpose of attempting to justify making no disbursements whatsoever.

129)    Plaintiff is informed and believes and thereon alleges that Defendants again purposely withheld Draws that were due and payable to Plaintiff and which reimbursed Plaintiff for payments he had to make from his personal funds to keep construction going, which funds Plaintiff could have

**VERIFIED COMPLAINT**

1   used to make the interest payments that were claimed due, had the costs of construction been paid

2   with the construction funds as required.

3         130)   On November 4, 2009, after further pleading for Defendants to comply with their

4   obligations, Plaintiff had advised Jackson: "I AM IN DIRE NEED OF FUNDS NOW. Please deduct

5   the interest payments and disburse the remainder and please schedule the inspection for the cabinetry

6   since they have been completely finished since the last inspection date."

7         131)   On November 4, 2009, Jackson wrote to Plaintiff stating that he was only eligible for

8   a $48,600 draw. She further states that: "If you bring in $20k we will take the remaining payments

9   from the construction funds as you have requested."

10         132)   In Plaintiff's November 4, 2009 email to Jackson, he once again added out of

11   desperation: "The bottom line is that I need funds to keep the Project going, and frankly I do not

12   trust the bank and I'm afraid that I could make the interest payments and still not receive the

13   disbursements on time. Therefore, if you are refusing to deduct the interest payments from the

14   disbursements, we would have to open a third-party escrow where I deposit the interest payments

15   and the bank deposits the disbursements into escrow and the escrow officer would have to disburse

16   the funds."

17         133)   In Jackson's November 4, 2009 email to Plaintiff, she states: "Previously we agreed

18   to take a portion of the construction funds from the loan to pay the partial interest due if you also

19   brought in partial payments." She further states: "I believe it would be helpful to deal with the

20   current situation and not re-hash the past in order to get your home to completion. The draw that you

21   are eligible is $48,600 should the payments be current. Today you owe $40,918.80. After payments

22   have been made your draw would be $7,681.20. We will agree to the following: if you bring in $20k

23   we will make the remaining payments from the construction funds as you have requested. You

24   would need to advise us as to which line items you would like the monies taken from. For future

25   draws I would like to send out a separate inspector to advise the bank of the estimated cost to

26   complete for your home to insure that there are enough funds in the budget. **Should this come back**

27   **and show what we believe to be true, that you have more than enough funds to complete we**

28   ///

1   would discuss moving funds into the interest reserve account so we don't continue to have

2   these issues." [emphasis added.]

3       134)   Jackson's statement regarding not "**rehashing**" the past is further written

4   confirmation that the parties had agreed, and Jackson had promised and represented, that any "past"

5   defaults had been cured. Jackson's November 4, 2009 email confirmed her oral agreement with

6   Plaintiff, that Plaintiff would be deemed in full compliance with his obligations under the Loan

7   Agreements and all defaults would be deemed cured if payments were made as outlined in Jackson's

8   email. Hence, once again Defendants had agreed the July 15, 2009 Default Letter was no longer of

9   any force or effect.

10      135)   As clearly reflected above, all the while claiming that disbursements could not be

11  made because the Project was over-disbursed, the Lender Defendants "believed" that in fact there

12  was more than enough money remaining to complete the Project, and therefore, the Lender

13  Defendants knew the Loan was not "over-disbursed," and that there was no legitimate reason to hold

14  back draws.

15      136)   Prior to November 5, 2009, the Bank's inspector verified that the cabinets were 100%

16  complete. However, 5 doors were later removed and then reinstalled after they were taken to be re-

17  sprayed with varnish. Defendants notwithstanding their own inspectors' findings took the position

18  that the cabinetry work was only 60% complete when the doors were removed. The Bank's position

19  that the interior cabinetry, with a total budgeted price of $86,135, was now only 60% complete

20  because 5 doors had been taken off to be re-varnished, is indicative of the Bank's pattern of blatant

21  bad faith and dishonest practices.

22      137)   On November 6, 2009, Jackson wrote to Plaintiff advising him that he was eligible

23  for a $86,081 draw. Nonetheless, the Bank was still conditioning making that draw, or any portion

24  of it, on payment of $20,000 "to assist with the late interest payments in order to release the draw."

25  Jackson further stated: "As our estimated cost to complete isn't done we are unable to take the full

26  balance of the payments from the construction funds." There is no provision in the Loan Agreement

27  that permits the Lender Defendants to delay payment of Draws for this reason.

28  ///

1     138)   On November 13, 2009, Plaintiff wrote to Jackson advising her that: "I am not asking

2  the bank to deduct interest payments for the work that yet remains to be done. If that was the case,

3  then I would understand that you would have to wait for your estimated costs to complete report.

4  Again I must state that I am in dire need of funds and it is now close to 3 months since my last

5  draw." As previously alleged, the previous draw had taken 110 days.

6     139)   Jackson wrote to Plaintiff on November 20, 2009, confirming what she "believed"

7  would be the case was, in fact, the case. "We have received our costs to complete back and have

8  validated the remaining loan funds are adequate to complete the Project, however, there is no excess

9  funds to contribute toward interest payments." Jackson makes no effort to support such statement.

10  She further states that a lien for $32,632 had been filed by Ehmche.

11     140)   On November 23, 2009, Plaintiff responds: "I have not had any draws in the past 5

12  months [pursuant to the Loan Agreements, it should not have taken 5 _months_ to make a draw], are

13  you surprised that there is a lien on the Project? The lien is directly associated with the construction.

14  Ehmche is one of the subcontractors on the job and has filed a [$32,632] lien for non-payment.

15  Please disburse funds today."

16     141)   Two requests for draws had taken over 110 days to disburse and were then

17  substantially less than the line items for which disbursement should have been made; a draw request

18  was made on October 7, 2009, for $81,940 which was still outstanding after almost a month; and a

19  draw request was made on October 26, 2009, for $37,135 was also outstanding, for a total due of

20  $119,077. Each of the items for which draw requests were made were complete, as was documented

21  by the Bank's inspectors. However, no funds were disbursed until December 23, 2009, 77 days after

22  first requested, and then, only in an amount of $62,395.  Furthermore, in order to receive the

23  $62,395, Plaintiff was required to pay $25,605 in interest accrued during the period of time he was

24  unable to move the Project forward because funds were being withheld wrongfully by the Lender

25  Defendants.  Another $40,000 was deducted from disbursements and applied toward interest.

26  Consequently, the net proceeds for draw requests for $119,077 in completed work, was $36,790; and

27  that was paid more than a month late and, in essence, primarily with Plaintiff's own funds.

28  ///

Exhibit A, page 62
**VERIFIED COMPLAINT**

1    142)    There was, therefore, a period of 187 days, or over six months, in which only one (1)

2    Draw payment was made:  This occurred in spite of the requirement that Draws be paid within 72 –

3    96 hours.

4    143)    When the December 23, 2009 Draw was made conditioned upon Plaintiff making

5    interest payments, and after the Bank deducted more interest payments from the Loan proceeds, the

6    Lender Defendants again acknowledged that the Loan was current, and not in default for any reason.

7    On January 4, 2010, plaintiff made another draw request for completion of the HVAC.  The next

8    Draw request was made on January 7, 2010, for completion of a glass railing. Both the HVAC and

9    railing were inspected and found to be complete by the Bank's inspector.

10    144)    On January 15, 2010, a disbursement of only $9,800, well below the amount due, was

11    made.  The stated reasons for the limited disbursement was that the finished HVAC funds could not

12    be disbursed until condensers were installed, even though the HVAC had never been a line item, and

13    condensers had never been planned to be installed.  The plans submitted and approved before

14    funding the Loan govern what must be installed pursuant to the Loan Agreement.  The Bank further

15    stated that since there was no line item for the glass railing, funds had to be come out of another line

16    item.

17    145)    As pointed out by Plaintiff to Jackson in an email dated January 19, 2010, $43,000

18    remained in the cabinetry line item, and had remained since October when the cabinets were

19    complete.  Additionally, $23,607 remained in the interior painting line item that was completed.  The

20    only basis given by the bank for failing to make these further disbursements was, again, that the

21    overall Project completion was less than the overall disbursements.  No other defaults were claimed

22    by Defendants.

23    146)    On January 20, 2010, Jackson advised Plaintiff that no draws would be made until the

24    January payment of interest was made.  At this time, payment of significantly more than the amount

25    of the January payment was due Plaintiff.

26    147)    Jackson's January 20, 2010, email further states: "We are more than happy to move

27    funds around but you didn't include any figures to tell us what you need moved."  This was false,

28    and further evidence of the Bank's absurd efforts to delay completion, collect interest, force a

1  default, and ultimately seek to either force Plaintiff to modify the Loan in a manner favorable to the
2  Bank, or to foreclose on Plaintiff's Property.  Jackson concludes her January 20, 2010 email: "At
3  this point you are disbursed to your percentage complete and no additional draws can go out until the
4  overall project is more complete. Please let me know when you will need an inspection." As of that
5  date, the Lender Defendants still had never responded with any meaningful explanation regarding
6  the errors Plaintiff had been bringing to their attention for almost two years, regarding the
7  calculation, or the methodology behind the calculation, of the percentage of work completed and
8  funds disbursed.  Furthermore, at this time, by their own admission, the Lender Defendants knew
9  there was more than enough money in the Construction Fund to complete the Project.

10      148)  On January 20, 2010, Plaintiff wrote to Jackson: "Can you please explain, how the
11  pool line item went backwards from 90% to 80%, after having been at 90% since 11/18/08, and
12  having substantial work done on it since then???? And also, how did line item 821 hardscape,
13  driveway go from 85% to 40% again in spite of more work done on that line item???" On May 18,
14  2009, the Lender Defendants had refused to pay Plaintiff 100% of the Budget for hardscape,
15  claiming that it was only 80% complete because of a "small driveway." Amazingly, Jackson's only
16  response to Plaintiff's inquiry as to why the Defendants had unilaterally decided the "small
17  driveway" now constituted not 20% of the total hardscape, but 60%, made by email dated January
18  21, 2010, was: "The inspection company was changed and they have determined the last inspection
19  completion percentage."

20      149)  Plaintiff responded on January 24, 2010, stating: "I already made the January
21  payment!" He further states: "Would you please let me know what criteria the inspection company
22  uses? Don't they all work off of the same criteria? Doesn't the Bank give them the criteria? How
23  could the two companies come up with such a big difference? Is this a subjective process???"

24      150)  Broyles responded on January 25, 2010: "The reason your pool line item is
25  considered 80% complete is that the plaster and equipment still remains. The reason line item 821 is
26  40% is the driveway [which was previously referred to as a "small driveway," that the Defendants'
27  own inspector had determined was only 20% of the total hardscape] still remains. When did you
28  make the January payment as it has not been posted to your account?"

Exhibit A, page 64
**VERIFIED COMPLAINT**

1       151)    Plaintiff responded on January 25, 2010: "Payment was made on Thursday! If that is

2 the criteria, the cost of equipment and plaster is under 10%. Also the cost of the driveway is under

3 20%. What I don't understand is that you were well aware of this over 14 months ago, why did the

4 percentages change? What criteria was used by the different inspection companies and who gives

5 them the criteria??" Of course no meaningful response was ever given – because there was no good

6 faith explanation.

7       152)    On January 25, 2010, Broyles responds: "How did you make the payment, because

8 we have not received it." She further states: "The inspection percentages <u>are not based on costs</u>.

9 [Again, flip-flopping on how percentages are determined]  We change our inspection companies to

10 insure that our loans are not over or under estimated on the inspections, this was done on all of our

11 loans. I have requested that the quality control department re-review the most recent inspection and

12 based on the work that remains they feel the percent complete that was rendered is accurate. I would

13 recommend that when you want another inspection, that you personally meet and walk the site with

14 the inspector, so he is fully aware of the scope of your Project."  In fact, Plaintiff had routinely

15 personally met with and walked the site with the inspectors, since he was acting as an owner-builder

16 and general contractor and was on site almost every day, which the Bank's representatives would

17 have known had they paid any attention whatsoever to his previous emails.

18       153)    Broyles' January 25, 2010 statement: "The inspection percentages are not based on

19 cost" like Broyles' statement in her email to Plaintiff on May 15, 2009, where she stated: "Your

20 percentage complete is derived off the line item costs in relation to the total hard cost budget of

21 $2,063,800.96," was a statement not only contrary to the Loan Agreement, but patently absurd and

22 inconsistent in its face with prior statements.  In fact, the "hard cost" budget was $1,773,487.00, not

23 $2,063,800.96. The $2,177,245 number included $22,973 in soft costs, $292,111 in interest reserve

24 accounts and $88,674 in contingency accounts. Therefore, if, using the Defendants' analysis, even if

25 all of the Budget line items identified were completed at the budget cost of $1,773,487, and the

26 Project was therefore 100% complete, the Project would be deemed by the Defendants to be only

27 81.45% complete; the total of the line item costs $1,773,487.00, divided by $2,063,800.96.

28 ///

Exhibit A, page 65

154) On February 12, 2010, Plaintiff wrote Jackson stating: "The granite for the kitchen area which is 80% of the total granite is completed. I need to draw funds. The garage doors are also completed. Please send your inspector to verify. If there is no line item for the garage, we need to make one."

155) Jackson responded later on February 12, 2010: "If you are looking to get credit for the garage doors we will need to create a line item prior to the inspector going out. Please let me know how much money and from which line item you would like to create the garage door line. Also, your February payment will need to be paid before a draw can go out."

156) On February 15, 2010, Plaintiff responded: "I need the following amounts for the following items:

| Garage Doors | $16,000 |
| Front Entry Door | $17,585 |
| Recessed Base Board | $ 7,000 |
| Total | $40,585 |

I authorize to take this amount from the remaining available funds in the following Line items.

| 707 | Finish Hardware | $20,920 |
| 818 | Mirrors | $ 5,794 |
| 821 | Hardscape | $ 7,500 |
| 822 | Landscaping | $ 6,371 |
| | Total | $40,585 |

The garage doors are complete. The front door is complete. The recessed base board is also complete. The granite countertops are 90% complete."

157) On February 22, 2010, Broyles writes Plaintiff stating: "We made the line item changes as you requested and re-inspected the home. Based on the new inspection your home is 90.5% complete and you are eligible for a $60,500 draw. In order for us to process the draw, please make you [sic] 2/1 interest payment." Later that same day, February 22, 2010, Broyles writes Plaintiff: "I have submitted your request for $60,500, below is the breakdown, please confirm you are okay with the draw." Once again, this correspondence reflects written confirmation by Lender Defendants that the Loan was not in default, since as the Lender Defendants stated many times, no Construction Draw would be made if there were any defaults then existing.

158)   On March 19, 2010, Broyles, on behalf of IndyMac Mortgage Services, advised Plaintiff that IndyMac Mortgage had established a modification program for existing construction loans and that Plaintiff may be eligible.  The letter states that if Plaintiff is interested in pursuing a modification or has any questions, he should contact the undersigned within 30 days.

159)   On March 25, 2010, Plaintiff emailed Broyles advising that he was interested in the program, and stated: "After all, I have been promised by Jackson and have been looking forward to a Modification for more than a year now.  In fact it has been the hope of modification that has made me persevere in this construction project after the countless difficulties that I have been facing and that you are familiar with."  As alleged previously, the "modification" that Plaintiff was promised would be provided was written confirmation of the new permanent loan commencement date, and the applicable interest rate, consistent with the agreement pursuant to which the parties had operated since November of 2008.

160)   On March 25, 2010, Plaintiff also wrote Jackson and Broyles stating:  "On Monday, March 22, 2010, your inspector inspected the project.  He verified that the cabinets are 100% completed.  The countertops are 95% completed, and the Hardscape is 85% completed.  Since then we have all the light fixtures installed also. . . .I am also requesting that the percent completion for the pool which was at 90% for more than a year and was brought down to 80%, to be adjusted to 90% again, since the pool coping is now completed.  Further I would like to bring to your attention that this pool is not an ordinary pool in terms of normal expenses.  This pool was constructed on 10 caissons, each one as deep as 30-40 feet and 2 feet in diameter and if this expense is taken under consideration, the conclusion would be that the pool is well completed beyond 90%."  Plaintiff then requested disbursements of $135,163.00.  Plaintiff adds:  "Please wire funds as soon as possible, since we are now getting some momentum to finish the project and have several sub contractors that have billed for their completed work."

161)   On March 26, 2010, Broyles wrote Plaintiff indicating that no draw would be made until the March, 2010 interest payment was made and claiming that Plaintiff "was not entitled to draw for the cabinets or countertops because funds were drawn from other line items."

///

162) As noted above, Defendant Lenders knew at this time that the total funds remaining were more than sufficient to finish the Project. The Loan Documents do not allow for Lender Defendants to refuse to make a draw if there are sufficient funds to complete the Project, and funds remain in the completed line items in the Budget for which Draws are requested. Broyles also states that the Lender Defendants refused to adjust the percentage complete of the pool because the pool is missing "sealings, plaster and equipment." As noted earlier, the Lender Defendants were advised by Plaintiff that the cost of the plaster and equipment was substantially less than 10% of the entire cost of the pool which was well in excess of $200,000. Defendants never contested that, nor responded in any way.

163) On April 29, 2010, Plaintiff wrote Broyles: "DRAW REQUEST!! PLEASE REFER TO EMAIL ON MARCH 25TH. THERE ARE MANY MORE ITEMS THAT ARE ALSO COMPLETE SINCE THEN. THE INSPECTOR IS COMING TOMORROW PER YOUR REQUEST. PLEASE INSTRUCT HIM TO GIVE YOU INFORMATION FOR AN IMMEDIATE DRAW. FUNDS ARE LONG OVERDUE. CONTRACTOR DEMANDING PAYMENTS. DELAYS ARE BEING CAUSED! TIME IS OF THE ESSENCE."

164) Notwithstanding Plaintiffs' pleas for additional draws as were due, Broyles responded on April 29, 2010: "I have received the inspection back and you are now 92.186% complete and eligible for a draw in the amount of $34,589, however in order for this draw to be processed, you will need to make your 3/1 and 4/1 interest payments. Please advise once you have made the payment and I will request the draw for you." Once again, as had been the case at this point for 2 years, or more, the Lender Defendants continued to insist upon interest being paid for months during which the Project was stalled because of their arbitrary and wrongful refusal to pay Draws based upon pretense and concocted excuses. Furthermore, as now had been the case, with but a couple of exceptions, for over a year, the Defendant Lenders were refusing to offset the amount of interest they claimed due from Plaintiff against the Draws which they conceded were due to Plaintiff, thereby forcing plaintiff to raise the interest from other sources, causing increased delay, more unfair interest charges, and additional damages.

///

165) On April 29, 2010, Plaintiff responded to Broyles "This means that I would net approximately $14,000. There has been a lot more progress than 82.186%. We need to discuss this. I need more funds. The draw needs to reflect the progress." As had virtually always been the case, notwithstanding that this communication constituted a "qualifying written request," pursuant to RESPA, it was ignored entirely.

166) On April 29, 2010, Plaintiff wrote an additional email to Broyles identifying line items which needed to be changed in order to create a line item for stairwell finish wood working which was 50% complete. He also noted that, "category number # 602 has been completed for the past 4 months, and I have forgotten to bring it to the inspector's attention. 100 [%] complete. Also, please note that the cabinetry has been completed for the past six months and I have not been reimbursed. Also line item 108 is 95% complete, but has not been released. After these items are addressed, I will make the two payments."

167) Plaintiff absolutely was entitled to demand the Draws that had been long since past due. Yet, consistent with the Lender Defendants' practice, they refused to make the Draws, which amounted to many times the amount of the allegedly past due interest payments, until the interest payments were made. There was no contractual basis to do this, and to take this position was in blatant bad faith and in violation of the implied covenant of good faith and fair dealing in the Loan Agreements. Furthermore, Plaintiff is informed and believes and thereon alleges, that this position was taken with fraudulent and wrongful intent, and consistent with the Defendants' scheme and criminal enterprise, as alleged herein.

168) On May 17, 2010, plaintiff wrote to Jackson and Broyles and informed them as of May 13, 2010, he had received approval to occupy the Subject Residence from the City of San Diego. He adds, "this should further demonstrate what I have repeatedly brought to your attention that mainly your calculations for percent complete are not accurate and are not based on the real facts in the field. You are using these calculations to withhold raising funds and therefore inflicting more damages and delay to this project. As I have stated many times in the previous emails, many line items are complete but are not funded and may need to be changed. Attached please find a copy of the inspection report by the city inspector. I will make payments when we come to an agreement

Exhibit A, page 69
**VERIFIED COMPLAINT**

1  that you will be releasing funds so that I don't have to pay the contractors out of pocket further like I

2  have been for so long because of lack of disbursements.  The project is completed and approved to

3  be occupied.  I need the loan to be finalized. Please cooperate with me!" As of May 17, 2010, all

4  funds remaining in the Construction Fund should have been disbursed to Plaintiff at that time.

5      169)  On May 17, 2010, Jackson responded to Plaintiff: "The city has different

6  requirements in which an approval to occupy is granted."  This is not supported by the Loan

7  Agreement, nor by other correspondence from Jackson, but rather yet another blatant breach of the

8  Loan Agreement, in furtherance of Defendants' scheme and criminal enterprise.  Then, in a display

9  of amazing indifference to the truth, Jackson writes: "We have always worked with you to change

10  items, in addition to the percent complete, and will continue to do so, as needed and deemed

11  appropriate. . . .Please advise when you will be sending in the past due interest payments, as you

12  currently owe for March, April and May."  Once again, the Lender Defendants absolutely refuse to

13  comply with the requirements of RESPA, the contractual agreements, their duty of implied good

14  faith and fair dealing, or any standard of decency.

15      170)  On May 24, 2010, Plaintiff again wrote to Broyles, "It has now been 60 days since I

16  have requested funds for draw # 7 and there has been no disbursements."  Plaintiff then notes that

17  category 602 had been completed for 4 months and was not paid; the cabinetry that had been

18  completed for 8 months had not been reimbursed; item number 801 was 95% complete but had not

19  been released; the fence was 100% complete, and was inspected and approved on May 16, 2010; the

20  finished plumbing was 75% complete, as was the plumbing fixtures; glass fence was 100% complete

21  at a cost of $37,000, and not yet credited to any line item by an inspector. Plaintiff adds: "Since the

22  last inspection on May 16th, THE FOLLOWING HAVE ALSO BEEN COMPLETED. The pool

23  equipment, plumbing and electrical are finished.  Please send your inspector.  This should bring the

24  pool completion which was already at 90% since a year ago and was arbitrarily reduced to 80%,

25  should now be at 95%. The iron posts for the front railings. Cost $15,000. FURTHER DELAYS IN

26  DISBURSEMENTS WILL CAUSE FURTHER DAMAGES. SINCE OCCUPANCY PERMIT

27  WAS GRANTED BY THE CITY OF SAN DIEGO, I DEMAND THAT THE LOAN BE FULLY

28  ///

1  FUNDED AND TURN INTO PERMANENT FINANCING!  After these items are addressed, I will

2  make the three payments."

### FALSE PROMISES REGARDING CONFIRMATION OF

### THE TERMS OF PLAINTIFF'S LOAN

5  171)  From and after January 1, 2009 until July 29, 2010, the Lender Defendants, on

6  numerous occasions, through their agents, servants and employees, including but not limited to,

7  Jackson, represented to Plaintiff that the Lender Defendants were in the process of adopting new

8  policies and procedures regarding loan modifications, and that if Plaintiff would continue to expend

9  his personal financial resources, time and effort to complete the Project, and thereby enhance the

10  security for the Loan, the Lender Defendants would reconfirm the essential terms of Plaintiff's

11  Permanent Loan, and specify a new commitment date for the Permanent Phase of the Loan, and an

12  interest rate consistent with the oral modification of the Loan made in November of 2008, as

13  confirmed in writing by written statements and correspondence thereafter.

14  172)  Said representations were made with the intent to induce Plaintiff to continue to

15  expend significant personal funds, time and energy to complete construction of the Project so as to

16  enhance Defendants' security for the Loan, to continue to pay interest, fees and other charges

17  assessed by the Lender Defendants, and to prevent Plaintiff from either discontinuing work on the

18  Project or discontinuing funding the Project with personal funds at times when the Loan proceeds

19  were not being disbursed, and to prevent Plaintiff from filing suit against Defendants for

20  Defendants' numerous breaches of contract and other wrongful and illegal acts as alleged herein.

21  173)  Plaintiff reasonably relied upon these representations and, as intended by Defendants,

22  did in fact continue to spend significant personal funds, time and energy, did continue working to

23  complete the Project, did continue to pay interest, fees and other charges assessed by the Lender

24  Defendants, did defer and delay filing any lawsuit against Defendants, and has enhanced

25  Defendants' security.

26  174)  On July 29, 2010, after obtaining the benefit of Plaintiff's full performance of his

27  obligations, the Lender Defendants sent Plaintiff what was represented would be a Loan

28  Modification Agreement confirming the terms of Plaintiff's Construction to Permanent Loan.  In

1   fact, the Agreement Plaintiff received was an Agreement by Defendants to forbear suing Plaintiff for

2   the alleged breach of his "construction loan." As alleged above, Plaintiff's Loan was **never** a

3   Construction Loan. It was a thirty two (32) year Construction to Permanent Loan, yet pursuant to

4   the terms of the Forbearance Agreement, Defendants demanded that Plaintiff agree that they and

5   Plaintiff were parties to that certain Residential Loan Construction Agreement, dated January 3,

6   2007. The Lender Defendants agreed not to foreclose on Plaintiff's loan if Plaintiff paid all interest

7   and fees claimed due, and completed the Project by October 29, 2010. If Plaintiff did so, the Lender

8   Defendants agreed to provide Plaintiff with extended financing for a 3 year term at an unspecified

9   rate of interest, all due at the end of the 3 year term. The lack of detail regarding the terms of such

10  new 3 year financing demonstrates the illusory nature of Defendants' offer. Plaintiff if informed and

11  believes that Defendants in truth and fact simply wanted Plaintiff to agree he was in default, when

12  they knew he was not.

13        175)   Defendants' unilateral refusal to recognize Defendants' Loan as a Permanent Loan

14  with a term of thirty-two (32) years, and their persistent and wrongful efforts to force Plaintiff to

15  essentially convert his Loan to a short term Bridge Loan was motivated by greed and without any

16  factual or legal basis. As alleged above, Plaintiff's Loan was a thirty-two (32) year "construction to

17  permanent" Loan. The due date of the Loan could be accelerated only if Plaintiff defaulted on the

18  Loan and Defendants did everything that was required of them pursuant to the Loan Agreements in

19  order to accelerate the Loan in the event of default.

20        176)   As alleged herein, Plaintiff was not, and is not, in default either for non-payment of

21  interest or for failure to complete the construction during the Construction Phase. Furthermore,

22  before Defendants can accelerate the payment of the Loan, they must provide Plaintiff with the

23  notice of the alleged defaults and an opportunity to cure, as required by the Loan Documents. The

24  only Default Letter was sent to Plaintiff on July 15, 2009. Thereafter, by written and oral agreement

25  on or about July 30, 2009, and on several occasions thereafter, as alleged above, the Lender

26  Defendants agreed that if Plaintiff would make interest payments demanded by the Lender

27  Defendants, the Lender Defendants would deduct additional interest payments then claimed due

28  ///

1 │ from the Loan Funds, and any alleged defaults would be deemed cured and the Draws requested by

2 │ Plaintiff would be made.

3 │      177)   For example, on July 30, 2009, when Plaintiff made the requested interest payment of

4 │ $18,909.47, and the Lender Defendants deducted two additional interest payments for the Loan

5 │ reserve, and the Lender Defendants made the Draw, any and all defaults listed in the July 15, 2009

6 │ Default Letter were cured.   Thereafter, Lender Defendants could not again seek to accelerate

7 │ repayment of the loan unless and until a new "Default Letter" was sent in compliance with the Loan

8 │ Agreement providing Plaintiff with notice of the alleged default(s), any requirements necessary to

9 │ cure them, and specification of the date, at least thirty (30) days later, when they must be cured.

10 │ This was never done.

11 │      178)   On August 2, 2010, Plaintiff wrote to Jackson advising her that interior doors, the

12 │ driveway, and the interior and exterior cladding of the stairwell at a cost of $38,000 had been

13 │ completed. Plaintiff requested an inspector for immediate funding, "whereas I have several

14 │ contractors that are demanding payment."

15 │      179)   Jackson responded on August 2 that the inspection had been ordered.  On August 3

16 │ plaintiff advised Jackson that he had not received a call from the inspector.  That day, August 3,

17 │ Jackson responded, "they will call you."

18 │      180)   On August 5, 2010, Plaintiff advised Jackson, "It has now been 4 days since I have

19 │ requested funds and notified you that some major line items are complete and still there is no sign of

20 │ your inspector nor any disbursements. As I have communicated to you several times, lack of funds

21 │ and delays in disbursements continue to cause more damages and unnecessary headaches for me and

22 │ all the contractors.  When the contractors do not get paid, they tell other contractors that there is no

23 │ money in this Project and therefore everyone takes off to other jobs.  By the time they get paid and

24 │ convinced to come back it could be several weeks if not months.

25 │      181)   On August 6, 2010, Jackson responded to Plaintiff's request and stated: "The

26 │ inspector should be calling you today.  You are also 1 month DQ on interest payments.  As you are

27 │ aware we are unable to disburse funds with DQ interest. The delay is not with the Bank."

28 │ ///

182)   In an August 10, 2010 email, Plaintiff further stated: ". . . The excuses for the delays are also well established:  If the payments are late, that is the excuse, if the payments are not late, then a number of other excuses are presented. . . . According to the terms of the Construction Loan Documents, the Draws should be funded in 48 hours, meaning the funds should be in my account in 48 hours, however, instead of 48 hours, it has been taking up to 80 days [actually, as much as 110 days].  That is not acceptable by any standard, especially when it happens draw after draw. . . . On this draw alone, it has taken 5 days for the inspector to just show up at the Property.  And of course by the time you approve the draw, I will owe in interest payments probably more than what the draws will be.  Under these terms, I am not sure to call this a construction loan.  The interest payments which I have been making under protest, have been late because the Draws are substantially late, and I need the funds to keep the Project moving along as I have been under a lot of stress and damages caused directly by the Banks actions.   Please release the funds, whereas further delay will lead to more damages and costs."

183)   Jackson then responded to Plaintiff in a cold and indifferent email dated August 10, 2010: "I'm sorry that you feel that way.  It is not the intention of the Bank to make you feel that way.  Based on the last inspection you are eligible for a $21,669 draw.  Please advise how you would like to proceed."

184)   On August 10, 2010, Plaintiff writes Jackson: "I have had to make several substantial partial payments for the work that is already done, and I also just paid over $21,000 for the appliances which will be delivered on Thursday.  I would appreciate it if you wire me the funds today."

185)   Jackson responded on August 10, 2010:  "I unable (sic) to wire the funds until the interest is brought current."

186)   On August 10, 2010, Plaintiff responds to Jackson:  "According to your calculations, how much interest is owed at this time?"  Jackson responded that same day: "The July payment is $10,200.20.  The August payment is $10,376.43.  Do you also have an unpaid insurance policy?  We currently have forced placed insurance on your home; however, I would like to reverse those charges and can only do so with a current policy."

187)   On August 11, 2010, Plaintiff advised Jackson: "I have my entire financial life at stake here."

188)   In response, by email dated August 12, 2010, Jackson writes Plaintiff: "If the project is 99% or more complete, the interest is current and I'm in receipt of an updated insurance policy we can disburse the remaining funds in the budget to you." At that time, substantially more funds than were claimed in interest remained in the construction account, and should have been disbursed once the Project was deemed certified for occupancy.

189)   On August 16, 2010, Plaintiff writes Jackson: "All appliances are now installed. I am calling this DRAW #10. Hopefully according to your last email, this will be the last request for funds. Please send your inspector. If your insurance department has not received the proof for insurance from my agent, please let me know and I will send you a copy."

190)   Jackson responds on August 17, 2010: "Your inspection has been ordered. We don't have an insurance department so I will need a copy of the policy. Can you please forward me the Certificate of Occupancy on the home again [recall that in May of 2010, Jackson took the position with Plaintiff in order to avoid distribution of the full balance remaining of the Loan proceeds that the Lender Defendants' criteria for "completion" was not the same as the city's]. Additionally, a lien from Ehmcke Sheet Metal $20,633 has showed up on the title. I will need a recorded lien release for this as well."

191)   On August 18, 2010, Plaintiff wrote Jackson: "Here is proof of insurance! The inspector showed up yesterday! In regards to certificate of Occupancy, according to the City of San Diego, there is no such document. The only document is the inspectors signature on the inspection card which I have forwarded to you 94 days ago. Please let me know when I can expect the loan to be fully funded and when I can expect the funds."

192)   Jackson responds on August 18, 2010: "I look forward to seeing the % complete. Please advise on the status of the mechanic lien that was filed. When will the Bank receive the recorded lien release." The Lender Defendants continued, and have continued to this day, to refuse to release the remaining Loan proceeds.

///

**VERIFIED COMPLAINT**

Exhibit A, page 75

193)   On August 18, 2010, Plaintiff responds to Jackson: "If the Bank insists on getting the lien removed before funds are released, it is a FURTHER evidence that this scenario is intentionally practiced by the Bank which I have alluded to several times: The bank does not release funds or disbursements are delayed, this causes damages in the form of contractors abandoning the job, and filing a lien on the property, the bank then uses the excuse of the lien so they further delay funds, meanwhile interest is accruing, which the bank insists on receiving before funds are released, and after the interest builds up then the bank turns around and disburses those funds.   This way the borrower is virtually financing the project. This has become so obvious, and I am sure it is unethical and an illegal practice.

. . . .

You promised last week, that you will fully disburse the loan after the appliances are installed.   Not only have the appliances been installed but a lot of other work has also been completed since then.  Please keep you promise."

194)   Jackson responds on August 19, 2010, contesting the percentage of completion without providing any factual support as required by RESPA, demanding again that the lien be removed before Draws were paid, and demanding the interest be brought current.

## THE LENDER DEFENDANTS AND T.D. SERVICE INITIATE A
## WRONGFUL AND FRAUDULENT FORECLOSURE

195)   After receiving IndyMac Venture's July 29, 2010 Forbearance Agreement, Plaintiff called Jackson and told her that the Forbearance Agreement did not comply with her repeated promises that the Lender Defendants would confirm the essential terms of his thirty two (32) year Loan as had been agreed upon since November 2009, if he made the demanded payments and continued to complete the Project. Jackson advised Plaintiff that the Lender Defendants' offer in the July 29, 2010 letter was "take it or leave it."

196)   When Plaintiff would not yield to the pressure, threats and extortion exerted upon him as part of the Defendants' scheme, and ongoing criminal enterprise, the Lender Defendants through T.D. Service, purportedly acting as Substitute Trustee, and/or the agent for the Lender Defendants, recorded a NOD on September 29, 2010.

61

Exhibit A, page 76

**VERIFIED COMPLAINT**

197)   The basis stated in the NOD for foreclosure is "you are behind in your payments." The NOD further provides that: "You may have the right to bring your account in good standing by paying all of your past due payments . . ." As alleged above, on <u>numerous occasions</u>, since July 15, 2009, Plaintiff was current on all payments due as represented and agreed by the Lender Defendants. Furthermore, failure to complete construction during the Construction Phase was waived, and/or the Loan Agreements were modified and amended after July 15, 2009, by the fully executed written and oral agreement of the parties to eliminate the requirement that the construction be complete by January 3, 2009, in return for Plaintiff's performance of the terms of the agreed upon modification.

198)   In the NOD and the accompanying "Debt Validation Notice," the Lender Defendants claim that the NOD relates to a debt owed to IndyMac Venture, LLC.  However, Defendants offered no documentation or other records to establish that the Note and/or Deed of Trust have been assigned for the benefit of IndyMac Venture, and there is no recorded document  in the San Diego County Recorder's Office that supports the Lender Defendants' claim, as is required by the Loan Documents, and California Civil Code section 2932.5

## DEFENDANTS LACK STANDING TO CONDUCT A NON-JUDICIAL FORECLOSURE PURSUANT TO CALIFORNIA CIVIL CODE 2932.5 AND OTHER APLICABLE LAW

199)   The Lender Defendants have no standing to proceed with a non-judicial foreclosure. They are strangers to this transaction, without authority to go forward with the foreclosure and Trustee's Sale.

200)   The Loan Agreements name IndyMac Bank as the Lender and Union Title Company, as Trustee under the Deed of Trust.  Absent a valid and enforceable recordable assignment of the Note and Substitution of Trustee, these parties are the only parties entitled to enforce the Note and exercise the Power of Sale in the Deed of Trust.

201)   The Lender Defendants and T.D. Service are not identified anywhere in the Note or Deed of Trust, or in any document recorded with the San Diego County Recorder's office regarding the Subject Property.

///

202)   California Civil Code section 2932.5 governs the Power of Sale under an assigned mortgage, and provides that the Power of Sale can only vest in a person entitled to money payments; "Where a power to sell real property is given to a mortgagee, or other encumbrancer, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The Power of Sale may be exercised by the assignee of **if the assignment is duly acknowledged and recorded.**" [Emphasis added.]

203)   The San Diego County Recorder's Office does not contain any evidence of a "duly acknowledged and recorded" assignment of the Note or Deed of Trust from IndyMac Bank to the Lender Defendants, on any Substitution of Trustee, substituting T.D. Service, or any other person or entity, in the place of Union Title Company.

204)   The Power of Sale may not be exercised by any of the Lender Defendants since there was never an acknowledged and recorded assignment pursuant to California Civil Code section 2932.5.

## DEFENDANTS DID NOT COMPLY WITH CALIFORNIA CIVIL CODE SECTION 2923.5 WHICH RENDERS THE NOTICE OF DEFAULT VOID AND OF NO EFFECT

205)   Plaintiff is informed and believes, and thereon alleges, that the Lender Defendants, in furtherance of their scheme and criminal enterprise, filed the NOD, like other similar NOD's in complete disregard for the requirements of Civil Code Section 2923.5, and falsely and fraudulently alleged compliance with the intention to defraud Plaintiff, and others similarly situated to Plaintiff, in order to obtain money and/or property from Plaintiff in violation of the civil and criminal laws of the State of California, and the United States of America, as alleged throughout this Complaint.

## DEFENDANTS IGNORE PLAINTIFF'S NOTICE OF DISPUTED DEBT

206)   T.D. Service's Debt Validation Notice states, "you may dispute the validity of this debt, or any portion thereof, by contacting our office within thirty (30) days after receiving this notice. In that event, we will obtain and mail to you written verification of the debt." In response to the Debt Validation Notice and Notice of Default, Plaintiff, through his attorneys, wrote the Lender

///

Defendants a letter dated October 22, 2010, and hence within thirty (30) days of the NOD, in which he disputes the debt and states the following as his reasons:

    a) The Beneficiary, and/or its successors, assigns and/or agents, have breached numerous provisions of the relevant Loan Documents, by, among other things, failing to timely disburse construction funds and concocting a seemingly endless series of unmeritorious excuses for not doing so, altering and/or disregarding inspection findings as to the status of completion of the construction, adopting and/or changing policies and/or methodology for determining the status of completion of the construction in order to withhold timely payment, charging interest and fees that were not due, or which were based on the passage of time or other events which were caused entirely by the wrongful acts and omissions of the beneficiary, and/or its successors, assigns and/or agents, and claiming the Loan Documents constituted essentially a "bridge loan" and "construction loan," and not a "permanent loan" as clearly was the case, thereby excusing Trustor from further performance, and preventing default;

    b) The Beneficiary, and/or its successors, assigns and/or agents, anticipatorily breached numerous provisions of the relevant Loan Documents, by, among other things, advising Trustor that they would not honor the "permanent loan" agreed to in the "construction to permanent loan" reflected in the Loan Documents thereby excusing Trustor from further performance, and preventing default;

    c) The Beneficiary, and/or its successors, assigns and/or agents, have tortiously breached the implied covenant of good faith and fair dealing in the Loan Documents thereby excusing Trustor from further performance, and preventing default;

    d) The Beneficiary, and/or its successors, assigns and/or agents, have prevented Trustor's performance under the Loan Documents by their numerous breaches of contract, wrongful conduct and violation of statutory law, and thereby have caused the circumstances upon which they now base their claim of default;

Exhibit A, page 79

**VERIFIED COMPLAINT**

1   e) The Beneficiary, and/or its successors, assigns and/or agents, have interfered with,
2       and made more difficult, Trustor's performance under the Loan Documents by
3       their numerous breaches of contract, wrongful conduct and violation of statutory
4       law, and thereby have caused the circumstances upon which they now base their
5       claim of default;

6   f) The Beneficiary, and/or its successors, assigns and/or agents are equitably
7       estopped by their numerous breaches of contract, wrongful conduct and violation
8       of statutory law from claiming Trustor is in default;

9   g) The Beneficiary, and/or its successors, assigns and/or agents are in violation of
10      the Real Estate Settlement Procedures Act (RESPA), as a result of which, Trustor
11      is entitled to damages, which, when offset against any amounts claimed due,
12      result in no default existing;

13  h) The Beneficiary, and/or its successors, assigns and/or agents are in violation of
14      the Truth In Lending Act (TILA), as a result of which, Trustor is entitled to
15      damages, which, when offset against any amounts claimed due, result in no
16      default existing;

17  i) The Beneficiary, and/or its successors, assigns and/or agents are in violation of
18      the Rosenthal Fair Credit Reporting Act (RFCRP), as a result of which, Trustor is
19      entitled to damages, which, when offset against any amounts claimed due, result
20      in no default existing;

21  j) The Beneficiary, and/or its successors, assigns and/or agents are in violation of
22      the Fair Debt Collections Act 15 USC 1601, *et seq* (FDCA), as a result of which,
23      Trustor is entitled to damages, which, when offset against any amounts claimed
24      due, result in no default existing;

25  k) The Beneficiary, and/or its successors, assigns and/or agents are in violation of
26      California Business and Professions Code Section 17200, as a result of which;
27      Trustor is entitled to enjoin any attempted foreclosure sale;

28

l) The Beneficiary, and/or its successors, assigns and/or agents violated California Civil Code Sections 1916.7, *et seq* and 1918.5-1921, as a result of which, Trustor is entitled to enjoin any attempted foreclosure sale;

m) The Beneficiary, and/or its successors, assigns and/or agents have failed to contact Trustor to "assess [Trustor's] financial situation and explore options for [Trustor] to avoid foreclosure," as required by California Civil Code Section 2923;

n) The Beneficiary, and/or its successors, assigns and/or agents have failed to advise Trustor of his right to a subsequent meeting to explore options to avoid foreclosure as required by California Civil Code Section 2923.5;

o) The Beneficiary, and/or its successors, assigns and/or agents have failed to declare in the NOD that they have contacted Trustor to "assess [Trustor's] financial situation and explore options for [Trustor] to avoid foreclosure," as required by California Civil Code Section 2923.5;

p) The Beneficiary, and/or its successors, assigns and/or agents have failed to provide any proof that any assignment of the security instrument has been recorded in the County Recorder's office;

q) The Beneficiary, and/or its successors, assigns and/or agents have failed to provide the book and page numbers in which any Loan Documents and/.or the assignment of any Loan Documents were recorded in the NOD, as required by California Civil Code Section 2924;

r) The Beneficiary, and or its successors, assigns and/or agents have made intentional misrepresentations to Trustor, as a result of which, Trustor is entitled to damages, which, when offset against any amounts claimed due, result in no default existing;

s) The Beneficiary, and or its successors, assigns and/or agents have made negligent misrepresentations to Trustor, as a result of which, Trustor is entitled to

Exhibit A, page 81
**VERIFIED COMPLAINT**

damages, which, when offset against any amounts claimed due, result in no default existing;

t) The Beneficiary, and or its successors, assigns and/or agents have made promises without any intention to perform to Trustor, as a result of which, Trustor is entitled to damages, which, when offset against any amounts claimed due, result in no default existing;

u) The Beneficiary, and or its successors, assigns and/or agents breached fiduciary duties owed to Trustor, as a result of which, Trustor is entitled to damages, which, when offset against any amounts claimed due, result in no default existing;

v) Pursuant to California Commercial Code Section 3301 neither the Beneficiary, nor its successors, assigns nor agents, are "person[s] who are entitled to enforce the security interest on the Trustor's property;"

w) Neither the Beneficiary, nor its successors, assigns nor agents were "holders" of the Note, or beneficial owner of the Note or Deed of Trust at the time the NOD was recorded;

x) The Notice of Default and Election to Sell Under Deed of Trust are false and fraudulent documents, and the proposed sale is a sham attempt to feign compliance with California foreclosure law in the hope that Trustor, like the vast majority of borrowers subjected to the wrongful conduct of the Beneficiary, and/or its successors, assigns and/or agents, simply will yield to the oppression and duress caused by such wrongful conduct and allow his property to be lost to foreclosure;

y) As a result of the wrongful acts of The Beneficiary, and or its successors, assigns and/or agents, Trustor is entitled to punitive and exemplary damages, which, when offset against any amounts claimed due result in no default existing; and,

z) The alleged Successor Trustee has not been appointed in compliance with the provisions of Paragraph 24 of the Deed of Trust.

Exhibit A, page 82

**VERIFIED COMPLAINT**

207)    Neither T.D. Service, nor any other Defendant, has "obtained and mailed to [Plaintiff] written verification of the debt."  Defendants have not responded whatsoever to the Plaintiff's letter of October 22, 2010.

## DEFENDANTS FALSELY AND FRAUDULENTLY STATE THAT T.D.
## SERVICE IS A LAWFULLY APPOINTED SUBSTITUTE TRUSTEE

208)    The NOD states that the "undersigned [the NOD is not signed] present beneficiary, desires to substitute a trustee under the *Deed of Trust* in the place and stead of the present trustee, thereunder in the manner provided for in said Deed of Trust."  Paragraph 24 of the Deed of Trust requires that a Substitution of Trustee be recorded.

209)    The purported Substitution of Trustee states its effective date is September 28, 2010, the day before the NOD was recorded, and is signed by Jeanie Caldwell.  However, the notary's affidavit reflects that the Substitution of Trustee was not mailed to the Substitute Trustee until November 3, 2010.  The Substitution of Trustee also contains a notary's affidavit dated October 7, 2010, verifying that Jeanie Caldwell acknowledged her signature on the Substitution of Trustee on October 7, 2010, not on September 28, 2010, as is stated to be the effective date on the Substitution of Trustee.

210)    A search of the County Recorder's Office, County of San Diego, for any documents recorded relative to the Subject Residence reveals no recorded assignment of the Note or Deed of Trust, or Substitution of the Trustee.

211)    Plaintiff is informed, believes and therefore alleges that as of the date the NOD was served and recorded, September 29, 2010, T.D. Service, in truth and in fact, had not been substituted as the Trustee to Paragraph 24 of the Deed of Trust, pursuant to California Civil Code section 2934(a), and had no authority whatsoever to act on behalf of any of the Lender Defendants at the time the NOD was served and recorded, and the statements to the contrary in the recorded NOD were false, fraudulent and constituted criminal acts by the Lender Defendants, T.D. Service, and the Doe Defendants.

///

///

Exhibit A, page 83

## THE NOTICE OF DEFAULT FALSELY AND FRAUDULENTLY CLAIMS
## THE LENDER DEFENDANTS ARE LAWFUL ASSIGNEES OF
## THIS NOTE AND DEED OF TRUST

212)   The NOD also states: "That the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the Beneficiary;"   Again, the NOD provides no basis for determining who is purportedly the "present beneficiary."   Furthermore, the NOD purports to be signed by: "T.D. Service Company as authorized agent for the Beneficiary by Servicelink as agent for TD Service Company."  However, the copy of the NOD received by Plaintiff is unsigned.

213)   As alleged above, no assignment for the benefit of any Defendant has been recorded. The NOD is invalid as the conditions precedent to proceeding with a non-judicial foreclosure have not been satisfied.

214)   Furthermore, the NOD states: "That a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

THE PRINCIPAL SUM OF $3,346,405.61, WHICH BECAME DUE ON 8/20/09 WITH INTEREST DUE THEREON FROM JUNE 1, 2010.   PURSUANT TO DEMAND LETTER DATED 7/15/09 THE SUM OF $2,807.00, ADVANCED BY THE BENEFICIARY.  PLUS ACCRUED LATE CHARGE(S) IN THE AMOUNT OF $1,546.91.  PLUS PROPERTY INSPECTION FEE(S) IN THE AMOUNT OF $975.00. PLUS MISCELLANEOUS FEE(S) IN THE AMOUNT OF $375.00."

215)   The NOD fails to explain how a demand letter dated July 15, 2009 could have demanded interest due "from June 1, 2010."

216)   Furthermore, as alleged above, on numerous occasions, including, but not limited to, July 30, 2009, Defendant Lenders agreed and represented that the defaults identified in the Default Letter of July 15, 2009, upon which the NOD is based, had been cured.

217)   Paragraph 22 of the Deed of Trust provides that in order to accelerate the debt, "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . . ." The Deed of Trust provides that the notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30

Exhibit A, page 84

1  days from the date the notice is given to Borrower, by which the default must be cured; and (d) that

2  failure to cure the default on or before the date specified in the notice may result in acceleration of

3  the sum secured by this Security Instrument and sale of the Property."

4       218)   The notice required by Paragraph 22 of the Deed of Trust also requires Defendant

5  Lenders to inform Plaintiff of his right to bring a court action to assert the non-existence of a default

6  or any other defense of Plaintiff to accelerate and sell.  The Deed of Trust and the Default Letter of

7  July 15, 2009 both provide that the Lender Defendants may or may not elect to seek to accelerate

8  repayment of the loan in the event of Plaintiff's failure to cure any default in the time and manner

9  provided.  As alleged above, the Lender Defendants repeatedly represented orally and in writing that

10  they would elect and did, in fact, elect not to accelerate repayment, and would and did deem all

11  defaults cured if Plaintiff would do as they demanded, which Plaintiff did. By virtue of the Lender

12  Defendants' promises, representation and agreements, Plaintiff did not previously file a court action

13  to assert the non-existence of a default and the defense of Plaintiff to acceleration and sale.  Instead,

14  in reliance on the Lender Defendants' promises, representations and agreements, Plaintiff continued

15  to expend his personal funds, time and energy to complete the Project, and continued to pay the

16  Lender Defendants interest, fees and other charges which he would not have done had he known the

17  Lender Defendants had no intention of honoring their promises, representations or agreements, and

18  had the Lender Defendants not wrongfully threatened foreclosure if he did not comply with their

19  requests.

20       219)   The notice as is contained in the "Default Letter" is required by the Deed of Trust

21  before the Lender can accelerate payment and/or seek non-judicial foreclosure of the Property for

22  alleged non-payment, or any other alleged default.  Since the alleged defaults in the July 15, 2009

23  Default Letter were cured, in order to accelerate payment and/or serve a NOD, a new "Default

24  Letter" was required. Consequently, the NOD filed on September 29, 2009, which relies on the

25  alleged defaults set forth in the July 15, 2009 Default Letter, which have been cured, is void and of

26  no force and effect, and is a false, fraudulent and bad faith proceeding.

27  ///

28  ///

Exhibit A, page 85

## THE APPOINTMENT OF THE "SUBSTITUTION OF TRUSTEE" IS

## ALSO A FALSE AND FRAUDULENT DOCUMENT

220)    As alleged above, Plaintiff received a "Substitution of Trustee" from the Lender Defendants on or about October 7, 2010 which on its face establishes that, in fact, when the NOD was recorded, T.D. Service was not the Trustee entitled to record the NOD. Specifically, while the NOD states that T.D. Service, "is either the original Trustee, the duly appointed substituted Trustee, or acting as agent for the Trustee or Beneficiary under the following described Deed of Trust," Plaintiff is informed, believes and thereon alleges that such statement was and is false and fraudulent.  Although the Substitution of Trustee claims on its face to have an effective date of September 28, 2010, the day before the NOD was recorded, the Substitution of Trustee is undated. Furthermore, as alleged above, attached to the Substitution of Trustee are two notary affidavits.  One is dated October 7, 2010, and certifies that Jeanie Caldwell appeared on that date and acknowledged her signature on the Substitution of Trustee. It fails to state when Ms. Caldwell signed the document. The second notary acknowledgement is dated November 3, 2010, and certifies that Ahmanda B. Macias acknowledged her signature on that date, on an Affidavit attesting that the Substitution of Trustee was mailed prior to the recording thereof in the manner provided in Civil Code section 2924b to all persons to whom a copy of the NOD was required to be mailed.  However, as alleged above, the Substituted Trustee was never recorded.  Furthermore, Plaintiff did not receive a copy of the Substitution of Trustee until on or about October 7, 2010.  Based thereon, Plaintiff is informed and believes that the Substitution of Trustee was not recorded until well after the NOD was filed.

221)    Furthermore, neither the NOD, nor the Substitution of Trustee establishes that the Lender Defendants complied with Paragraph 24 of the Deed of Trust, which provides that appointment of a successor trustee can be made: ". . .by an instrument executed **and** acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where the Security Instrument is recorded and the name and address of the successor trustee." [Emphasis added.]    T.D. Service could not initiate the foreclosure by recording the NOD as agent

///

1  for any purported beneficiary unless the assignment of the Power of Sale to such alleged beneficiary

2  was recorded.

3      222)  The Substitution of Trustee was not "acknowledged by Lender" until October 7,

4  2010.  There is no indication the Substitution of Trustee was recorded with the County Recorder

5  before the Notice of Default was recorded, if at all.  Additionally, the Substitution of Trustee fails to

6  state the book and page where the Deed of Trust is recorded, as required by the Deed of Trust.  The

7  Deed of Trust provides that its Paragraph 24 governs the procedure for substituting the trustee to the

8  exclusion of all other provisions for substitution.  As a result of the failure of the Substitution of

9  Trustee to comply with Paragraph 24 of the Deed of Trust, the substitution is ineffective, and T.D.

10  Service had no authority to record, and to this day, has no authority to record the NOD, or to proceed

11  with a non-judicial foreclosure of Plaintiff's property.

12      223)  By recording the NOD, and posting a copy thereof on the Subject Residence,

13  Defendants further injured Plaintiff's reputation and his relationship with existing and potential

14  future contractors, subcontractors, material men and laborers, as well as potential sellers and buyers

15  of real estate who are essential to his professional success, and rendered completion of the remaining

16  work on the Project more difficult and more expensive, thereby causing additional delays and

17  damage to Plaintiff.

18                                    **PLAINTIFF'S DAMAGES**

19      224)  As a direct and proximate result of Defendants' breach of contract and numerous

20  other wrongful and illegal acts as alleged in this Complaint, Plaintiff has suffered damages in an

21  amount in excess of the jurisdiction of this Court, the exact amount of which will be proven at trial.

22  Such damages include, but are not limited to, the following.

23          a)  Payment of insurance premiums for insurance required to be maintained pursuant

24              to the Loan Agreement from when construction would have been completed but

25              for Defendants' conduct until the Loan is fully funded.  Specifically, as required

26              by the Loan Agreement, Plaintiff has carried construction insurance, flood

27              insurance, and other types of insurance, in place of, and/or in addition to, the

28

Exhibit A, page 87

typical homeowners' insurance that Plaintiff will need to carry once the Loan is fully funded;

b) Costs of maintaining security for the Property during construction in order to avoid theft, vandalism and third party injury from when construction would have been completed but for Defendants' conduct until the Loan is fully funded;

c) The loss of use of the Property from when construction would have been completed but for Defendants' conduct until the Loan is fully funded, measured by the reasonable rental value of the Property or the value of the loss of use of the Property. Based upon the rental values of other similar luxury, ocean view, single family residences in La Jolla and other central San Diego coastal communities, Plaintiff has been damaged in an amount of at least $20,000 per month for each month from and after January 1, 2009, until the present, and continuing until such time as Defendants have fully funded the Loan;

d) The amount of interest paid on the Loan during the time no benefit was obtained from the Loan proceeds by Plaintiff by virtue of the construction delays caused by Defendants' breaches of contract and other wrongful conduct;

e) The diminution of the value of the Subject Residence from the date it would have been completed, January 1, 2009, through and including the date the Loan is fully funded;

f) Inspection fees charged as a result of unnecessary and duplicative inspections that resulted from a change in inspection companies made by Defendants in order to obtain new, different and more favorable opinions by the inspectors with regard to the percentage of the work completed as to each line item in the construction Budget, or as a result of Defendants' wrongful refusal to fund Construction Draws, and the delays caused by Defendants which resulted in multiple inspections before Construction Draws were made;

g) Late fees, and other charges for alleged non-payment of interest during times when the Defendants owed Plaintiff more in Construction Draws than the amount

of allegedly unpaid interest, and yet Defendants refused to offset the interest payments against the Draws that were due, even though Defendants knew that Plaintiff had advanced the money needed to complete the Budget items for which a draw was requested, and therefore needed to be reimbursed for his expenses to have the funds needed to pay the allegedly due interest.

h) In order to continue to complete construction of the Project without the Defendants making the agreed upon Construction Fund Disbursements, Plaintiff was required to divert his personal funds, time and effort from other investments, which resulted in his inability to avoid foreclosure of other investment properties he owned. Had Plaintiff had available to him the personal funds, time and effort, that were diverted to the Project because of Defendants' many breaches of contract and wrongful acts, he would have saved those other investments from foreclosure and avoided the damages caused by the loss of those other investments;

i) Due to the delays caused by Defendants, the increased time required to complete construction, and the need to conserve funds as much as possible, Plaintiff acted as owner builder, general contractor and construction superintendent on the Project. Plaintiff has been required to work in such capacities without compensation since January 1, 2009 due to Defendants' breaches of contract and other wrongful acts.  The reasonable value of Plaintiff's work in these capacities is at least $8,000 per month;

j) Plaintiff, who is a real estate investor, has suffered significant damage to his reputation in the industry, and to his credit rating. Such injury would not have occurred had it not been for the numerous breaches of contract and other wrongful acts of Defendants as alleged herein.  As a result of the significant erosion of Plaintiff's reputation and credit scores, Plaintiff's ability to borrow money and/or obtain investment capital on favorable terms, if at all, has been significantly impaired. The result is that now and for the indefinite future, Plaintiff, in order to

pursue his trade and profession, will be required to pay high rates of interest, more "points" and fees, and otherwise incur additional costs and liabilities well in excess of those which would have been incurred had it not been for Defendants' numerous breaches of contract and other wrongful acts as alleged herein. Furthermore, Plaintiff will suffer the loss of investment opportunities which he otherwise would have been able to pursue;

k) As result of Defendants' breach of contract and other wrongful acts, and the delays and non-payment that resulted, the Project's construction schedule was disrupted, contractors, subcontractors, material men and laborers walked off the job, either temporarily or permanently, and it became more difficult, costly and time intensive to keep contractors, subcontractors, material men and laborers on the Project and/or attract them to the Project. As a result, the overall Project costs were increased significantly;

l) Liens were filed against the Project which have required retention of attorneys and payment of attorney's fees and additional costs.

m) Plaintiff suffered severe emotional and physical distress, including and not limited to anxiety, depression, sleeplessness, loss of appetite and fear;

n) By wrongfully recording the Notice of Default, Defendants caused Plaintiff further damage to reputation, decreased value of the Property, increased costs to carry and complete the Project and other damages;

o) As a direct and proximate result of Defendants' breach of contract and other wrongful conduct, Plaintiff has been required to retain attorneys to stop the wrongful foreclosure on Plaintiff's Property, and to pursue recovery of damages for Defendants' many breaches of contract and other wrongful acts. Plaintiff is entitled to recover his attorneys fees and costs from Defendants; and

p) As alleged herein, Defendants have violated numerous Federal and State laws which provide for recovery of additional statutory damages.

Exhibit A, page 90

**PUNITIVE DAMAGES MUST BE IMPOSED TO PUNISH DEFENDANTS**

225)    The conduct of Defendants, and each of them, as alleged herein, was and is oppressive, fraudulent, malicious, willful, illegal and despicable.    Defendants knowingly, intentionally, in complete disregard of Plaintiff's rights, and with the intention to cause Plaintiff injury and financial ruin, ignored the terms of the Loan Agreements and disregarded the manner in which the parties to the Loan Agreements had intended, interpreted, and carried out the terms of the Loan Agreement until Defendants' scheme was conceived and implemented.  In furtherance of their scheme and criminal enterprise, Defendants concocted one feeble excuse after another to delay disbursement of construction funds, demand interest, fees and charges Defendants knew were not due and eventually to seek to wrongfully foreclose on Plaintiff's Property by use of false and fraudulent documents.    Plaintiff is informed and believes and thereon alleges that the Lender Defendants, and the other Defendants acting as their agents, or in concert with them, made every effort to force Plaintiff to default on the Loan and to be able to foreclose on Plaintiff's home because -- under the agreements by which they acquired whatever interest they allegedly have in the ownership, beneficial interest and/or servicing or collection right regarding the Loan -- they make more money in less time and with less effort, capital outlay, or risk if they can force borrowers such as Plaintiff into foreclosure than if they abide by their contract and legal obligations. The reprehensibility of Defendants' conduct as alleged herein warrants a punitive damage award in the maximum amount permissible under applicable law.

**FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT –**

**COUNT ONE (BREACH OF EXPRESS CONTRACT)**

**(Against The Lender Defendants and Does 1 through 100, inclusive.)**

226)    Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in Paragraphs 1 through 225, as if fully and completely set forth herein.

227)    As alleged above, on or about January 3, 2007, Plaintiff and Defendant IndyMac Bank entered into the Loan Agreements, the Lender Defendants claim to be the successors in interest, through IndyMac Bank and IndyMac Federal, of IndyMac Bank's interest in the Loan, and are subject to the claims and defenses Plaintiff could assert against their predecessors in interest. The

76

Exhibit A, page 91

**VERIFIED COMPLAINT**

1   numerous breaches of contract of which Plaintiff complains occurred beginning in late 2007 or early

2   2008, and continued thereafter, while the loan was owned by IndyMac Bank, then IndyMac Federal,

3   and finally purportedly by the Lender Defendants.

4       228)   Plaintiff has fully and faithfully performed all of the covenants, terms, conditions and

5   obligations required under the Loan Agreements, except to the extent his performance has been

6   prevented or excused by the conduct of the Lender Defendants and/or their predecessors.

7       229)   The Defendants breached the Loan Agreements with Plaintiff, as alleged above, by

8   among other things: (1) failing to properly discharge their contractual obligations to disburse

9   construction funds as required by the Loan Agreements; (2) failing to comply with RESPA, which

10   they acknowledged was required pursuant to the Loan Agreement, and in particular, by failing to

11   investigate and correct any errors noted by Plaintiff in "qualified consumer letters:" (3) failing to

12   disburse the balance of the Loan proceeds remaining in the Construction Loan Account when the

13   Project was "complete," as that term is defined in the Loan Agreement, on or about May 13, 2010,

14   and at all times thereafter; (4) failing to provide proper notice of any purported transfers or

15   assignments of the interest in the Note and/or Deed of Trust; (5) failing to comply with the

16   requirements of the Loan Agreements and applicable law in their attempt to foreclose on the

17   Property by recording the NOD without strictly complying with the requirements of the Deed of

18   Trust and applicable law, and by use of willfully false and fraudulent documents; and (6) failing to

19   comply with the requirements in the Deed of Trust as to what must be done before the Lender

20   Defendants can commenced foreclosure procedures, including the requirement that a written notice

21   must be sent to the borrower, Plaintiff, identifying the alleged defaults, and setting forth what is

22   required to cure the defaults, and a time by which such cure must take place.

23       230)   Additionally, the Lender Defendants breached the Loan Agreement as amended

24   orally and in writing on July 30, 2009 and thereafter. Specifically, the Lender Defendants agreed

25   that if Plaintiff would pay interest allegedly due at that time, and would continue to complete the

26   Project, the Lender Defendants would deem the defaults identified in the July 15, 2009 Default

27   Letter to be cured, and the Loan Agreements amended to remove the requirement that construction

28   ///

1   be completed by January 3, 2009.  Plaintiff fully performed as requested.  However, the Lender

2   Defendants have breached the agreement with Plaintiff by filing the NOD.

3       231)   As a direct result of the Defendants' breaches of the Loan Agreements, as set forth

4   herein, Plaintiff now faces unlawful foreclosure on the Subject Residence.  In addition, Plaintiff has

5   suffered damages as alleged more fully in Paragraph 224 (a) to (p) hereof, in an amount in excess of

6   the Court's jurisdictional minimum, which amount will be proven at trial.

7       232)   Plaintiff further seeks, as the result of the Defendants' breaches of the Loan

8   Agreement, restitution, disgorgement of sums wrongfully obtained or withheld, costs of suit,

9   reasonable attorney fees, which the Loan Agreements provide may be awarded in any action to

10  enforce their terms, and such other relief as the Court deems just and proper.

11  **FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT  - COUNT TWO**

12  **(BREACH OF ORAL AND WRITTEN CONTRACT)**

13  **(Against The Lender Defendants and Does 1 through 100, inclusive)**

14      233)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as

15  stated above in Paragraphs 1 through 232, as if fully and completely set forth herein.

16      234)   Commencing on or about July 30, 2009, Defendants agreed orally and in writing, on

17  numerous occasions, as alleged herein, that the defaults claimed to exist in the July 15, 2009 Default

18  Letter were cured, and that the Loan Agreements were deemed modified and amended to eliminate

19  the requirement that the construction of the Project be completed as of January 3, 2009.

20      235)   Commencing in or about December of 2009, the Lender Defendants promised

21  Plaintiff that if Plaintiff continued to invest the personal resources, time and energy necessary to

22  complete the Project and thereby enhance the Defendants' security for the Loan, Defendants would

23  not assert that the loan was in default, but rather, would modify the Loan Agreement, leaving its

24  essential terms in tact, including its term through 2039, and specifying an interest rate consistent

25  with the parties' agreement.

26      236)   Nonetheless, and in violation of oral and written agreement, on or about July 29,

27  2010, Defendants sent Plaintiff, not a Modification Agreement, but a Forbearance Agreement,

28  providing in essence that Plaintiff must agree that the Loan is in default and that the Lender

1  Defendants would agree to forebear on suing on the Loan Agreements, and/or extended the terms of

2  the Loan for a period of only three years. The proposed Forbearance Agreement did not contain any

3  specific terms with regard to the rate of interest Plaintiff would be required to pay.

4     237)  The Forbearance Agreement, as presented to Plaintiff, bore no relationship

5  whatsoever to the Loan Modification which Plaintiff was promised as an inducement for him to

6  continue working to complete the Project, as he did.

7     238)  On September 29, 2009, in further breach of their oral and written agreement that the

8  defaults claimed to exist in the July 15, 2009 Default Letter were cured, the Lender Defendants

9  recorded a NOD based upon the July 15, 2009 Default Letter.

10    239)  The Plaintiff's obligations pursuant to these oral and written agreement have been

11  fully performed, and therefore, the agreements are fully executed, and binding upon the Lender

12  Defendants.

13    240)  As a direct result of the Defendants' breaches of the oral and written agreements, as

14  set forth herein, Plaintiff now faces unlawful foreclosure on the Subject Residence.  In addition,

15  Plaintiff has suffered damages as alleged more fully in Paragraph 228 (a) to (p) hereof, in an amount

16  in excess of the Court's jurisdictional minimum, which amount will be proven at trial.

17  **FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT  - COUNT THREE**

18  **(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIL DEALING)**

19  **(The Lender Defendants and Does 1 through 100, inclusive)**

20    241)  Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as

21  stated above in Paragraphs 1 through 240, as if fully and completely set forth herein.

22    242)  The Loan Agreements contained an implied covenant of good faith and fair dealing,

23  that the Lender Defendants would do nothing to wrongfully deny Plaintiff the benefits of his

24  "bargain." The implied covenant of good faith and fair dealing also includes the covenant and duty

25  for the Defendants to comply with all applicable Federal and State laws.  Furthermore, the implied

26  covenant of good faith and fair dealing required Defendants to act in good faith and deal

27  fairly with Plaintiff in all respects in regard to the Loan, the handling of the Construction Funds, the

28  servicing of the Loan and any efforts to collect the Loan.

Exhibit A, page 94

**VERIFIED COMPLAINT**

1    243)   As alleged herein, commencing in late 2007 or early 2008, at which time IndyMac

2  Bank's financial fortunes began waning, and continuing thereafter until the present time, the Lender

3  Defendants failed to act in good faith or fairly toward Plaintiff in virtually every respect., as more

4  particularly alleged hereinafter.   The nature and extent of the Lender Defendants' breach of the

5  implied covenant of good faith and fair dealing are reflected in the correspondence set forth

6  previously in this Complaint, and is the manner in which the Lender Defendants have

7  misrepresented facts and attempted to wrongfully foreclose on Plaintiff's property.

8    244)   As a direct result of the Defendants' breaches of the implied covenant of good faith

9  and fair dealing in the Loan Agreements, as set forth herein, Plaintiff now faces unlawful foreclosure

10  on the Subject Residence.  In addition, Plaintiff has suffered damages as alleged more fully herein in

11  an amount in excess of the Court's jurisdictional minimum, which amount will be proven at trial.

12    245)   Plaintiff further seeks, as the result of the Defendants' breaches of the Loan

13  Agreement, restitution, disgorgement of sums wrongfully obtained or withheld, costs of suit,

14  reasonable attorney fees and such other relief as the Court deems just and proper.

15  ## SECOND CAUSE OF ACTION FOR QUIET TITLE

16  ### (Against All Defendants)

17    246)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as

18  stated above in Paragraphs 1 through 245, as if fully and completely set forth herein.

19    247)   As alleged above, on or about January 3, 2007, Plaintiff and Defendant IndyMac

20  Bank entered into the Loan Agreements.   The Lender Defendants claim to be the successors in

21  interest through IndyMac Bank and IndyMac Federal of IndyMac Bank's interest in the Loan. As

22  alleged above, the breaches of contract of which Plaintiff's complains occurred continuously to some

23  degree or another since the beginning of 2008, while the Loan was allegedly owned by IndyMac

24  Federal and finally, the Lender Defendants.

25    248)   Plaintiff is informed and believes and based thereon alleges that, as a result of the

26  causes of action asserted herein, he is the owner in fact of the Subject Property, and is in rightful

27  possession and control of the Subject Property.

28  ///

249)   Plaintiff is informed and believes and on that basis alleges that Defendants claim an interest adverse to Plaintiff's title in the real property. These claims are without any right and Defendants, and each of them, including the Doe and unknown Defendants, have no right, title, estate, lien, or interest in the real property.

250)   Plaintiff seeks a judgment quieting title to his unencumbered fee simple title to the Subject Residence in this action on the date of the NOD, in that Plaintiff claims the non-judicial foreclosure process and any foreclosure sale made pursuant thereto are **void *ab initio*** as set forth herein, and that Plaintiff's interest in the Subject Residence continues unabated.

### THIRD CAUSE OF ACTION FOR REFORMATION

### (As Against the Lender Defendants and Does 1 through 100, inclusive)

251)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 250, as if fully and completely set forth herein.

252)   The Loan Agreements should be reformed and the Loan Documents restated to reflect an offset against the Loan balance equal to that amount which is due in accordance with equity by reducing the amount of the Loan by the following:

a)   Any and all interest payments made by Plaintiff after Defendants' breach of the Loan Agreements, and/or during such time as Plaintiff was receiving no benefit from the Loan because of the delay caused by Defendants, and/or such time as Plaintiff's performance pursuant to the Loan Documents was excused because it was prevented by Defendants' conduct;

b)   Any and all costs, fees and other changes paid by Plaintiff to Defendant after the Defendants' breach of the Loan Agreements, and/or during such time as Plaintiff was receiving no benefit from the Loan because of the delay caused by Defendants, and/or such time as Plaintiff's performance pursuant to the Loan Documents was excused because it was prevented by Defendants' conduct.

c)   Any penalties for which Defendants are liable pursuant to TILA, RESPA, Bus. & Prof. Code § 17200, et seq, CRMLA, RFDCA, RICO, or any other applicable law.

d)  All damages incurred by Plaintiff as a result of Defendants' breaches of contract, wrongful conduct, statutory violations and/or criminal conduct, as alleged herein;

e)  All attorneys' fees and costs incurred as a result of Defendants' conduct and the prosecution of this Complaint.

f)  Prejudgment interest at the rate of 10% from and after the date Defendants' conduct caused Plaintiff damages as alleged herein.

## FOURTH CAUSE OF ACTION FOR RESCISSION

### (As Against the Lender Defendants and Does 1-100, inclusive)

253)  Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 252, as if fully and completely set forth herein.

254)  Plaintiff's consent to the Loan Documents was not real, mutual, or free in that consent was obtained through misrepresentation, and other wrongful acts, as alleged herein.

255)  Furthermore, Defendants' breaches of contract and other wrongful conduct, as alleged herein, have been so numerous, continuous, and damaging, as to have deprived Plaintiff of the benefit to which he was entitled pursuant to the Loan Agreements.

256)  Plaintiff intends the service of the Summons and Complaint in this action to serve as notice of rescission of the Loan Agreements. Plaintiff hereby demands that Defendants restore to Plaintiff all consideration paid pursuant to the Loan Agreements.

## FIFTH CAUSE OF ACTION FOR FRAUD –
## INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

257)  Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 256, as if fully and completely set forth herein.

258)  As alleged herein, Defendants and their predecessors in interest intentionally have misrepresented and deceived Plaintiff in relation to virtually every aspect of the Loan from the application, origination, underwriting, closing, funding, servicing and assignment thereof, to wrongfully seeking to exercise the power of sale in the Deed of Trust and recording the NOD without legal standing to do so in violation of California's non-judicial foreclosure laws, including,

1   but not limited to, by the Defendants preparing, recording, and serving false and fraudulent

2   documents created solely for the purpose of perpetuating Defendants' scheme to wrongful foreclose

3   on the Subject Residence.

4      259)   Defendants' false representations to Plaintiff were of material facts concerning the

5   Subject Loan and the construction, use and enjoyment of the Subject Residence, and Plaintiff

6   reasonably relied upon them.

7      260)   Defendants' and their predecessors' misrepresentations, as alleged previously,

8   include, but are not limited to: (1) that IndyMac Bank would be able to honor its commitment to

9   fund the construction in accordance with the terms of the Loan Agreements, whereas in fact,

10  IndyMac had built a house of cards that was about to collapse, making it impossible for IndyMack

11  Bank to meet its commitments to borrowers such as Plaintiff; (2) that the Construction Loan would

12  be disbursed, and/or was being disbursed, in a timely, good faith and flexible fashion whereas in

13  fact, IndyMac knew that it heavily invested in high risk assets which could result in a lack of

14  liquidity and inability to fund the Loan, and the Lender Defendants who allegedly succeeded to

15  IndyMac Bank's interest in the Loan intended to rely on numerous bogus excuses, concocted

16  formulas regarding the percentage the Project was complete and/or the Loan disbursed and other

17  unmeritorious excuses as alleged herein; (3) that all material factual disclosures, including whether

18  the Subject Loan had been assigned or securitized, were accurate and that Plaintiff either had been,

19  or would be, provided with accurate disclosures of any assignment of the Loan and/or the beneficial

20  interest under the Deed of Trust, and/or Substitution of the Trustee, whereas, Plaintiff is informed

21  and believes that Defendants never intended to so, and did not do so; (4) that the Defendants' claims

22  regarding the percentage of completion of the Project and the percentage of funds disbursed were

23  based on the inspectors' findings and the methodology dictated by the Loan Agreements, whereas in

24  fact, the Defendants' position was fabricated and not consistent with the Loan Agreements; (5) on

25  numerous occasions Plaintiff was told by Defendants that if he continued to work to complete the

26  Project and made the interest payments the Lender Defendants demanded, Construction Draws

27  would be made forthwith, and any allegedly outstanding defaults would be cured, whereas in fact,

28  the Lender Defendants routinely just moved from one excuse for non-payment to another, refused to

1   make Draws when due, and ultimately claimed that the alleged failure to make payments on the

2   Loan when due, and complete construction by January 3, 2009, identified in the one and only

3   Default Letter ever sent by Defendants to Plaintiff, on July 15, 2009, was never cured; (6) that one or

4   more representatives of the City of San Diego advised Pray that Fire Sprinklers were required at the

5   Project, whereas Plaintiff is informed and believes and thereon alleges, that Pray was never so

6   informed; (7) that if Plaintiff continued to work to complete the project and made the interest

7   payments and other charges demanded, the Lender Defendants would reconfirm the essential terms

8   of his Loan in a Modification Agreement, whereas in fact, Plaintiff is informed and believes and

9   thereon alleges that the Lender Defendants never had any intention of honoring their commitment to

10  a Permanent Loan, but rather always intended to offer Plaintiff nothing more than the terms

11  contained in the Forbearance Agreement; (8) that Defendants had standing as beneficiaries of the

12  Deed of Trust to initiate foreclosure when, in fact, they did not have standing, as alleged hereinafter;

13  and that they had complied with California Civil Code section 2923.5 when, in fact, they had made

14  no effort to comply, and their statement to the contrary in the NOD was knowingly false; (9) that the

15  NOD was filed by a duly authorized Substitute Trustee, whereas in fact, T.D. Service was not the

16  duly appointed Substitute Trustee at the time the NOD was recorded and had no right or authority

17  whatsoever to initiate a non-judicial foreclosure on Plaintiffs residence; (10) that at the time the

18  Loan was made, it was a Construction to Permanent Loan with a term of thirty-two (32) years, and

19  that the only way the thirty-two (32) year term for repayment of the Loan could be accelerated was

20  as specified in the Loan Agreement, whereas, the Lender Defendants, at the time the July 15, 2009

21  Default Letter was sent, advised Plaintiff that regardless if he cured the alleged defaults within the

22  time specified in the Default Letter, as provided in the Loan Agreement, the Lender Defendants

23  would not honor their commitment to provide permanent financing for a term of thirty-two (32)

24  years; (11) that Defendants would fulfill their obligations under RESPA, and respond as provided

25  therein to any "qualified consumer letters" sent to Defendants by Plaintiff, whereas in fact,

26  Defendants never intended to, and never did, comply with their requirements pursuant to RESPA, or

27  otherwise respond to Plaintiff's complaints that Defendants were not properly handling his Loan;

28  (12) that Defendants would not seek to foreclose on the Subject Residence without first providing

1  Plaintiff with notice and an opportunity to cure any alleged defaults, as provided in the Loan

2  Agreements, whereas in fact, Defendants never intended to comply with the requirements of the

3  Loan Agreement with regard to foreclosure, and have attempted to foreclose on Plaintiff's Property

4  without providing Plaintiff with the notice and opportunity to cure required by the Loan Agreement;

5  (13) that if Plaintiff would do specific things, such as install the appliances, the Lender Defendants

6  would fund the balance remaining within the Construction Fund; whereas, in fact, the Lender

7  Defendants had no intention to make such distributions and to this day have not distributed the

8  balance of the Construction Fund; (14) that, as alleged herein, from and after July 30, 2009, on

9  numerous occasions Defendants, and in particular Defendants Broyles and Jackson, acting on their

10  own behalf and on behalf of the Lender Defendants promised and represented that if Plaintiff made

11  all payments of interest and other charges claimed due by Defendants and continued to work to

12  complete the Project, his Loan would be deemed free of default and that any alleged defaults would

13  be deemed cured, whereas in fact, based on the filing of the NOD in reliance on the July 15, 2009

14  Default Letter, all such representations were lies made to Plaintiff with no intention to honor them,

15  but with the intention to induce Plaintiff to continue to work to complete the Project to enhance

16  Defendants' security, and to collect additional interest and other charges that were not due in truth

17  and in fact, all in furtherance of Defendants scheme and criminal enterprise as alleged herein; and

18  (15) that the terms of the loan modification agreed to in November 2009, and implemented thereafter

19  would be memorialized in a loan modification; whereas, in fact, the Lender Defendants had no

20  intention to do so, and never did so.

21       261)   As a result of Defendants' intentional and fraudulent representations and Plaintiff's

22  reasonable and justifiable reliance thereon, Plaintiff's have been injured in an amount in excess of

23  this Court's jurisdictional minimum, which amount will be proven at trial.

24       262)   Defendants' willful, oppressive, fraudulent and intentional interference with

25  Plaintiff's economic advantage authorizes the imposition of exemplary damages, pursuant to

26  California Civil Code Section 3294.

27  ///

28  ///

**VERIFIED COMPLAINT**

## SIXTH CAUSE OF ACTION FOR FRAUD – CONCEALMENT

### (Against All Defendants)

263)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 262, as if fully and completely set forth herein.

264)   As alleged herein, Defendants concealed material facts regarding the application, origination, underwriting, closing, funding, servicing, assignment and foreclosure of the Loan which they had a duty to disclose.  Plaintiff is informed and believes and alleges that Defendants knew that Plaintiff had been given inaccurate and/or incomplete information regarding the status of IndyMac Bank's financial condition at the time the Loan was made and its ability to fund the loan as called for in the Loan Agreement.   Additionally, having undertaken the responsibility for determining the percentage the Project was completed and the percentage the Construction Funds were used, the Bank had a duty to accurately and honestly disclose all relevant facts pertaining to those issues. Nonetheless, Defendants willfully suppressed material facts and/or misrepresented them. Furthermore, during the period from approximately November of 2008 until July 29, 2010 when Defendants provided Plaintiff with a Forbearance Agreement, Plaintiff is informed and believes and therein alleges that Defendants had willfully concealed the intended term of the Forbearance Agreement that would be offered to him, and instead, represented that he would be offered a Modification Agreement that would leave the essential terms of the Loan in tact.

265)   Plaintiff is informed and believes and alleges that Defendants also have concealed that they did not execute and record documentation by which either they or their trustee would have authority to foreclose on the Subject Residence.

266)   Plaintiff relied upon Defendants' fidelity and belief that Defendants would not conceal material facts as to which they had a duty to disclose.  As a result, Plaintiff continued to perform all of the obligations as to which he was to perform, pursuant to the Loan Agreement, as amended and modified, while Defendants failed to perform theirs.  The result is that now that the Subject Residence is virtually completed, and Defendants' security has been enhanced, Plaintiff has paid hundreds of thousands of dollars in interest fees, construction expenses and other costs; and Plaintiff is faced with a threatened foreclosure, has suffered significant damages and delays, and has

1   and will continue to incur attorney fees and costs as well as the need to expend considerable time

2   and effort pursuing recovery of the damages caused him by the Defendants, while fighting off the

3   Defendants' unlawful, false and fraudulent efforts to foreclosure on his home.

4          267)   As a result of Defendants' intentional and fraudulent concealment and Plaintiff's

5   reasonable and justifiable reliance on Defendants' fidelity, Plaintiff's have been injured in an amount

6   in excess of this Court's jurisdictional minimum, which amount will be proven at trial.

7          268)   Defendants' willful, oppressive, fraudulent and intentional interference with

8   Plaintiff's economic advantage authorizes the imposition of exemplary damages, pursuant to

9   California Civil Code Section 3294.

10   <u>**SEVENTH CAUSE OF ACTION FOR NEGLIGENCE – COUNT ONE**</u>

11   <u>**(Against All Defendants)**</u>

12          269)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as

13   stated above in Paragraphs 1 through 268, as if fully and completely set forth herein.

14          270)   Defendants were required to exercise reasonable care and diligence toward Plaintiff

15   as lenders, Loan contract agents and servicers.

16          271)   As alleged herein, Defendants and their predecessors were negligent throughout their

17   involvement with Plaintiff by, including but not limited to, failing to provide Plaintiff with executed

18   Loan documentation; failing to adequately or reasonably monitor and dispense Loan proceeds,

19   failing to respond to qualified consumer letters from Plaintiff, pursuant to RESPA; encouraging

20   Plaintiff to spend significant personal resources, time and effort to continue the Project on the

21   promise that if he did, the remainder of his thirty-two (32) year Construction to Permanent Loan

22   would stay in effect, when in fact, Defendants had no reason to believe that was true; filing the NOD

23   through a Trustee without any standing; and making willfully false statements that Defendants

24   complied with California Civil Code Sections 2923.5 and 2932.5 before serving and recording the

25   NOD when, in fact, Defendants had made no effort to comply.

26          272)   As a direct and proximate result of Defendants' negligence, Plaintiff has been

27   damaged as alleged above, in an exact amount to be proven at trial.

28   ///

Exhibit A, page 102

## SEVENTH CAUSE OF ACTION FOR NEGLIGENCE – COUNT TWO

### (Against The Lender Defendants)

273)    Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as stated above in Paragraphs 1 through 272, as if fully and completely set forth herein.

274)    Plaintiff is informed and believes and thereon alleges that the representations made by Defendants to Plaintiff, as set forth above, were made negligently, at a time when Defendants either knew them to be false, or had no reason to believe they were true and correct: but Defendants nonetheless represented to have known and/or believed them to be true and correct at the time they were made.

275)    As a direct and proximate result of Defendants' negligence, Plaintiff has been damaged as alleged above, in an exact amount to be proven at trial.

## EIGHTH CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

276)    Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 275, as if fully and completely set forth herein.

277)    Defendants were Plaintiff's agents with respect to the Loan; they were Plaintiff's mortgage lenders and/or mortgage brokers and loan servicers; and, most importantly, held and controlled the disbursement of the loan proceeds needed by Plaintiff to complete the construction of the Subject Residence.

278)    Defendants knew, as alleged previously, that Plaintiff was relying upon their honesty and fidelity to properly and fairly service his Loan and administer the distribution of Loan Proceeds, and that Plaintiff would suffer great harm if they failed to do so. Specifically, Defendants knew it was essential that requests for loan draws be processed quickly and fairly. In undertaking these responsibilities, the Lender Defendants assumed duties beyond those that exist in a typical lender/borrower relationship. Defendants, therefore, owed a fiduciary duty to Plaintiff to act to benefit Plaintiff, and to act with proper skill and diligence. Defendants also owed a duty to Plaintiff not to profit unfairly from the relationship at the expense of Plaintiff, and not to aid and abet the breach of fiduciary duty owed by any Defendants. Defendants owed a duty of loyalty and a duty to

Exhibit A, page 103

1   deal fairly with Plaintiff at all times. Defendants willfully and intentionally breached their fiduciary

2   obligations and their duty of loyalty to Plaintiff as alleged herein.

3        279)   As a direct and proximate result of Defendants' breaches as alleged herein, Plaintiff

4   has been damaged in an amount to be proven at trial.

5        280)   Defendants' willful, oppressive, intentional and malicious breaches of fiduciary duty

6   also warrant the imposition of exemplary damages pursuant to California Civil Code Section 3294.

7       **NINTH CAUSE OF ACTION FOR  INTENTIONAL INTERFERENCE WITH**

8                **PROSPECTIVE ECONOMIC ADVANTAGE**

9                    **(Against All Defendants)**

10       281)   Plaintiff incorporates by reference herein, all prior allegations of this Complaint, as

11   stated above in paragraphs 1 through 280, as if fully and completely set forth herein.

12       282)   Defendants knew at all times relevant hereto that Plaintiff had existing and

13   prospective economic relationships with contractors, subcontractors, material men and laborers who

14   were working, or would in the future, work on the Project. Defendants also knew that Plaintiff's

15   relationships with them were critical for the success of the Project, and in particular, in order for the

16   Project to be completed on time and on budget.

17       283)   With full knowledge of the nature and importance of these relationships to Plaintiff,

18   Defendants willfully, intentionally, and with knowledge of the consequences of their actions and

19   omissions, interfered with these relationships by wrongfully withholding Construction Draws and

20   other payments due Plaintiff, and thereby rendering it impossible for Plaintiff to meet his financial

21   commitments to contractors, subcontractors, material men and laborers. As a direct result,

22   contractors, subcontractors, material men and laborers walked off the Project, delayed commencing

23   their work on the Project, filed liens against the Project, and/or otherwise cause delays, increased

24   costs and caused other damage to Plaintiff, in an amount to be proven at trial.

25       284)   Defendants' willful, oppressive, fraudulent and intentional interference with

26   Plaintiff's economic advantage authorizes the imposition of exemplary damages, pursuant to

27   California Civil Code Section 3294.

28   ///

## TENTH CAUSE OF ACTION FOR INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS

285)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 284, as if fully and completely set forth herein.

286)   Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, engaged in the conduct alleged herein for the purpose, and with the intent, to cause Plaintiff severe emotional distress in order to obtain an economic advantage, as alleged herein.

287)   As a result of said Defendants' conduct, Plaintiff did suffer severe emotional distress, as alleged herein, as well as related physical injury, including but not limited to, severe emotional distress such as loss of appetite, frustration, fear, anger, helplessness, sleeplessness, sadness and depression.

288)   Defendants' willful, oppressive, fraudulent and intentional interference with Plaintiff's economic advantage authorizes the imposition of exemplary damages, pursuant to California Civil Code Section 3294.

## ELEVENTH CAUSE OF ACTION – VIOLATION OF THE
## REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)
### (Against the Lender Defendants)

289)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 288, as if fully and completely set forth herein.

290)   The subject Loan is a mortgage loan subject to the provisions of the Real Estate Settlement Procedures Act set forth at 12 U.S.C. Section 2605 et seq. ("RESPA").

291)   A violation of RESPA is also made unlawful under California state law by Financial Code Section 50505, which states, "Any person who violates any provision of (RESPA) or any regulation promulgated there under, violates this division (California Residential Mortgage Lending Act)."

292)   Plaintiff is not certain at this time exactly which of Defendants were actually the servicer(s), or beneficial owners of the Subject Loan at all relevant times.  However, due to the conspiratorial nature of the misdeeds alleged herein, and also due to Defendants' general failure to

90

Exhibit A, page 105

**VERIFIED COMPLAINT**

1   properly disclose to Plaintiff the roles and identities of the various entities that were purportedly

2   handling, servicing and/or holding other interest in the Loan at any given time, these allegations are

3   made as to all Defendants.

4       293)   Plaintiff is informed and believes and thereon alleges that Defendants have engaged

5   in a pattern or practice of non-compliance with the requirements of the mortgage servicer provisions

6   of RESPA as set forth in 12 U.S.C. § 2605, including without limitation, the following:

7         a)   Failure to disclose all affiliated business arrangements. 24 C.F.R. § 3500.15;

8         b)   Failure to show or disclose that Defendants did not give, provide or receive a

9           hidden fee or thing of value for the referral of settlement business, including, but

10          not limited to, kickbacks, hidden referral fees, and/or yield spread premiums. 24

11          C.F.R. § 3500.14;

12        c)   No evidence that an accurate HUD1 was provided at the time of closing. 24 C.F.R

13          3500.8(b).Plaintiff is further informed and believes and thereon alleges that

14          Defendants received excessive fees for obtaining the Subject Loan: i.e., without

15          limitation; a yield spread premium, an underwriting fee, an administration fee and

16          a table funding fee. 12 U.S.C. § 2607.  Plaintiff is further informed and belies and

17          thereon alleges that these fees do not represent the reasonable value of services

18          performed and are therefore subject to the treble damage provision of RESPA in

19          addition to the recovery of attorney fees and costs of litigation.

20        d)   Furthermore, as alleged above, Plaintiff wrote the Defendant Lender many

21          "qualified written requests" as defined in RESPA, 18 U.S.C. 2605  (e), but never

22          received any replies that complied with the Lender Defendant's obligations under

23          RESPA, nor were any corrections ever made to Plaintiff's account.  Specifically,

24          RESPA requires that within 60 days after receipt of a qualified written request,

25          and before taking any action with respect to the inquiry of the borrower, the loan

26          servicer must: (1) make appropriate corrections in the account of the borrower,

27          including the crediting of any late charges or penalties and must transmit to the

28          borrower a written notification of such correction; and (2) after conducting an

Exhibit A, page 106

**VERIFIED COMPLAINT**

investigation, provide the borrower with a written explanation or clarification that includes, to the extent possible, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer, and the name and telephone number of an individual associated with the servicer who can provide further assistance to the borrower. Also, after an investigation, the servicer must provide the borrower with a written explanation or clarification that includes the information requested by the borrower or an explanation of why the information requested is unavailable. Plaintiffs many pleas that the Lender Defendants review and explain the criteria used to deny Plantiff's draw requests based on the percentage the project was complete and the percentage the construction funds, as well as with respect to other matters, were ignored for the past three years while the Defendant lenders simply continued to withhold Draws, and otherwise act wrongfully and illegally, causing significant delays and damage to plaintiff.

294)   Pursuant to RESPA and/or TILA, Defendants were required to furnish Plaintiff with fully executed copies of all Loan Documents.  In fact, Plaintiff never received signed copies of any documents upon execution of the Loan Agreements.   Plaintiff only received a partially executed copy of the Residential Construction Loan Agreement, including the Line Item Budget Worksheet, on September 29, 2010 after numerous requests.  In addition, the Construction Loan budget provided by Defendants to Plaintiff on September 29, 2010, is largely illegible, contains Plaintiff's signature only on the last page, and incorrectly sets forth Plaintiff's phone number.

295)   Plaintiff was not provided with any fully executed documents related to the Loan, including inter alia, the following:

a)  Deed of Trust

b)  Residential Construction Loan Rider

c)  Extension/Interest Reserve Acknowledgment

d)  Lender's Loan Instructions, including the Additional Conditions

e)  Disbursement Agent Authorization

Exhibit A, page 107

1    f) Insurance Requirements Agreement

2    g) Errors and Omissions Compliance Agreement

3    h) Signature/Name Affidavit

4    i) Borrower's Certification & Authorization

5    j) IRS Form W-9

6    k) IRS Form 4506

7    l) IRS Form 8821

8    m) RESPA Servicing Disclosure

9    n) Affidavit of Occupancy

10   o) Limited Power of Attorney

11   p) Appraisal Disclosure

12   q) Interest Deductibility Disclosure Notice

13   r) Service Provider Disclosure

14   s) IndyMac Anti-Predatory Lending Disclosure

15   t) Notice to Home Loan Applicant

16   u) Borrower Date of Funding Request

17   v) Notice to Consumer

18   w) Itemization of Amount Financed

19   x) Borrower Acknowledgement of Prepayment Charge

20   y) Prepayment Penalty Disclosure

21   z) Adjustable Rate Mortgage Loan Disclosure

22   296) Furthermore, at least the following documents were never received by Plaintiff at all:

23   a) Adjustable Rate Mortgage (ARM) Program Disclosure

24   b) CHARM Booklet

25   c) Settlement Costs and You Booklet

26   d) Credit Score/FICO Code Disclosures

27   ///

28   ///

Exhibit A, page 108

297)   As a direct result of Defendants' conduct, Plaintiff has been damaged in an amount in excess of the jurisdictional limits of this Court, the exact amount of which will be proven at trial. Plaintiff also in entitled to statutory damages and penalties as provided by RESPA.

## TWELFTH CAUSE OF ACTION FOR VIOLATION

## OF TRUTH IN LENDING ACT 15 USC § 1600 et seq. ("TILA")

### (Against Lender Defendants)

298)   Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 297 of the Complaint herein as though set forth in full.

299)   The Subject Loan is a consumer credit transaction subject to the provisions of TILA.

300)   The Subject Loan involved the extension of credit to a consumer (Plaintiff) for personal, family or household purposes subject to a finance charge and/or payable by written agreement in more than four installments.

301)   Defendants are "creditors" as defined by 15 U.S.C. § 1602.   The Loan was a consumer loan transaction wherein credit was extended to Plaintiff, which was secured by an interest purportedly held by said Defendants in the Subject Residences.

302)   As a consumer credit transaction, Defendants were required to provide Plaintiff with mandatory Truth-in-Lending disclosure statements and notice of the borrower's right to rescind, among many other disclosures.

303)   Plaintiff is informed and believes and thereon alleges that in the course of soliciting and executing the Loan and/or extending other consumer credit, Defendants in numerous instances have violated the requirements of TILA and Regulation Z, said violations include but are not limited to the following:

a)   Failure to provide copies of all Loan Documents.

b)   Failure to correctly identify the payment schedule 12 C.F.R. § 226.18(g)(h);

c)   There was no evidence of delivery of good faith estimates of disclosures including without limitation, the preliminary TILDS within three days of the loan application 12 C.F.R. § 226.19(a);

94

Exhibit A, page 109

**VERIFIED COMPLAINT**

d)   There is no evidence that the "Consumer Handbook on Adjustable Rate Mortgages" (CHARM), or equivalent disclosure, was not provided within three days of application. 12 C.F.R. § 226.19(b);

e)   Failure to adequately disclose the interest-only payment feature. 15 U.S.C. § 1638, 12 C.F.R. § 226.17-18;

f)   Failure to adequately disclose penalties;

g)   Internal inconsistencies within the Loan Agreements as to the payment schedule and interest rates;

h)   Failure to provide notice within 30 days as required of change in owner of the Loan.

i)   Failure to provide notice within 30 days as required of change in servicer of the Loan.

304)   By failing to disclose, or accurately disclose, material credit information, as described above, Defendants have engaged, and continue to engage, in deceptive acts or practices.

305)   A violation of TILA is also made unlawful under California state law by Financial Code § 50505, which states, "Any person who violates any provision of (RESPA) or any regulation promulgated there under, violates this division (California Residential Mortgage Lending Act)."

306)   As a result of these TILA violations, among others, Plaintiff have an ongoing right of rescission of the Loan. Plaintiff hereby gives notice of rescission by and through this Complaint.

307)   These matters are herein asserted as a matter of defense by recoupment or set-off to the non-judicial foreclosure instituted by Defendants.

308)   As a result of these TILA violations, among others, Defendants are liable to Plaintiff in the amount of twice the finance charge, actual damages to be established at trial, and costs in accordance with 15 U.S.C. § 1640(a). Plaintiff is also entitled to: rescission of the Loan, an order requiring Defendants to take all actions necessary to terminate any security interest in the Residence created under the Loan and a declaration by this Court that the security interest is void; expungement of any foreclosure instruments, including without limitation, the NOD, relating to the Subject Loan from any public record; removal of any derogatory information reported to any credit reporting

95

**VERIFIED COMPLAINT**

1  agency or credit reporting bureau relating to the Subject Loan; the return to Plaintiff of any money
2  given by Plaintiff to anyone, including said Defendants in connection with the Subject Loan;
3  statutory damages; costs and reasonable attorneys' fees; and such other relief and this Court deems
4  just and proper.

5      309)   As a result of Defendants' misconduct, Plaintiff have suffered and continue to suffer
6  damages in an amount to be proven at trial, which they are entitled to recover. As a result of said
7  Defendants' misconduct, Plaintiff are entitled to declaratory and injunctive relief preventing said
8  Defendants from taking any action to collect on the Subject Loan, and/or to foreclose upon the
9  Subject Residence and/or to transfer or sell the Subject Residence.

10  **THIRTEENTH CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA**
11  **ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT**
12  **(Against Lender Defendants and T.D. Service)**

13      310)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this
14  Complaint, as stated above in paragraphs 1 through 309, as if fully and completely set forth herein.

15      311)   Plaintiff is informed and believes and thereon alleges Defendants' actions constitute a
16  violation of California Civil Code Section 1788 et. seq., in that they threatened to, and intend to, take
17  actions prohibited by law, including without limitation, falsely stating the amount of a debt;
18  increasing the amount of a debt by including amounts not permitted by law or contract; improperly
19  foreclosing upon the Subject Residence; using unfair and unconscionable means in an attempt to
20  collect a debt; failure to take corrective action, or any action in response to Plaintiff's attorneys'
21  letter of October 22, 1010; and wrongfully reporting negative credit information regarding Plaintiff.

22      312)   Defendants' misconduct had caused Plaintiff to suffer actual damages including
23  without limitation: severe emotional distress such as loss of appetite, frustration, fear, anger,
24  helplessness, sleeplessness, sadness and depression.

25      313)   As a result of Defendants' misconduct, Plaintiff are entitled to actual damages and
26  statutory damages in an amount to be determined at trial. Moreover, Defendants misconduct was
27  willful, malicious and outrageous and therefore punitive damages are warranted and demanded.

28  ///

Exhibit A, page 111
**VERIFIED COMPLAINT**

314)   As a result of the above alleged misconduct, Plaintiff have incurred and will incur attorney fees and costs in an amount to be proven at trial.  Pursuant to the controlling contractual document(s) and applicable law, Plaintiff are entitled to recover their costs and reasonable attorney fees.

## FOURTEENTH CAUSE OF ACTION FOR VIOLATION OF
## THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT
### (Against Lender Defendants and T.D. Service)

315)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 314, as if fully and completely set forth herein.

316)   Plaintiff is informed and believes and thereon alleges Defendants' actions constitute violations of 15 U.S.C. Section 1692, et seq., in that they threatened to and intend to take actions prohibited by law, including without limitation,: falsely stating the amount of a debt; increasing the amount of a debt by including amounts not permitted by law or contract; improperly foreclosing upon the Subject Residence; using unfair and unconscionable means in an attempt to collect a debt; and wrongfully reporting negative credit information regarding Plaintiff.

317)   Defendants' misconduct caused Plaintiff to suffer actual damages, including without limitation: severe emotional distress such as loss of appetite, frustration, fear, anger, helplessness, sleeplessness, sadness and depression.

318)   As a result of Defendants' misconduct, Plaintiff is entitled to actual damages and statutory damages in an amount to be determined at trial.  Moreover, Defendants' misconduct was willful, malicious and outrageous and therefore punitive damages are warranted and demanded.

319)   As a result of the above alleged misconduct, Plaintiff has incurred and will incur attorneys' fees and costs in an amount to be proven at trial.  Pursuant to the controlling contractual document(s) and applicable law, Plaintiff is entitled to recover his costs and reasonable attorneys' fees.

///

///

///

97

**VERIFIED COMPLAINT**

## FIFTEENTH CAUSE OF ACTION – VIOLATION OF THE RACKETEER
## INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
### (Against All Defendants)

320) Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 317, as if fully and completely set forth herein.

321) Plaintiff is informed and believes and thereon alleges that when Defendants either made or acquired ownership of Plaintiff's Loan, and/or other loans similar to Plaintiff's Loan, and/or obtained the authorization to service Plaintiff's Loan, and/or other loans similar to Plaintiff's Loan, and/or initiated and/or conducted non-judicial foreclosure, or other action, to recover Loan proceeds and other charges from their borrowers, such as Plaintiff, Defendants conspired with and aided and abetted one another, and did agree upon a plan, scheme, and artifice, and formed a criminal enterprise which during the past 10 years depended upon, and which included, hundreds if not thousands of interstate communications using the United States Mail, telephones, faxes, the Internet, and other forms of interstate communication, intended to and did defraud and otherwise injure Plaintiff, and others similarly situated to Plaintiff.  As alleged herein, more than a sufficient number of predicate acts were committed by Defendants within the past ten years to cause Defendants to be liable to Plaintiff for violation of RICO.

322) Plaintiff is informed and believes and thereon alleges that Defendants never intended to perform as agreed in the Loan Agreement as alleged herein; and that Defendants knew that Plaintiff was not in default of the Loan Agreement at any time, but rather know that Plaintiff had and has fully performed as agreed, notwithstanding the many breaches of contract and wrongful and illegal acts of Defendants which were designed to impair or prevent Plaintiffs' performance, and force him to default on the Loan so Defendants could foreclose and reap huge profits with the expenditure of minimal effort or time.   In furtherance of their criminal enterprise, Defendants withheld distribution of construction funds when due, and concocted claims of default, and thereby exerted economic pressure and duress upon Plaintiff under threat of foreclosure, in order to force him to pay additional interest, fees and costs, and to either modify the Loan Agreements in a way that would substantially benefit Defendants and substantially damage Plaintiff, or, if Plaintiff did not

Exhibit A, page 113
**VERIFIED COMPLAINT**

yield to Defendants' tactics, would provide Defendants with a pretextual basis upon which to foreclosure on Plaintiff's Property, causing Plaintiff great financial loss, emotional stress and other damage.

323)   Among the predicate acts committed by the Defendants, in furtherance of their criminal enterprise, as alleged herein, are the following:

a.   The commission of felonies punishable by imprisonment for more than one year in the State of California which constitute a pattern of racketeering activity as defined in Title 18 U.S.C. 1961, including but not limited to:

i.   Theft, in violation of California Penal Code section 484 et seq. Pursuant to California Penal Code section 484, "any person who by any false or fraudulent representations or pretenses defrauds another person of money, labor or real or personal property" is guilty of theft.   As alleged above, the Defendants willfully misrepresented the amounts allegedly due by Plaintiff to Defendants, and the percentage of completion and distribution of Loan proceeds, among other things, in order to be able to collect excessive amounts of interest, charges and other fees from Plaintiff. Defendants also willfully manufactured false claims that Plaintiff was not entitled to construction Draws in order to be able to create additional delays thereby demanding and obtaining additional and excessive payments from Plaintiff that were not due.

ii.   Attempted theft.   To the extent Plaintiff has resisted some of Defendants' overt acts in furtherance of their attempt to commit to theft in violation of California Penal Code section 484 et seq., including but not limited to Defendants' efforts to obtain money by

filing a false and fraudulent NOD, the Defendants have committed attempted theft. In addition to those items specifically identified in the preceding paragraph as constituting theft, Defendants also attempted to deprive Plaintiff of money and real property by filing a NOD which, for all the reasons set forth hereinabove, Defendants knew was false and fraudulent.

iii. Forgery pursuant to California Penal Code section 470, et. seq. The NOD which was recorded with the County Recorder's Office and posted on Plaintiff's Property and served upon Plaintiff was posted, recorded and served with the intent to defraud Plaintiff, as alleged hereinabove. The NOD is a required document necessary to trigger non-judicial foreclosure, and which must be recorded in the office of the County Recorder for the County of San Diego, and therefore is an "instrument ...which is by law evidence." California Penal Code section 470 defines forgery to include the attempt to pass off or offer to pass off as true and genuine any document which is false and contains a request for the payment of money. The NOD contains material false statements and contains a demand for the payment of money, and is therefore, a forgery under California law.

iv. Extortion pursuant to California Penal Code section 518, et. seq. Extortion is defined in the California Penal Code as the obtaining of property from another, with his consent, ". . . induced by a wrongful use of . . . fear . . ." Pursuant to California Penal Code

Exhibit A, page 115

section 519, extortion includes, among other things, any threat to cause unlawful injury to property and/or "expose, or . . . impute to [another] any . . . disgrace." Defendants repeatedly threatened Plaintiff with damage to Plaintiff's interest in the Subject Residence by foreclosure, although they knew they had no lawful grounds to foreclose. Additionally, by filing the NOD, Defendants exposed Plaintiff to disgrace associated with the alleged default on his Loan.

v. Money laundering pursuant to California Penal Code Section 186.10(a), which provides, in part:

> Any person who conducts or attempts to conduct a transaction ... of a total value exceeding five thousand dollars ($5,000) ... through one or more financial institutions (1) with specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of criminal activity, is guilty of the crime of money laundering.

Defendants conducted numerous transactions as alleged herein, with a total value exceeding $5,000, in violation of California Penal Code Section 186.10.

vi. Pursuant to California Penal Code section 31, all Defendants have aided and abetted all other Defendants in the furtherance of their racketeering enterprise. In addition, pursuant to California Penal Code section 182, all Defendants also have conspired with one another as alleged herein.

**VERIFIED COMPLAINT**

Exhibit A, page 116

b.   The Defendants' racketeering activity, as defined in Title 18 U.S.C. section 1961, which is actionable pursuant to 18 U.S.C. 1962(c), also includes the following violations of Federal law, in addition to those acts which constitute the violation of California law, as previously alleged:

   i.   The violation of 18 U.S.C. 1341, relating to mail fraud, as numerous communications were transmitted through the mail in furtherance of the racketeering activity over the previous 10 years.

   ii.   The violation of 18 U.S.C. 1343, relating to wire fraud, as numerous communications were transmitted through the wire in furtherance of the racketeering activity over the previous 10 years.

   iii.   The violation of 18 U.S.C. 1956, relating to money laundering, as Defendants engaged in criminal activity, including, but not limited to, false accounting, in furtherance of their racketeering enterprise.

324)   Plaintiff has been damaged by the racketeering activity engaged in by Defendants as alleged above in an amount to be proven at trial. In addition to compensatory damages in the amount to be proven at trial, Plaintiff requests treble damages pursuant to Title 18 U.S.C. 1964(c) and recovery of all legal expenses including attorney fees and costs.

## SIXTEENTH OF ACTION FOR WRONGFUL FORECLOSURE

### (Against All Defendants)

325)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 324, as if fully and completely set forth herein

326)   At the time the NOD was recorded, September 29, 2010, the Lender Defendants claimed that $46,812 was owed by Defendant for past due interest, and other charges. However, as alleged herein, the Lender Defendants were obligated to release all of the funds remaining in the Construction Fund once the Subject Residence was certified for occupancy. That occurred on May 13, 2010, yet the Lender Defendants wrongfully refused to release the funds. The amount remaining

1   in the Construction Fund as of September 29, 2010 was in excess of $66,000. Therefore, at the time

2   of the recording of the NOD, the Lender Defendants owed Plaintiff at least, $66,000, more than

3   offsetting what they claimed Plaintiff owed them in past due interest.

4       327)   Furthermore, as alleged herein, the Project has been delayed almost two years by the

5   Defendants' wrongful conduct. During the periods of delay caused by Defendant's wrongful

6   conduct, Plaintiff received no benefit from the Loan, and no interest, or other fees and charges were

7   due the Lender Defendants, yet Defendants' wrongfully demanded, and were paid under protest by

8   Plaintiff, all interest and other charges demanded. Plaintiff is entitled to have such overpayments

9   applied against any interest and/or other charges now due, which, when applied, will eliminate any

10  amount claimed to be owed by Plaintiff to Defendants, and instead, will result in Plaintiff having

11  pre-paid interest for a period of at least 24 months from the date hereof. Therefore, rather than owe

12  the Lender Defendants money as of the date the NOD was filed, the Defendants owed, and continue

13  to owe, Plaintiff significantly more money.

14      328)   Also, as alleged herein, the Defendants' wrongful conduct rendered Plaintiff's

15  performance of his obligations pursuant to the Loan Agreement impossible at times, and caused

16  considerable delays in Plaintiff's ability to perform his obligations under the Loan Agreement at

17  other times, thereby excusing Plaintiff from performing his obligations to the Lender Defendants

18  during such periods of time as Plaintiff's performance was rendered impossible or impracticable by

19  Defendants' conduct. Defendant's conduct rendered Plaintiff's performance impossible or

20  impracticable for a period of at least 24 months. As a result, Plaintiff is not in breach of the Loan

21  Agreements, either for non-payment of money, or failure to complete construction of the Project

22  during the Construction Phase; and Defendants have no right to foreclose on the Deed of Trust.

23      329)   The Loan Agreements require Defendants to provide Plaintiff with notice and an

24  opportunity to cure any alleged defaults prior to Defendants seeking to accelerated payment of the

25  Loan. The only such Default Letter ever sent to Plaintiff was sent on July 15, 2009. For the reasons

26  set forth previously in this Complaint, Plaintiff cured the alleged defaults set forth in the Default

27  Letter. Since no subsequent Default Letter was ever sent to Plaintiff,   Defendants seek to

28  ///

Exhibit A, page 118

**VERIFIED COMPLAINT**

1  foreclose on the Subject Residence without complying with the requirements set forth in the Loan

2  Agreements.

3      330)    Furthermore, the NOD, on its face, demonstrates that any alleged default pursuant to

4  the Default Letter or July 15, 2009 has been cured, and that the NOD is a false and fraudulent,

5  wrongful, and even criminal, attempt by the Lender Defendants to extort money and/or property

6  from Plaintiff as part of Defendants' pattern of racketeering and scheme to defraud Plaintiff, and

7  others similarly situated, as alleged herein. Specifically, the NOD alleges: "That a breach of, and

8  default in, the obligations for which such Deed of Trust is security has occurred in that payment has

9  not been made of: THE PRINCIPAL SUM OF $3,346.405.61, WHICH BECAME DUE ON 8/20/09

10 WITH INTERIST DUE THEREON FROM JUNE 1, 2010, PURSUANT TO DEMAND LETTER

11 DATED 7/15/09 THE SUM OF $2,807.00, ADVANCED BY THE BENEFICIARY...." By its own

12 terms, the NOD acknowledges that it relies upon a "demand letter dated 7/15/09," yet it seeks to

13 recover only "interest due thereon from June 1, 2010." The action required to cure that default in

14 accordance with the July 15, 2009 Default Letter, was "payment before August 20, 2009 of

15 $38,307.88 as of July 1, 2009, plus any additional accrued interest, late charges and costs." The

16 NOD provides only one reason for the foreclosure; "BECAUSE YOU ARE BEHIND ON YOUR

17 PAYMENTS." All payments due had long since been made before the NOD was recorded.

18     331)    Plaintiff is informed and believes, and thereon alleges, that the following statement in

19 the NOD is false, and fraudulent, and is yet another indication of Defendants' complete contempt for

20 the truth and legitimate legal process: "...the present Beneficiary under such Deed of Trust has

21 executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand

22 for Sale, and has deposited with said duly appointed Trustee such Deed of Trust and all documents

23 evidencing obligations secured thereby...." Plaintiff is informed and believes, as alleged herein, T.D.

24 Service was not the duly appointed Trustee as of the date of the NOD, and that the Loan Agreement

25 was not in the possession of the alleged present beneficiary, nor transferred to T.D. Services as of the

26 date of the default notice as claimed in the NOD; and that neither the Lender Defendants, nor T.D.

27 Service had or have standing to commence non-judicial foreclosure.

28 ///

332)    Paragraph 14 of the Loan Agreement, referred to in the Default Letter provides: "Completion. For purposes of this Agreement the Work shall be deemed completed and "completion" shall be deemed to have occurred on the day the Property is ready for occupancy, subject only to the completion of the usual punch list items. As of July 15, 2009, the completion date set forth in the Loan Agreements of January 3, 2009 had passed solely due to Defendants wrongful conduct as alleged in this Complaint, and the Property was not "ready for occupancy" until May 13, 2010. The Lender Defendants are estopped from claiming a default exists under the Loan Agreements by virtue of their own breaches of contract, and other wrongful and illegal conduct.

333)    As alleged herein, Defendants are fraudulently and wrongfully seeking to foreclosure on the Subject Residence by purportedly exercising the power of sale in the Deed of Trust and recording a NOD without legal standing to do so, in violation of California's non-judicial foreclosure laws, including but not limited to, preparing, recording and filing false and fraudulent documents created solely for the purpose of perpetrating their wrongful foreclosure scam, and by falsely stating who actually owns the Note, and who is the holder in due course with authority to enforce the Note, and who is the Trustee under the Note when, in fact, no assignment of the Note or Deed of Trust, or Appointment of Substitute Trustee has ever been recorded as required by California Civil Code Sections 2932.5, 2934(a) and the Loan Agreements.

334)    Civil Code Section 2923.5(a)(1) requires that:

(a) (1) A mortgagee, trustee, beneficiary, or authorized agent may not file a notice of fault pursuant to Section 2924 until 30 days after initial contact is made as required by paragraph (2) or 30 days after satisfying the due diligent requirement as described in subdivision (g).

Civil Code Section 2923.5 , at Paragraph 2 provides:

(2) A mortgagee, beneficiary, or authorized agent shall contact the barrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. During the initial contact, the mortgagee, beneficiary, or authorized agent shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. The assessment of the borrower's financial situation and discussion of options may occur during first contact, or at the subsequent meeting scheduled for that purpose. In either case, the

borrower shall be provided the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency. Any meeting may occur telephonically.

Subdivision (b) of Civil Code Section 2923.5 provides:

(g)    A notice of default may be filed pursuant to Section 2924 when a mortgagee, beneficiary, or authorized agent has not contacted a borrower as required by paragraph (2) of subdivision (a) provided that the failure to contact the borrower occurred despite the due diligence of the mortgagee, beneficiary, or authorized agent. For purpose of this section, "due diligence" shall require and mean all of the following:

(1) A mortgagee, beneficiary, or authorized agent shall first attempt to contact a borrower by sending a first-class letter that includes the toll-free telephone number made available by HUD to find a HUD-certified housing counseling agency.

(2) (A)  After the letter has been sent, the mortgagee, beneficiary, or authorized agent shall attempt to contact the borrower by telephone at least three times at different hours and on different days. Telephone calls shall be made to the primary telephone number on file. California Commercial Code Section 3301 specifically identifies the persons who are entitled to enforce a security interest, such as instituting a foreclosure sale under a Deed of Trust. The statute is exclusive, rather than inclusive in nature, and those who are not identified do not have the right to enforce such an interest.

335)   The NOD claims the Lender Defendants complied with Civil Code Section 2923.5. However, this is a false and fraudulent statement as is clear from T.D. Service's failure to state whether the communication required by Civil Code Section 2923.5 was made, or if it was not made, after due diligence. The fact is no effort was made to comply with Civil Code Section 2923.5, and the Defendants' statement in the NOD to the contrary is simply false and fraudulent.

336)   Plaintiff is informed and believes and thereon alleges that the Defendants who initiated the foreclosure of the Subject Residence by serving and recording the NOD were not and are not in possession of the Note pertaining to the Subject Residence and Subject Loan and, therefore, are not entitled to foreclose on the Subject Residence. Plaintiff is informed and believes and based thereon alleges that Defendants are not "persons entitled to enforce" the security interest on the Subject Residence as that term is defined in Commercial Code Section 3301.

Exhibit A, page 121

**VERIFIED COMPLAINT**

337) Plaintiff alleges on information and belief, that there has never been any legally effective assignment of the Power of Sale in the Deed of Trust, and the Lender Defendants, and other Defendants involved in the foreclosure of the Subject Residence, were not and are not the current beneficiaries on the Deed of Trust entitled to give instructions to the trustee, nor were they or are they entitled to keep the proceeds from any sale of the Subject Residence. In commencing and processing a foreclosure Defendants committed deceit or fraud within the meaning of California Civil Code § 2924h(g) entitling Plaintiff to damages.

338) The NOD pertaining to the Subject Residence fails to reference any assignment of the Note or Deed of Trust to the Defendants or other recorded document which identifies said Defendants as the holder of the beneficial interest in the Note and Deed of Trust. Rather, the only recorded document referenced in the NOD is the Deed of Trust originally recorded in favor of IndyMac Bank on January 12, 2007, with Union Title Company as the Trustee; and no documents have ever been recorded with the San Diego County Recorder changing these designations.

339) A non-judicial foreclosure can not be initiated by any person or entity who does not have standing or authority to initiate the procedure. The NOD was recorded on September 29, 2010, by T.D. Service purporting to act on behalf of IndyMac Venture. T.D. Service, purporting to act as the Substitute Trustee, states in the Substitution of Trustee, "the undersigned present beneficiary desires to substitute the trustee in the manner provided in said Deed of Trust" and states further that the effective date of the substitution is September 28, 2010, the day before the NOD was recorded. Plaintiff is informed and believes, however, that the Substitution of the Trustee did not, in fact, take place prior to the time T.D. Service recorded the NOD, the Substitution of Trustee never was recorded; any assignment of the beneficial interest in the Note or Deed of Trust was never recorded; and the statements in the NOD otherwise are false and fraudulent statements by Defendants made with the intent to deceive Plaintiff and others relying upon the veracity of such statements made in a recorded document, the purpose of which is to wrongfully and fraudulently take and sell the property of another, Plaintiff in this instance. The Notary Affidavit attached to the NOD shows the notice was not mailed until November 3, 2010, to the Trustee; but the NOD wrongfully claims a copy was mailed before recording the NOD. And, the NOD is unsigned.

340)   On information and belief, the Lender Defendants, T.D. Service, and the other Defendants involved in the foreclosure of the Subject Residence do not have any legal right to foreclose on the Subject Residence.  Furthermore the procedures implemented by Defendants in attempting to enforce the alleged security interest in the Subject Residence violated statutory requirements governing non-judicial foreclosure proceedings and the express terms of the Deed of Trust.

341)   As a direct and proximate result of Defendants' misconduct, Plaintiff have suffered damages, including, without limitation, direct monetary losses, consequential damages and emotional distress.  Most damaging is Plaintiffs' potential loss of his home which is unique and cannot be compensated for by any adequate remedy at law.  Only injunctive relief can prevent the imminent harm and irreparable damage of losing the Subject Residence to wrongful foreclosure as set forth herein.

342)   As a direct and proximate result of Defendants' failure to comply with California's non- judicial foreclosure laws, among others set forth herein, Plaintiff have suffered and continue to suffer damages and costs of suit. Plaintiff is entitled to recover statutory damages, actual damages in an amount to be determined at trial, costs and reasonable attorneys' fees incurred herein.

343)   Defendants intentionally misrepresented, and/or concealed the true facts in order to wrongfully foreclose and sell the Subject Residence.  Plaintiff is entitled to exemplary and punitive damages against Defendants Pursuant to Civil Code Section 3294 in an amount sufficient to punish and deter Defendants.

### SEVENTEENTH CAUSE OF ACTION FOR VIOLATON OF UNIFORM
### BUSINESS & PROFESSIONS CODE SECTION 17200, ET. SEQ. FOR
### UNFAIR AND UNLAWFUL BUSINESS PRACTICE
### (Against Lender Defendants, T.D. Service and Does 1 through 100, inclusive)

344)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint, as stated above in paragraphs 1 through 343, as if fully and completely set forth herein.

345)   Plaintiff is informed and believes and thereon alleges that Defendants have engaged in a pattern of unfair and unlawful business practices, as alleged herein, in violation of California

108

Exhibit A, page 123

1  Business and Professions Code § 17200 et seq.  Such unfair and unlawful business practices include,

2  without limitation: fraud; violation of the California non-judicial foreclosure statutes by seeking to

3  foreclose on the underlying Note and Deed of Trust on the Subject Property when Defendants do not

4  have standing or authority to do so; Defendants knew Plaintiff was not in default; Defendants

5  knowingly failed to comply with the requirements of the Loan Documents that a Default Letter be

6  sent to Plaintiff giving notice of the alleged defaults and an opportunity to cure; Defendants created

7  and recorded false and fraudulent documents, including but not limited to the NOD which contained

8  false and fraudulent statements regarding the assignment of the Note and/or Deed of Trust and/or

9  Substitution(s) of the Trustee, as well as false statements regarding compliance with California Civil

10  Code section 2923.5.

11      346)   Plaintiff is informed and believes and thereon alleges the violation of law by

12  Defendants includes, but is not limited to, the following, as alleged above:

13          a)  Fraud, in violation of California Civil Code Section 1572

14          b)  Theft, in violation of California Penal Code Section 484

15          c)  Forgery in violation of California Penal Code Section 470

16          d)  Extortion, in violation of California Penal Code Section 518

17          e)  Money laundering in violation of California Penal Code Section 186.10

18          f)  Mail fraud in violation of 18 U.S.C. Section 1341

19          g)  Wire fraud in violation of 18 U.S.C. Section 1343

20          h)  Money laundering in violation of 18 U.S.C. Section 1956

21          i)  Violation of RICO

22          j)  Violation of TILA

23          k)  Violation of RESPA

24          l)  Violation of California Fraud Code Section 50505

25          m) Violation of California Rosenthal Fair Collection Practices Act

26          n)  Violation of the Federal FCPA

27          o)  Violation of FDCPA

28          p)  Violation of C.C.P. Sections 1916.7, et seq.

q) Violation of C.C.P. Sections 1918.5 through 1921, et seq.

r) Wrongful foreclosure in violation of Cal. Civ. Code Sections 2932.5 and 2932.5, et seq.

347) Additionally, Plaintiff is informed and believes and thereon alleges that the Lender Defendants are and at all times herein mentioned were required by law to devise and maintain internal lending policies regarding the administration and disbursement of real estate loans. The FDIC regulations specifically mandate that real estate lending institutions adopt real estate lending policies that establish loan administration procedures for the bank's real estate portfolio. FDIC Rules an Regulations, 12 C.F.R. Section 365.2(b)(iii) (1992). The appendix to the regulation specifically states that lenders should "establish loan administration procedures, including documentation, disbursement, collateral inspection, collection, and loan review." 57 Fed. Reg. 62,890 (December 31, 1992) (Codified to 12 C.F.R. Appendix A to Pt 365).

348) Plaintiff is informed and believes and thereon alleges that the Lender Defendants either devised and maintained internal lending policies regarding the administration and disbursement of real estate loans pursuant to 12 C.F.R. 365.2(b)(iii) (1992) and then ignored them, or failed to enact said policies altogether. Plaintiff is informed and believes and thereon alleges that to the extent the Lender Defendants did in fact devise and maintain such policies, the Lender Defendants were and are required, in part, to follow such policies with regard to the disbursement of Loan funds, but failed to do so.

349) Plaintiff is informed and believes and thereon alleges that the Lender Defendants willfully, knowingly, and intentionally violated their own lending policies, thereby violating FDIC Rules and Regulations, by failing to disburse Loan funds for the Project, as alleged herein, without regard to, or in violation of , the disbursement policies to the extent contained in the Loan Agreement.

350) Because of said violations, the Lender Defendants did not disburse the Loan proceeds commensurate with the progress, development and construction of the Project, but rather, pursuant to the scheme alleged herein, willfully, knowingly and intentionally withheld Loan Disbursements when due.

Exhibit A, page 125

**VERIFIED COMPLAINT**

351)   Plaintiff seeks injunctive relief to prevent Defendants from further engaging in the unfair and unlawful business practices as described herein, and in particular from further attempting to foreclose upon the Subject Residence, and/or to collect interest, fees and other charges to which Defendants are not entitled.

352)   Plaintiff further seek restitution, disgorgement of sums wrongfully obtained, costs of suit, reasonable attorney fees and such other and further relief as the court may deem just and proper.

### EIGHTEENTH CAUSE OF ACTION FOR DECLARATORY RELIEF

### (Against All Defendants)

353)   Plaintiff re-alleges and incorporates by reference herein all prior allegations of this Complaint, as stated above in paragraphs 1 through 352, as fully and completely set forth herein.

354)   An actual controversy has arisen and now exists between Plaintiff and each Defendant concerning their respective rights and duties in relation to the Loan and Subject Residence which are the subject of this Complaint, as alleged herein, including, but not limited to, the following.

355)   Pursuant to California Civil Code Section 2932.5 where a power to sell real property is given to a mortgagee, or other encumbrance, in an instrument intended to secure the payment of money, the power is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee _if_ the assignment is duly acknowledged _and recorded_. For the reasons set forth herein, Plaintiff seeds a declaration that no such assignment in favor of any Defendant has been duly acknowledged and recorded.

356)   Pursuant to California Commercial Code Section 3301, Defendants are not "person[s] who are entitled to enforce the security interest on the Subject Property, and Plaintiff seeks a Declaration accordingly;

357)   Plaintiff is informed and believes and based thereon alleges that none of the Defendants held a power of sale under the Deed of Trust at the time the NOD was recorded, and Plaintiff seeks a Declaration accordingly.

///

Exhibit A, page 126

**VERIFIED COMPLAINT**

358)   Plaintiff is informed and believes that none of the Defendants was a beneficial owner of the Note, or Deed of Trust as of the NOD recording date; and Plaintiff seeks a Declaration accordingly.

359)   Plaintiff is informed and believes and thereon alleges that Defendants failed to comply with the requirements of California Civil Code Section 2923.5, and Plaintiff seeks a Declaration accordingly.

360)   Plaintiff is informed and believes and therefore alleges that none of the Defendants were the "holder" of the Note and therefore had no right, authority or standing to enforce the Note through the California statutory non-judicial foreclosure process; and Plaintiff seeks a Declaration accordingly.

361)   Plaintiff is informed and believes and thereon alleges that the Defendants' executed and recorded the NOD knowing it to be a false and fraudulent document, and that the foreclosure is a sham attempt to feign compliance with California foreclosure law; and Plaintiff seeks a Declaration accordingly.

362)   Plaintiff desires a judicial Declaration of the parties' rights and duties, and a Declaration as to whether or not the imminent foreclosure and sale is based on false and fraudulent documents that confer upon Defendants no beneficial interest in the Subject Residence and that none of the Defendants therefore is a "holder in due course," making the imminent foreclosure and any Trustee's sale held pursuant thereto void and of no effect.

363)   Plaintiff also desires a judicial Declaration that Plaintiff is not in default of the Loan by virtue of the credit to which he is entitled by reason of his payment of interest and other charges for periods of time when his performance pursuant to the Loan Agreements was rendered impossible or impracticable, as alleged hereinabove.

364)   Judicial Declarations of Plaintiff's and Defendants' rights are necessary and appropriate under the circumstances to determine who holds beneficial interest in the Subject Residence. There is no adequate remedy at law.

///

///

Exhibit A, page 127

112

**VERIFIED COMPLAINT**

## NINETEENTH CAUSE OF ACTION FOR INJUNCTIVE RELIEF

### (Against All Defendants)

365)   Plaintiff re-alleges and incorporates by reference herein, all prior allegations of this Complaint an Facts, as stated above in paragraphs 1 through 363, as if fully and completely set fort herein.

366)   The imminent and, as set forth herein, unlawful foreclosure sale of the Subject Residence, will irreparably harm Plaintiff, causing him to lose his home and substantial investment of his time, money and effort,  without the ability to fully litigate his claims against Defendants as required by Due Process and fundamental fairness.  Plaintiff intends to file an ex parte application for a temporary restraining order and order to show cause why preliminary injunction should not issue; and/or a motion for issuance of a preliminary injunction, as soon as the time and place for hearing on such application can be determined.

367)   Plaintiff has demonstrated herein: (1) a reasonable probability of success on the merits; (2) that the imminent, unlawful foreclosure will irreparably damage Plaintiff; (3) that neither monetary damages nor an other remedy at law is adequate to compensate Plaintiff for the unlawful loss of the Subject Residence because all real property is considered unique; and (4) that the balance of hardships favors Plaintiff as opposed to Defendants should the foreclosure be allowed to go forward.

368)   Furthermore, Plaintiff is entitled to injunctive relief by virtue of Defendants' violations of California Business and Professions Code Sections 17200, et seq., and other laws as set forth hereinabove.

369)   Plaintiff's application for a temporary restraining order and order to show cause why a preliminary injunction should not issue; and/or motion for preliminary injunction, should be granted to restrain and enjoin Defendants from proceeding further with the foreclosure of the Subject Residence, and in any way damaging Plaintiff's credit or reputation during the pendency of this action until all rights, responsibilities and remedies of all parties to this Action have been fully litigated and properly adjudicated.

///

Exhibit A, page 128

370)    Any Trustee's Deed Upon Sale obtained via the unlawful foreclosure sale will be void in that it will have been created through the false and fraudulent acts and documents utilized to enforce the Note and Deed of Trust on the Subject Residence by conducting an unlawful non-judicial foreclosure sale by Defendants and misrepresenting and failing to disclose material facts in the origination, processing, funding, closing, assigning and servicing of the Subject Loan on the Subject Residence.

371)    During the pendency of this action and until all rights, responsibilities and remedies of all parties to this Action have been fully litigated and properly adjudicated, and the amount of interest, fees and other charges which Defendants wrongfully have demanded and received from Plaintiff, and the amount of Plaintiff's other damages, have been ascertained, Plaintiff should not be required to make any further payments to Defendants.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment and order against Defendants, inclusive, as follows:

1.   That judgment is entered in Plaintiff's favor and against Defendants, and each of them;

2.   For a temporary restraining order and/or an order requiring Defendants to show cause, if any, why they should not be enjoined as set forth above, during the pendency of the action;

3.   For a temporary restraining order, preliminary and permanent injunction preventing Defendants, or anyone acting in concert with them, from taking any action to collect on the Loan or make any negative credit reports and from causing the Subject Residence to be sold, assigned or transferred to a third party;

4.   For an order declaring the parties' rights and obligations;

5.   Damages, disgorgement, and injunctive relief under applicable California's state and federal law;

6.   For compensatory and statutory damages, attorneys' fees and costs according to proof at trial;

7.   For exemplary damages in an amount sufficient to punish and deter Defendants' misconduct;

114

**VERIFIED COMPLAINT**

8.  For reformation of the Loan Agreements.

9.  For an order of rescission of the Loan and expungement of any security interests or recorded instruments reflecting interests, liens or encumbrances inconsistent with the orders of the court and/or judgment rendered on behalf of Plaintiff.

10. For such other and further relief as the Court may deem just and proper.


Dated:  December 9, 2010                                    MAZZARELLA CALDARELLI LLP


                                                           By: _____
                                                              Mark C. Mazzarella
                                                              Attorneys for Plaintiff
                                                              Kamran Banayan

**VERIFIED COMPLAINT**

Exhibit A, page 130

## VERIFICATION

STATE OF CALIFORNIA, COUNTY OF San Diego

I have read the foregoing ___ COMPLAINT _____

_____ and know its contents.

### ☐ CHECK APPLICABLE PARAGRAPHS

[X]   I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am ☐ an Officer ☐ a partner _____ ☐ a _____ of _____

a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. [X] I am informed and believe and on that ground allege that the matters stated in the foregoing document are true. [X] The matters stated in the foregoing document are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☐   I am one of the attorneys for _____

a party to this action. Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason. I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

Executed on ____ DECEMBER 8, 2010 _____ , at _____ SAN DIEGO _____ , California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____ KAMRAN BANAYAN _____     _____
       Type or Print Name                                                                  Signature

## PROOF OF SERVICE
1013a (3) CCP Revised 5/1/88

STATE OF CALIFORNIA, COUNTY OF

I am employed in the county of _____ , State of California.

I am over the age of 18 and not a party to the within action; my business address is: _____

_____

On, _____ I served the foregoing document described as _____

_____

_____ on _____ in this action

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list:

☐ by placing ☐ the original ☐ a true copy thereof enclosed in sealed envelopes addressed as follows:

☐ **BY MAIL**

     ☐ *I deposited such envelope in the mail at _____ , California.
The envelope was mailed with postage thereon fully prepaid.

     ☐ As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at _____ California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on _____ , at _____ , California.

☐ **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

Executed on _____ , at _____ , California.

☐ (State)   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_____     _____
     Type or Print Name                                                                  Signature

*(BY MAIL SIGNATURE MUST BE OF PERSON DEPOSITING ENVELOPE IN MAIL SLOT, BOX, OR BAG)
**(FOR PERSONAL SERVICE SIGNATURE MUST BE THAT OF MESSENGER)

Legal
Solutions
Plus

Rev. 7/99

Exhibit A, page 131

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

1

2

## PROOF OF SERVICE

3

(Code Civ. Proc. §§ 1013 and 2015.5)

4

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 333 South Grand Avenue, #2100, Los Angeles, California 90071.

5

6

7

On January 14, 2011, I served the foregoing documents described as **NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1331 AND 1441(B) (FEDERAL QUESTION)** on all interested parties in this action as follows:

8

9

### SEE ATTACHED SERVICE LIST

10

11

☒  **(BY U.S. MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on the same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing on affidavit.

12

13

14

15

16

☐  **(BY PERSONAL SERVICE)** I delivered such envelope by hand to the offices of the addressee.

17

☐  **(BY OVERNIGHT SERVICE)** Via Federal Express

18

☐  **(BY FACSIMILE)** By transmitting in true copy thereof by facsimile from facsimile number (213) 457-1850 to the facsimile number(s) shown above.

19

20

☒  (Federal) I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

21

22

Executed on January 14, 2011, at Los Angeles, California.

23

24

Caroline Acossano

25

26

27

28

1

KAMRAN BANYAN vs. ONEWEST BANK F.S.B., et al.

**San Diego Superior Court Case No.: 37-2010-00105791-CU-OR-CTL
USDC, CASE NO.: NEW ACTION PENDING**

| | |
|---|---|
| MAZZARELA CALDARELLI LLP<br>Mark C. Mozzarella<br>Micaehl J. Cody<br>Marisa Jamie-page<br>550 West C Street, Suite 700<br>San Diego, California 92101-3235<br>Telephone: (619) 238-4900<br>Facsimile: (619( 238-4959 | Attorney for Plaintiff<br>KAMRAN BANAYAN, an individual |

DYKEMA GOSSETT LLP
333 SOUTH GRAND AVENUE
SUITE 2100
LOS ANGELES, CALIFORNIA 90071

2